DAVID SYDNEY,
Care of: Levi & Korsinsky LLP
1101 30th Street, N.W., Suite 115
Washington, DC 20007

SWC PHOENIX FUND I, L.P.,
Care of: Levi & Korsinsky LLP
1101 30th Street, N.W., Suite 115
Washington, DC 20007

MARTIN NOVICK,
Care of: Levi & Korsinsky LLP
1101 30th Street, N.W., Suite 115
Washington, DC 20007

J RENEE BRENNAN LIVING TRUST,
Care of: Levi & Korsinsky LLP
1101 30th Street, N.W., Suite 115
Washington, DC 20007

SCOTT SCHROEPFER,
Care of: Levi & Korsinsky LLP
1101 30th Street, N.W., Suite 115
Washington, DC 20007

KENNETH KAMHOLZ,
Care of: Levi & Korsinsky LLP
1101 30th Street, N.W., Suite 115
Washington, DC 20007

JOE SPEISER,
Care of: Levi & Korsinsky LLP
1101 30th Street, N.W., Suite 115
Washington, DC 20007

and

ELBERT CAPITAL I LLC,

IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY,
MARYLAND

Case No.: C-15-CV-22-001527

Jury Trial Demanded

**AMENDED CLASS ACTION
COMPLAINT**

Care of: Levi & Korsinsky LLP
1101 30th Street, N.W., Suite 115
Washington, DC 20007


Individually and On Behalf of All Others
Similarly Situated,

                              Plaintiffs,

      v.

CEDAR REALTY TRUST, INC.,
928 Carmans Road,
Massapequa, NY 11758
Serve on:
CSC-Lawyers Incorporating Service Company
7 St. Paul Street Suite 820
Baltimore MD, 21202

CEDAR REALTY TRUST PARTNERSHIP,
L.P.,
c/o Cedar Realty Trust, Inc.
928 Carmans Road
Massapequa, New York 11758
Serve on:
CSC-Lawyers Incorporating Service Company
7 St. Paul Street Suite 820
Baltimore MD, 21202

WHEELER REAL ESTATE INVESTMENT
TRUST, INC.,
2529 Virginia Beach Blvd. Suite 200
Virginia Beach, VA 23452
Serve on:
Cogency Global Inc.
1519 York Road
Lutherville MD, 21093

BRUCE J. SCHANZER,
 c/o Cedar Realty Trust, Inc.
928 Carmans Road
Massapequa, NY 11758

Serve on:
 CSC-Lawyers Incorporating Service Company
 7 St. Paul Street Suite 820
 Baltimore MD, 21202

 GREGG A. GONSALVES,
 c/o Cedar Realty Trust, Inc.
 928 Carmans Road
 Massapequa, NY 11758
 Serve on:
 CSC-Lawyers Incorporating Service Company
 7 St. Paul Street Suite 820
 Baltimore MD, 21202

 ABE EISENSTAT,
 c/o Cedar Realty Trust, Inc.
 928 Carmans Road
 Massapequa, NY 11758
 Serve on:
 CSC-Lawyers Incorporating Service Company
 7 St. Paul Street Suite 820
 Baltimore MD, 21202

 STEVEN G. ROGERS,
 c/o Cedar Realty Trust, Inc.
 928 Carmans Road
 Massapequa, NY 11758
 Serve on:
 CSC-Lawyers Incorporating Service Company
 7 St. Paul Street Suite 820
 Baltimore MD, 21202

 SABRINA KANNER,
 c/o Cedar Realty Trust, Inc.
 928 Carmans Road
 Massapequa, NY 11758
 Serve on:
 CSC-Lawyers Incorporating Service Company
 7 St. Paul Street Suite 820

Baltimore MD, 21202

DARCY D. MORRIS,
c/o Cedar Realty Trust, Inc.
928 Carmans Road
Massapequa, NY 11758
Serve on:
CSC-Lawyers Incorporating Service Company
7 St. Paul Street Suite 820
Baltimore MD, 21202

RICHARD H. ROSS,
c/o Cedar Realty Trust, Inc.
928 Carmans Road
Massapequa, NY 11758
Serve on:
CSC-Lawyers Incorporating Service Company
7 St. Paul Street Suite 820
Baltimore MD, 21202

and

SHARON STERN
c/o Cedar Realty Trust, Inc.
928 Carmans Road
Massapequa, NY 11758
Serve on:
CSC-Lawyers Incorporating Service Company
7 St. Paul Street Suite 820
Baltimore MD, 21202

                              Defendants.

# Table of Contents

INTRODUCTION .................................................................................................... 7

PARTIES ............................................................................................................... 16

JURISDICTION AND VENUE .............................................................................. 23

CLASS ACTION ALLEGATIONS ........................................................................ 31

SUBSTANTIVE ALLEGATIONS ......................................................................... 33

    Cedar's Preferred Stock Is Senior to Common Stock and Is Owed a Liquidation
    Preference. ........................................................................................................ 33

    Cedar's Preferred Stock Has Conversion Rights Upon A Change Of Control.......... 37

    Cedar Rejects Merger Overture by Wheeler in November 2017.............................. 42

    Wheeler's Oppressive Treatment of its Own Preferred Stockholders....................... 43

    Wheeler's History of Management Dysfunction ..................................................... 46

    The Cedar Directors Orchestrate a Series of Transactions in Bad Faith Intended to
    Deprive Preferred Stockholders of Their Liquidation Preference and Conversion
    Rights, and to Crash the Price of the Preferred Stock................................................ 50

    The Terms of the Wheeler Merger Agreement Demonstrate That Cedar Is
    Liquidating and Winding Up...................................................................................... 58

    The Terms of the Wheeler Merger Agreement Effect a "Change of Control,"
    Entitling the Preferred Stockholders to Exercise Their Conversion Rights .............. 63

    The Defendants Are Breaching The Contracts with the Preferred Stockholders
    Through the Proposed Transactions............................................................................ 64

    There Is Insufficient Equity Value in the Wheeler Properties to Satisfy The
    Liquidation Preference, and Insufficient Cash Flow from the Wheeler Properties to
    Pay Future Dividends on the Preferred Stock. .......................................................... 66

    The Contents of the Proxy Substantiate the Concerns of Preferred Stockholders........ 70

COUNT I ............................................................................................................... 75

    Breach of Contract – Liquidation Preference............................................................ 75

COUNT II .............................................................................................................. 77

    Tortious Interference with Contract – Liquidation Preference (Against Wheeler).... 77

COUNT III ............................................................................................................. 78

    Breach of Contract – Conversion Rights .................................................................. 78

COUNT IV ............................................................................................................. 81

    Tortious Interference with Contract – Conversion Rights (Against Wheeler)........... 81

COUNT V .................................................................................................... 82

    Breach of Fiduciary Duties (Against the Board) ...................................... 82

COUNT VI .................................................................................................. 83

    Aiding and Abetting Breach of Fiduciary Duties (Against Wheeler) ...................... 83

PRAYER FOR RELIEF ............................................................................... 84

DEMAND FOR JURY TRIAL ..................................................................... 86

CERTIFICATION OF SIGNING ATTORNEY .......................................... 87

EXHIBIT A .................................................................................................. 88

EXHIBIT B .................................................................................................. 90

**INTRODUCTION**

1.     This case concerns a scheme orchestrated by Defendants in bad faith to deprive preferred stockholders of Cedar Realty Trust, Inc., ("Cedar") of a liquidation preference of at least $25.00 per share (worth $161.3 million in the aggregate), and crash the price of Cedar's preferred stock so they can be taken out in a future tender offer and/or open market purchases at prices far below the liquidation preference. To date, the scheme has cost preferred stockholders over $65 million in losses after recent sharp drops in the market price of the preferred stock.

2.     The scheme arises out of a series of transactions under which Cedar is (i) selling *all* of its properties to third parties for over $1 billion, and distributing the net proceeds of approximately $396 million *exclusively* to common stockholders (despite the liquidation preference entitling preferred stockholders to priority payment), and (ii) transferring responsibility for paying future preferred stock dividends to a wholly-owned subsidiary of Defendant Wheeler Real Estate Investment Trust, Inc. ("Wheeler")—a tiny publicly-traded REIT (ticker: WHLR) with a market cap slightly north of $20 million, a history of dysfunctional management, and a track record of oppressing its own preferred stockholders (including suspending all preferred dividends since December 2018, and then in 2021, wiping out the accrued but unpaid dividends of its Series A and B preferred stock).

3.    Defendants' abuse of Cedar's preferred stockholders gives rise to claims for breach of contract, tortious interference with contract, breaches of fiduciary duty, and aiding and abetting breaches of fiduciary duty.The allegations of this complaint are based on the knowledge of Plaintiffs as to themselves and their own actions and stockholdings, and on information and belief as to all other matters, based upon investigation of counsel, which included, *inter alia*, a review of documents filed and/or published by Defendants (defined below), documents obtained via news reports, press releases, and other publicly available documents.

4.    Cedar's capital structure consists of (i) common stock ("Common Stock", with holders thereof referred to as "Common Stockholders"), (ii) Cedar 6.50% Series C Preferred Stock ("Series C Preferred Stock"), and (iii) Cedar 7.25% Series B Preferred Stock ("Series B Preferred Stock") (with "Series C Preferred Stock" and "Series B Preferred Stock" collectively referred to as "Preferred Stock," and holders thereof as "Preferred Stockholders").

5.    Under the documents governing Cedar's Preferred Stock (referred to as Articles Supplementary), if Cedar conducts "any" liquidation, dissolution, or winding up, Preferred Stockholders are entitled to a liquidation preference ("Liquidation Preference") of at least $25.00 per share that must be paid in full before any distributions to Common Stockholders.

6.    The Articles Supplementary further provide that in the event that Cedar

undergoes a "Change of Control" (as defined in the Articles Supplementary), the Preferred Stockholders have the right to convert their Preferred Stock into Common Stock at a specified ratio ("Conversion Right"), *unless* Cedar elects to redeem the Preferred Stock "at a redemption price of $25.00 per share, plus all accrued and unpaid dividends" (i.e., pay the Liquidation Preference).

7.      Here, Cedar is attempting to evade both the Liquidation Preference and the Conversion Right via the transactions described below.

8.      On March 2, 2022, Cedar announced that it had entered into a series of proposed transactions ("Proposed Transactions") under which Cedar will sell all of its properties to third parties for gross proceeds equal to $1.05 billion (less the outstanding principal of any assumed mortgage debt) ("Gross Proceeds"), and distribute all of the net proceeds from those sales (totaling approximately $396 million) ("Net Proceeds") *exclusively* to Common Stockholders. Despite their entitlement to the Liquidation Preference in the event of a liquidation and winding up (or at a minimum, the Conversion Right in the event of Change of Control), Preferred Stockholders will not receive *any* distributions from the Proposed Transactions. That outcome breaches the terms of the Articles Supplementary and the fiduciary duties of the Cedar board.

9.      In the wake of the March 2, 2022 announcement, Cedar's Common Stock skyrocketed:



10.    Simultaneously, on March 2, 2022, the Preferred Stock plummeted:





11.     The reason for the polar opposite reaction is simple: as noted, the $396

million in Net Proceeds from the Proposed Transactions will be distributed

***exclusively*** to Common Stockholders, ***while Preferred Stockholders receive***

***nothing.*** Instead, the Preferred Stock will nominally remain an obligation of Cedar (as the

so-called "surviving entity" in a merger with Wheeler), and Cedar will become a wholly-

owned subsidiary of Wheeler. Thus, as a practical matter, Preferred Stockholders will be at

the mercy of Wheeler with its well-documented history of dysfunctional management

and preferred shareholder oppression.[1]

12.     Defendants' apparent position is that because Cedar is technically merging

_____

[1] As discussed below, as evidence of Defendants' bad faith, in November 2017—
when depriving Preferred Stockholders of the Liquidation Preference did not exist as

into Wheeler in connection with the Proposed Transactions, the Proposed Transactions are not a "liquidation" or "winding up" under the Articles Supplementary triggering payment of the Liquidation Preference. But despite the outward formalities of the Proposed Transactions, there is no disguising that the Proposed Transactions *de facto* constitute a winding up and liquidation of Cedar triggering payment of the Liquidation Preference since beyond just selling *all* of its assets, Cedar is also (i) discharging *all* of its debts and obligations, (ii) distributing *all* of the net proceeds from its asset sales to Common Stockholders, (iii) terminating *all* its officers and employees, (iv) terminating its board of directors, and (v) cancelling *all* shares of its publicly traded Common Stock. This is the epitome of a winding up and liquidation.

13.     Moreover, even if the Proposed Transactions somehow did not trigger the Liquidation Preference, at the very least they effectuate a Change of Control triggering the Conversion Right under the Articles Supplementary, since there is no doubt that the Proposed Transactions allow Wheeler to "exercise more than 50% of the total voting power" of Cedar (i.e., as a result of the Proposed Transactions, Cedar will become a wholly-owned subsidiary of Wheeler).

14.     Defendants' apparent position on this point is that the Proposed Transactions are not a Change of Control because (i) a Change of Control is only triggered by

_____

a motive—Cedar *rejected* Wheeler as a merger partner precisely because of Wheeler's small size (at a time when Wheeler was valued at nearly $100 million—*nearly five time what it is worth today*).

transactions in which "neither the Corporation [i.e., Cedar] nor the acquiring or surviving entity [i.e., Cedar as a wholly-owned subsidiary of Wheeler] has a class of common securities" that are publicly listed on the NYSE or NASDAQ, and (ii) Wheeler, as the purported acquiring entity, has publicly-traded common stock (the "Publicly-Traded Stock Exclusion").

15.    That argument, however, would misapply the Publicly Traded Stock Exclusion to the Proposed Transactions. The obvious rationale of the Publicly Traded Stock Exclusion is that if the Preferred Stock would remain an obligation of an entity with publicly-traded stock after a transaction closes, then the transaction would not prejudice Preferred Stockholders since they would still retain the opportunity to convert their Preferred Stock into publicly-traded Common Stock in the future. But here, after the Proposed Transactions close, the Preferred Stock will remain an obligation of *Cedar*, which would be the "surviving entity" as a wholly owned subsidiary of Wheeler, and Cedar will ***not*** have publicly-traded common stock. The fact that Wheeler will have publicly-traded common stock is irrelevant since, after the Proposed Transactions close, the Preferred Stock will be Cedar's continuing obligation (not Wheeler's), and Preferred Stockholders will have no right to convert their shares into Wheeler common stock. Therefore, the Publicly Traded Stock Exclusion does not apply to the Proposed Transactions, and the Conversion Right is triggered.

16.    In sum, the Proposed Transactions breach the Articles Supplementary in two ways: (i) Defendants are attempting in bad faith to avoid paying the Liquidation Preference in connection with a winding up and liquidation; and (ii) Defendants are denying Preferred Stockholders their Conversion Right under the Articles Supplementary triggered by the Change of Control effected by the Proposed Transactions (absent Cedar electing to redeem the Preferred Stock for $25.00 per share as required).

17.    Analysts have pilloried Defendants' bad faith attempt to employ "legal gymnastics" to abuse the Preferred Stockholders in connection with the Proposed Transactions. As one Raymond James analyst has observed:

> CDR common equity shareholders are winning, but at the cost of Preferred Stockholders . . . Certainly other REIT Preferred Stock have been sent to purgatory in other M&A transactions, but they have been more of a byproduct of M&A, ***and not the driving factor behind the deal structure***. ***CDR and its advisors may be patting themselves on the back for creative deal/legal gymnastics, but there could be other broader negative implications for the industry***. If CDR can use this structure, what's to stop other REITs from structuring a similar transaction? Could that potentially hurt the investability of other outstanding REIT preferred stock? And what kind of updated language needs to be incorporated into preferred offerings to prevent this from happening again? ***We believe this [deal] sets a bad precedent for the sector***.[2]

18.    The Cedar Board's motive for benefitting Common Stockholders at the expense of Preferred Stockholders is transparent: while none of the Cedar Board

---

[2] All emphasis in quotes is added unless otherwise noted.

members own Preferred Stock, Cedar's outgoing CEO—and investment firms with whom Cedar Board members are affiliated—stand to reap tens of millions of dollars in cash upon consummation of the Proposed Transactions from (i) their holdings of Common Stock, and (ii) in the CEO's case, accelerated vesting of equity awards because the Proposed Transactions are (ironically enough) a "Change of Control" under his employment agreement.

19.    To the right the wrongs being inflicted upon Preferred Stockholders in connection with the Proposed Transactions, Plaintiffs seek, *inter alia*, injunctive relief: (i) enjoining the Wheeler Merger; and (ii) escrowing the Gross Proceeds from the Proposed Transactions and holding same in constructive trust for Plaintiffs and the Class pending a determination on the merits of their claims for breach of contract, tortious interference with contract, breaches of fiduciary duty, and aiding and abetting breaches of fiduciary duty.

## PARTIES

### Plaintiffs

20.    Plaintiff David Sydney is a current Preferred Stockholder of Cedar Series C Preferred Stock and has been a continuous stockholder of such Preferred Stock at all relevant times.  Plaintiff David Sydney is a retiree who resides in Larkspur, California.

21.    Plaintiff SWC Phoenix Fund I, L.P. ("SWC Phoenix") is a current Preferred Stockholder of Cedar Series C Preferred Stock and has been a continuous stockholder of such Preferred Stock at all relevant times.  Plaintiff SWC Phoenix is a Delaware limited partnership with a principal place of business in Fort Lauderdale, Florida.

22.    Plaintiff Martin Novick is a current Preferred Stockholder of Cedar Series C Preferred Stock and Series B Preferred Stock and has been a continuous stockholder of such Preferred Stock at all relevant times. Plaintiff Martin Novick is a retiree who resides in Syosset, New York.

23.    Plaintiff J Renee Brennan Living Trust is a current Preferred Stockholder of Cedar Series C Preferred Stock and has been a continuous stockholder of such Preferred Stock at all relevant times. Plaintiff J Renee Brennan Living Trust is domiciled in Columbus, Indiana.

24.    Plaintiff Scott Schroepfer is a current Preferred Stockholder of Cedar Series C Preferred Stock and has been a continuous stockholder of such Preferred

Stock at all relevant times. Plaintiff Scott Schroepfer is a retiree who resides in Minneapolis, Minnesota.

25.    Plaintiff Kenneth Kamholz is a current Preferred Stockholder of Cedar Series B Preferred Stock and has been a continuous stockholder of such Preferred Stock at all relevant times. Plaintiff Kenneth Kamholz is a retiree who resides in Cherry Hill, New Jersey.

26.    Plaintiff Joe Speiser is a current Preferred Stockholder of Cedar Series C Preferred Stock and has been a continuous stockholder of such Preferred Stock at all relevant times. Plaintiff Joe Speiser resides in Manhasset, New York.

27.    Plaintiff Elbert Capital I LLC is a current Preferred Stockholder of Cedar Series C Preferred Stock and has been a continuous stockholder of such Preferred Stock at all relevant times. Plaintiff Elbert Capital I LLC is a Colorado LLC and has a principal place of business in Denver, Colorado.

**Defendants**

28.    Defendant Bruce Schanzer ("Schanzer") has been the President, Chief Executive Officer, and director of Cedar since 2011. The definitive proxy ("Proxy") filed by Cedar on April 21, 2022, in connection with the Proposed Transactions discloses that Schanzer stands to earn potentially $30,891,078 from cash severance payments, accelerated equity awards, and deferred compensation upon consummation of the Proposed Transactions. Much of that compensation is triggered

because Cedar deems the Proposed Transactions a "Change of Control" under the terms of Schanzer's employment agreement.  Additionally, the Proxy discloses that Schanzer beneficially owns 380,687 shares of Common Stock, which would generate potentially up to an additional $11 million in proceeds for Schanzer based on the $29 per share that Cedar estimates will be distributed to Common Stockholders in connection with the Proposed Transactions. The Proxy does not disclose that Schanzer owns any Preferred Stock, and thus Schanzer was not looking out for the interests of Preferred Stockholders in connection with the Proposed Transactions.[3]

29.    Defendant Gregg Gonsalves ("Gonsalves") has been a Cedar director since 2017 and became Chairman in 2021. The Proxy discloses that Gonsalves beneficially owns 18,626 shares of Common Stock, and was issued 12,577 restricted stock units that will accelerate upon consummation of the Proposed Transactions. The Proxy does not disclose that Gonsalves owns any Preferred Stock, and thus Gonsalves was not looking out for the interests of Preferred Stockholders in

_____

[3] It is unclear from the Proxy whether any of the 380,687 shares of Common Stock that Schanzer beneficially owns overlap with the 265,150 shares of Common Stock underlying the equity awards granted to Schanzer that will accelerate upon consummation of the Proposed Transactions. If there is a complete overlap, then 380,687 shares of Common Stock beneficially owned by Schanzer would represent an additional 115,537 shares of Common Stock beyond the equity awards worth an additional $3.35 million in proceeds to Schanzer upon consummation of the Proposed Transactions. The same uncertainty regarding overlap with equity awards applies to the beneficial ownership reported in the Proxy for the other individual Defendants named herein.

connection with the Proposed Transactions.

30.    Defendant Abe Eisenstat ("Eisenstat") has been a Cedar director since 2015. The Proxy discloses that Eisenstat beneficially owns 41,829 shares of Common Stock, and was issued 12,577 restricted stock units that will accelerate upon consummation of the Proposed Transactions. The Proxy does not disclose that Eisenstat owns any Preferred Stock, and thus Eisenstat was not looking out for the interests of Preferred Stockholders in connection with the Proposed Transactions.

31.    Defendant Steven Rogers ("Rogers") has been a Cedar director since 2016. The Proxy discloses that Rogers beneficially owns 19,746 shares of Common Stock, and was issued 12,577 restricted stock units that will accelerate upon consummation of the Proposed Transactions. The Proxy does not disclose that Rogers owns any Preferred Stock, and thus Rogers was not looking out for the interests of Preferred Stockholders in connection with the Proposed Transactions.

32.    Defendant Sabrina Kanner ("Kanner") has been a Cedar director since 2018. The Proxy discloses that Kanner beneficially owns 16,897 shares of Common Stock, and was issued 12,577 restricted stock units that will accelerate upon consummation of the Proposed Transactions. The Proxy does not disclose that Kanner owns any Preferred Stock, and thus Kanner was not looking out for the interests of Preferred Stockholders in connection with the Proposed Transactions.

33.    Defendant Darcy Morris ("Morris") has been a Cedar director since

2021. The Proxy discloses that Morris beneficially owns 2,493 shares of Common Stock, and was issued 2,493 restricted stock units that will accelerate upon consummation of the Proposed Transactions. Additionally, Morris is Co-President and Chief Executive Officer of Ewing Morris & Co. Investment Partners Ltd. ("EM Partners"), which beneficially owned 1,103,277 shares of Common Stock as of April 18, 2022 (equal to 8.09% of the Company), and thus stands to earn nearly $32 million upon consummation of the Proposed Transactions. The Proxy does not disclose that Morris or EM Partners own any Preferred Stock, and thus Morris was not looking out for the interests of Preferred Stockholders in connection with the Proposed Transactions.

34.    Defendant Richard Ross ("Ross") has been a Cedar director since 2021.The Proxy discloses that Ross beneficially owns 2,493 shares of Common Stock, and was issued 2,493 restricted stock units that will accelerate upon consummation of the Proposed Transactions.  The Proxy does not disclose that Ross owns any Preferred Stock, and thus Ross was not looking out for the interests of Preferred Stockholders in connection with the Proposed Transactions. The Proxy further discloses that Ross was appointed to the Board under a settlement agreement between Cedar and EM Partners and other activist investors following a proxy fight. Therefore, Ross is partial to EM Partners' interests.

35.    Defendant Sharon Stern ("Stern") has been a Cedar director since

2021.The Proxy discloses that Stern beneficially owns 6,093 shares of Common Stock, and was issued 2,493 restricted stock units that will accelerate upon consummation of the Proposed Transactions.  The Proxy does not disclose that Stern owns any Preferred Stock, and thus Stern was not looking out for the interests of Preferred Stockholders in connection with the Proposed Transactions. The Proxy further discloses that Stern was appointed to the Board under a settlement agreement between Cedar and EM Partners and other activist investors following a proxy fight. Therefore, Stern is partial to EM Partners' interests.

36.    Defendant Cedar is a real estate investment trust ("REIT") that focuses primarily on ownership, operation and redevelopment of grocery-anchored shopping centers in high-density urban markets from Washington, D.C. to Boston. Cedar is incorporated in Maryland and has a principal executive office address of 928 Carmans Road, Massapequa, New York 11758. Cedar has a resident agent in Maryland. The resident agent is CSC-Lawyers Incorporating Service Company, with an address of 7 St. Paul Street Suite 820, Baltimore MD, 21202.

37.    Defendant Cedar Realty Trust Partnership, L.P. ("Cedar Operating Partnership") is a Delaware limited partnership. Cedar Operating Partnership exists because Cedar employs an umbrella partnership structure by which it has contributed substantially all of its assets to Cedar Operating Partnership, and conducts substantially all of its business through the Cedar Operating Partnership. Cedar

Operating Partnership is registered in Maryland and has the same resident agent as Cedar.

38.    As of December 31, 2021, Cedar owned a 99.4% general and limited partnership interest in, and was the sole general partner of, the Cedar Operating Partnership. The limited partners' interest in the Cedar Operating Partnership (0.6% at December 31, 2021) is represented by Operating Partnership Units ("OP Units"). The 81,000 OP Units outstanding at December 31, 2021 are economically equivalent to shares of the Company's Common Stock. The holders of OP Units have the right to exchange their OP Units for the same number of shares of Cedar's Common Stock or, at the Cedar's, for cash. For purposes of this Complaint, the defined term "Cedar" shall be deemed to include the Cedar Operating Partnership.

39.    Defendant Wheeler Real Estate Investment Trust, Inc. ("Wheeler") is REIT incorporated in Maryland with principal executive offices at 2529 Virginia Beach Blvd., Suite 200, Virginia Beach, VA 23452. Wheeler has a resident agent in Maryland. Wheeler's resident agent is Cogency Global Inc., with an address of 1519 York Road, Lutherville MD, 21093.

40.    Wheeler currently has three series of preferred stock outstanding: Series A Preferred, Series B Convertible Preferred ("Series B Preferred" or "Series B Preferred Stock"), and Series D Cumulative Convertible Preferred ("Series D Preferred" or "Series D Preferred Stock"). The Series B Preferred trade publicly on

Nasdaq under the ticker WHLRP, and the Series D Preferred trade publicly on Nasdaq under the ticker WHLRD.

41.    Defendants in paragraphs 28-35 are collectively referred to as the "Board" or the "Board Defendants," and Defendants in paragraphs 28-39 are collectively referred to as the "Defendants."

## **JURISDICTION AND VENUE**

42.    Plaintiffs repeat and reallege all foregoing and following paragraphs as if fully set forth herein.

43.    This Court has personal jurisdiction over Cedar pursuant to Md. Code Ann. Cts. & Jud. Proc. § 6-102(a) as Cedar is organized under Maryland law.

44.    On May 15, 2012, Cedar caused Cedar Realty Trust, Inc. Articles Supplementary ("Series B Articles Supplementary") to be executed under seal in its name and on its behalf by its President, Defendant Schanzer, who signed the execution himself. The Series B Articles Supplementary was filed with the State of Maryland on May 15, 2012.

45.    On August 18, 2017, Cedar caused Cedar Realty Trust, Inc. Articles Supplementary ("Series C Articles Supplementary") to be executed under seal in its name and on its behalf by its President, Defendant Schanzer, who signed the execution himself. The Series C Articles Supplementary was filed with the State of Maryland on August 18, 2017.

46.    Cedar is a party to the Grocery-Anchored Sale Agreement (as defined

23

below), and the Board approved the Grocery-Anchored Sale Agreement. Specifically, the Board

> **unanimously**, **by resolutions duly adopted** at a meeting duly called and held (i) **approved, and declared advisable, this [**Grocery-Anchored **Sale] Agreement**, the Related Agreements and the Transactions, (ii) **determined that the terms of this [Grocery-Anchored Sale] Agreement**, including, without limitation, the Purchase Price, **are fair** to, and in the best interests of, Seller Parent and its stockholders, (iii) **directed that [Cedar] submit the approval of the Transactions contemplated by this [Grocery-Anchored Sale] Agreement to a vote** at the [Cedar] Stockholder Meeting as promptly as practicable, (iv) recommended (the "Seller Parent Board Recommendation") that the common stockholders of [Cedar] approve the Transactions at the [Cedar] Stockholder Meeting, which resolutions have not (subject to Section 5.10(c)) been subsequently rescinded, modified or withdrawn.

(Emphasis added).

47. If the Grocery-Anchored Sale Agreement is consummated, Cedar would sell thirty-three properties to the purchasers, including four properties located in the State of Maryland: Yorktowne Plaza in Cockeysville, MD; Shoppes at Arts District in Hyattsville, MD; Valley Plaza in Hagerstown, MD; and Oakland Mills in Columbia, MD. On March 10, 2022, Cedar caused its annual report on Form 10-K (the "2022 10-K") to be filed with the United States Securities and Exchange Commission (the "SEC"). Therein, Cedar indicated that the four Maryland properties it would sell through the Grocery-Anchored Sale Agreement are leased to various tenants, including LA Mart, Busboys and Poets, Yes! Organic Market, Tractor Supply, Food Lion, and Dollar Tree, and collectively have approximately

419,820 square feet of gross leasable area.

48.    The Grocery-Anchored Sale Agreement is designed to include certain fiduciary-out clauses, a governing law provision specifying that the Grocery-Anchored Sale Agreement is governed by Maryland law, and a forum selection provision choosing certain Maryland courts, namely the Circuit Court for Baltimore City, Maryland and/or the U.S. District Court for the District of Maryland, Northern Division, for certain actions between the parties to that agreement. While this forum selection provision does not apply to or bind the Plaintiffs in this action, it demonstrates that the Defendants intentionally availed themselves of the protection of the State of Maryland and its courts.

49.    Accordingly, the Board adopted, approved, declared advisable, and directed Cedar to submit for approval to stockholders a sale that includes four Maryland properties, certain fiduciary-out provisions that would ultimately be effectuated by Maryland law, a governing law provision specifying that the Grocery-Anchored Sale Agreement is governed by Maryland law, and a forum selection provision choosing certain Maryland courts, namely the Circuit Court for Baltimore City, Maryland and/or the U.S. District Court for the District of Maryland, Northern Division, for certain actions between the parties to the Grocery-Anchored Sale Agreement. The Grocery-Anchored Sale Agreement can only be given effect in accordance with Maryland General Corporation Law.

50.    Defendant Schanzer also signed the Grocery-Anchored Sale Agreement for multiple entities.

51.    Cedar, Cedar Operating Partnership, and Wheeler are parties to the Wheeler Merger Agreement (as defined below), and the Board approved the Wheeler Merger Agreement. Specifically, the Board

> (i) **duly authorized and approved** the execution, delivery and performance by [Cedar] of this [Merger] Agreement and the consummation by the [Cedar] of the [Proposed] Merger, (ii) **declared that the [Proposed Wheeler] Merger is advisable** on substantially the terms and conditions set forth in this Agreement, (iii) **directed that the [Proposed Wheeler] Merger be submitted for consideration** at a special meeting of the [Cedar]'s stockholders and (iv) recommended that the [Cedar]'s stockholders approve the [Proposed Wheeler] Merger[.]

(Emphasis added).

52.    If the Wheeler Merger Agreement is consummated, Cedar would transfer control over the nineteen Wheeler Properties to Wheeler via the merger of Merger Sub into Cedar. Those properties include one property located in the State of Maryland: Patuxent Crossing in California, MD. According to the 2022 10-K, this property is leased to various tenants, including McKay's Market and Café, Marshalls, Home Goods, World Gym, JoAnn Fabrics, and Dollar Tree, and has 264,164 square feet of gross leasable area.

53.    The Wheeler Merger Agreement is designed to include certain fiduciary-out provisions, a governing law provision specifying that the Wheeler Merger Agreement is governed by Maryland law, and a forum selection provision

26

choosing Circuit Court for Baltimore City, Maryland Business and Technology Case Management Program for certain actions between the parties to the Wheeler Merger Agreement. While this forum selection provision does not apply to or bind the Plaintiffs in this action, it demonstrates that the Defendants hereto intentionally availed themselves of the protection of the State of Maryland and its courts.

54.    Accordingly, the Board authorized, adopted, approved, declared advisable, and directed Cedar to submit for approval to stockholders the sale of a valuable Maryland property, certain fiduciary-out provisions that would ultimately be effectuated by Maryland law, a governing law provision specifying that the Wheeler Merger Agreement is governed by Maryland law, and a forum selection provision choosing Circuit Court for Baltimore City, Maryland Business and Technology Case Management Program for certain actions between the parties to the Wheeler Merger Agreement. The Wheeler Merger Agreement can be given effect only in accordance with Maryland General Corporation Law.

55.    Defendant Schanzer signed the Wheeler Merger Agreement for Cedar and Cedar Operating Partnership.

56.    The Board is at least closely related to the Maryland forum selection provisions in the Grocery-Anchored Sale Agreement and the Wheeler Merger Agreement, and it is foreseeable that the Board would be bound to a suit in Maryland.

57.    Cedar's 2022 10-K indicated that its portfolio of properties includes

five properties in the State of Maryland (as identified above). During the tenure of the current Board, on October 14, 2021, Cedar purchased a 60% ownership interest in the San Souci Plaza joint venture, located in California, Maryland.

58.    Plaintiffs served the original Complaint in this matter upon Cedar's resident agent, CSC- Lawyers Incorporating Service Company. Pursuant to Md. Code, Cts. & Jud. Proc. § 6-102.1, and the Board is deemed to have accepted service of process upon service to Cedar's resident agent. By virtue of accepting service of process in Maryland, this Court has personal jurisdiction over the Board pursuant to Md. Code Ann. Cts. & Jud. Proc. § 6-102(a).

59.    As an additional basis for personal jurisdiction, if needed for some reason, this Court also has personal jurisdiction over the Board pursuant to Md. Code Ann. Cts. & Jud. Proc. § 6-103(b). The Cedar Board members, *inter alia*, directly or by an agent transact business or perform work or service in Maryland, contract to supply services in Maryland, and regularly do or solicit business in Maryland or derive substantial revenue from Maryland services, and/or have an interest in or use real property in Maryland.

60.    If needed for some reason, this Court has additional bases to exercise personal jurisdiction over Cedar. Plaintiffs served the original Complaint in this matter upon Cedar's resident agent, CSC-Lawyers Incorporating Service Company, and thus pursuant to Md. Code Ann. Cts. & Jud. Proc. § 6-102(a), this Court has

personal jurisdiction over Cedar. This Court also has personal jurisdiction over Cedar pursuant to Md. Code Ann. Cts. & Jud. Proc. § 6-103(b) because Cedar, *inter alia*, directly or by an agent transacts business or performs any character of work or service in Maryland, contracts to supply services in Maryland, and/or has an interest in, uses, or possess real property in Maryland.

61.    This Court has personal jurisdiction over Cedar Operating Partnership pursuant to Code Ann. Cts. & Jud. Proc. § 6-102(a). Plaintiffs served the original Complaint in this matter upon Cedar Operating Partnership's resident agent, CSC-Lawyers Incorporating Service Company, and thus this Court has personal jurisdiction over it.

62.    As an additional basis for personal jurisdiction, if needed for some reason, this Court has personal jurisdiction over Cedar Operating Partnership pursuant to Md. Code Ann. Cts. & Jud. Proc. § 6-103(b). Cedar Operating Partnership, *inter alia*, directly or by an agent transacts business or performs any character of work or service in Maryland, contracts to supply services in Maryland, and/or has an interest in, uses, or possess real property in Maryland.

63.    This Court has personal jurisdiction over Wheeler pursuant to Md. Code Ann. Cts. & Jud. Proc. § 6-102(a) as Wheeler is organized under the laws of Maryland.

64.    If needed for some reason, this Court has additional bases to exercise personal jurisdiction over Wheeler. By the acts and transactions set forth herein,

Wheeler is purchasing real properties located in the State of Maryland. Additionally, Plaintiffs served the original Complaint in this matter upon Wheeler's resident agent, Cogency Global Inc., and thus pursuant to Md. Code Ann. Cts. & Jud. Proc. § 6-102(a), this Court has personal jurisdiction over Wheeler. This Court also has personal jurisdiction over Wheeler pursuant to Md. Code Ann. Cts. & Jud. Proc. § 6-103(b) because Wheeler, *inter alia*, directly or by an agent transacts business or performs any character of work or service in Maryland, contracts to supply services in Maryland, causes tortious injury outside of Maryland and regularly derives substantial revenue from Maryland, and/or has an interest in, uses, or possess real property in Maryland.

65.     As an additional basis for personal jurisdiction over all Defendants, if needed for some reason, all Defendants may be deemed to have consented, whether expressly or impliedly, to personal jurisdiction in Maryland.

66.     This Court has subject matter jurisdiction pursuant to Md. Code Ann. Cts. & Jud. Proc. § 1-501.

67.     Venue is proper in this Court pursuant to Md. Code Ann. Cts. & Jud. Proc. § 6-201 and Md. Code Ann. Cts. & Jud. Proc. § 6-202. This case involves an action for damages against nonresident individuals. Cedar, Cedar Operating Partnership, and Wheeler do not maintain a principal place of business in Maryland, and Plaintiffs are out-of-state residents.

## CLASS ACTION ALLEGATIONS

68.     Plaintiffs bring this Action as a class action, pursuant to Maryland Rule 2-231, on behalf of themselves and all other holders of Cedar's Series B and C Preferred Stock (the "Class").  Excluded from the Class are the Defendants, and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant and their successors in interest.

69.     This Action is maintainable as a class action.

70.     The Class is so numerous that joinder of all members is impracticable. As of April 1, 2022, Cedar had issued and outstanding (i) 13,640,067 shares of Common Stock; (ii) 1,450,000 shares of Series B Preferred Stock; and (iii) 5,000,0000 shares of Series C Preferred Stock. Accordingly, Cedar had 6,450,000 shares of Preferred Stock outstanding, which Plaintiffs expects to be held by hundreds or thousands of individuals and entities scattered throughout the United States and elsewhere.

71.     Questions of law and fact are common to the Class, including among others:

    a. Whether to enjoin (i) consummation of the Wheeler Merger, and (ii) distribution of the Gross Proceeds generated by the Proposed Transactions and hold such proceeds in constructive trust for Plaintiffs;

    b. Whether Cedar, Cedar Operating Partnership, and/or the Board are breaching the Article Supplementary governing the Preferred Stock;

31

c. Whether the Board is violating its fiduciary duties to Plaintiffs and other members of the Class;

d. Whether Wheeler tortiously interfered with Cedar's contract with the owners of the Preferred Stock (i.e., the Articles Supplementary);

e. Whether Plaintiffs and other members of the Class are entitled to remedies as a result of such misconduct; and

f. Whether Plaintiffs and other members of the Class would be irreparably harmed were the Court not to enjoin consummation of the Wheeler Merger and distribution of the Gross Proceeds of the Proposed Transactions before a determination on the merits.

72.    Plaintiffs do not have any interests adverse to the Class. Plaintiffs are committed to prosecuting this Action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of the claims of other members of the Class and Plaintiffs have the same interests as other members of the Class.  Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

73.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the

Class who are not parties to such adjudications or would substantially impair or impede their ability to protect their interests.

74.    The Defendants have acted or refused to act on grounds generally applicable to the Class with respect to matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

75.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.  Plaintiffs anticipate that there will be no difficulty in the management of this litigation as a class action.

## SUBSTANTIVE ALLEGATIONS

**Cedar's Preferred Stock Is Senior to Common Stock and Is Owed a Liquidation Preference.**

76.    The terms of the Series C Preferred Stock are set forth in the Series C Articles Supplementary.

77.    The Series C Articles Supplementary provide that Series C Preferred Stock ranks "senior" to Common Stock with respect to dividend, liquidation, dissolution, and/or winding up rights:

> (2) <u>Rank</u>. **The Series C Preferred Stock will, with respect to dividend rights and rights upon liquidation, dissolution or winding up of the Corporation, rank (a) senior to all classes or series of Common Stock** (as defined in the Charter), and to all equity securities the terms of which provide that such equity securities shall rank junior to the Series C Preferred Stock; (b) on parity with the Series B Preferred Stock (as defined in the Charter) and with all equity securities issued

by the Corporation the terms of which specifically provide that such equity securities rank on parity with the Series C Preferred Stock; and (c) junior to all equity securities issued by the Corporation the terms of which specifically provide that such equity securities rank senior to the Series C Preferred Stock. The term "equity securities" shall not include convertible debt securities.

(Emphasis added).

78.    The Series C Articles Supplementary also provide that Series C Preferred Stock has a liquidation preference of at least $25.00 in the event that Cedar does "any" liquidation, dissolution, or winding up ("Liquidation Preference"):

(a) **In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation** (referred to herein sometimes as a "liquidation"), **the holders of Series C Preferred Stock then outstanding shall be entitled to receive out of the assets of the Corporation legally available for distribution to stockholders (after payment or provision for payment of all debts and other liabilities of the Corporation) the sum of (i) the liquidation preference of $25.00 per share and (ii) an amount equal to any accrued and unpaid dividends (whether or not declared) to the date of payment, before any distribution of assets is made to holders of Common Stock** (as defined in the Charter) or any equity securities that the Corporation may issue that rank junior to the Series C Preferred Stock as to liquidation rights.

79.    The Series C Articles Supplementary further clarify that a consolidation, merger, statutory share exchange, or asset sale—without more—does not constitute a liquidation, dissolution, or winding up:

(e) None of a consolidation or merger of the Corporation with or into another entity, the merger of another entity with or into the Corporation, a statutory share exchange by the Corporation or a sale, lease, transfer or conveyance of all or substantially all of the Corporation's assets or business shall be considered a liquidation, dissolution or winding up of

34

the Corporation.

80.     Cedar's Series C Articles Supplementary, however, do not expressly define the terms "liquidation," "dissolution," or "winding up."

81.     In particular, Cedar's Series C Articles Supplementary do ***not*** carve out any of the following events, among others, whether individually or collectively, from the terms "liquidation, dissolution, or winding up": distributing all of the proceeds from asset sales to stockholders; settling all debts and obligations; terminating the Board, officers, and employees; and canceling stock.

82.     The terms of the Series B Preferred Stock are set forth in the Series B Articles Supplementary.

83.     Just like the Series C Preferred Stock, the Series B Preferred Stock ranks senior to Common Stock:

> <u>Rank</u>. The Series B Preferred Stock will, with respect to distribution rights and rights upon liquidation, dissolution or winding up of the Corporation, rank (a) senior to all classes or series of Common Stock (as defined in the Charter), and to all equity securities the terms of which provide that such equity securities shall rank junior to the Series B Preferred Stock; (b) on parity with the Series A Preferred Stock (as defined in the Charter) and with all equity securities issued by the Corporation the terms of which specifically provide that such equity securities rank on parity with the Series B Preferred Stock; and (c) junior to all equity securities issued by the Corporation the terms of which specifically provide that such equity securities rank senior to the Series B Preferred Stock. The term "equity securities" shall not include convertible debt securities.

84.     The Series B Preferred Stock also has Liquidation Preference terms that

are substantially the same as those of the Series C Preferred Stock:

> (a) In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation (referred to herein sometimes as a 'liquidation'), the holders of Series B Preferred Stock then outstanding shall be entitled to receive out of the assets of the Corporation legally available for distribution to stockholders (after payment or provision for payment of all debts and other liabilities of the Corporation) the sum of (i) the liquidation preference of $25.00 per share and (ii) an amount equal to any accrued and unpaid distributions (whether or not declared) to the date of payment, before any distribution of assets is made to holders of Common Stock (as defined in the Charter) or any equity securities that the Corporation may issue that rank junior to the Series B Preferred Stock as to liquidation rights.

85.    The Series B Articles Supplementary further clarify that a consolidation, merger, statutory share exchange, or asset sale—without more—does not constitute a liquidation, dissolution, or winding up:

> (e) None of a consolidation or merger of the Corporation with or into another entity, the merger of another entity with or into the Corporation, a statutory share, exchange by the Corporation or a sale, lease, transfer or conveyance of all or substantially all of the Corporation's assets or business shall be considered a liquidation, dissolution or winding up of the Corporation. The Series B Articles Supplementary does not expressly define the terms "liquidation", "dissolution", or "winding up."

86.    In particular, Cedar's Series B Articles Supplementary do ***not*** carve out any of the following events, among others, whether individually or collectively, from the terms "liquidation, dissolution, or winding up": distributing all of the proceeds from asset sales to stockholders; settling all debts and obligations; terminating the Board, officers, and employees; and canceling stock.

**Cedar's Preferred Stock Has Conversion Rights Upon A Change Of Control**

87.    In addition to the above-described rights to a Liquidation Preference, the Articles Supplementary for both the Series C and Series B Preferred Stock grant Preferred Stockholders certain Conversion Rights upon a Change of Control of Cedar, unless Cedar chooses to exercise its right to redeem the Preferred Stock for a $25.00 cash payment.  As set forth below, triggering of the Conversion Right entitles a Preferred Stockholder to convert the Preferred Stock into Cedar Common Stock pursuant to a prescribed conversion ratio. As a general matter, the applicable ratio seeks to give holders of Preferred Stock the number of shares of Common Stock equivalent to $25.00 (for example, if Cedar's Common Stock was worth $50.00 per share, the formula would dictate that each share of Preferred Stock would be exchanged for 0.50 shares of Common Stock).

88.    The Articles Supplementary further provide, however, that the conversion formula is subject to the "Stock Cap." The Stock Cap limits the number of shares of Common Stock that a Preferred Stockholder may receive upon exercising the Conversion Rights.

89.    The Articles Supplementary for the Series C Preferred Stock originally set the Stock Cap at 9.8814 shares, but provide that "[t]he Stock Cap is subject to pro rata adjustments for any stock splits . . . subdivisions or combinations."  On or about November 27, 2020, Cedar effected a reverse common stock split of 6.6 to

1—*i.e.*, holders of Common Stock received 1 share of Common Stock for every 6.6 shares of Common Stock they held, reducing the number of shares of Common Stock that were issued and publicly trading. As a result, the Stock Cap for the Series C Preferred Stock was reduced pro rata to 1.4972 shares (9.8814/6.6), and the maximum Common Shares that would be issuable to Series C Preferred Stockholders in connection with a Change of Control given the 5,000,000 of Series C Preferred Stock shares currently outstanding would be: 1.4972 x 5,000,000, or 7,485,909.[4]

90.    This conversion mechanism is described in Section 7(b)(i) of the Articles Supplementary for the Series C Preferred Stock as follows:

> ***Upon the occurrence of a Change of Control*** (as defined in subparagraph (j) of Section 5), each holder of Series C Preferred stock shall have the right, unless, prior to the Change of Control Conversion Date (as defined below), the Corporation has provided or provides notice of its election to redeem the Series C Preferred Stock pursuant to the Redemption Right, to convert some or all of the Series C Preferred Stock held by such holder (the "Change of Control Conversion Right") on the Change of Control Conversion Date into a number of shares of Common Stock per share of Series C Preferred Stock to be converted (the "Common Stock Conversion Consideration") equal to the lesser of (A) the quotient obtained by dividing (1) the sum of (x) the $25.00 liquidation preference plus (y) the amount of any accrued and unpaid dividends to, but not including, the Change of Control Conversion Date . . . by (2) ***the Common Stock Price*** (as defined below) and (B) 9.8814 (the "Stock Cap"), subject to

---

[4] The Stock Cap for the Series B Preferred Stock was set at 10.2041. Adjusted for the stock split, that number would be reduced to 1.5461. As a result, the maximum Common Shares that would be issuable to Series B Preferred Stockholders in connection with a Change of Control given the 1,450,000 of Series B Preferred Stock shares currently outstanding would be: 1.5461 x 1,450,000, or 2,241,810.

Section 7(b)(ii) [by which the reverse stock split triggered a pro rata reduction of the Stock Cap to 1.4972].

91.    As referenced in the passage quoted above, Section 7(b)(i) of the Articles Supplementary uses the defined term "Common Stock Price" to determine the applicable conversion ratio.  Section 7(b)(vii) of the Articles Supplementary defines "Common Stock Price" as follows:

> The "Common Stock Price" shall be (i) the amount of cash consideration per share of Common Stock, if the consideration to be received in the Change of Control by holders of Common Stock is solely cash, or (ii) the average of the closing prices per share of Common Stock on the NYSE for the ten consecutive trading days immediately preceding, but not including, the effective date of the Change of Control, if the consideration to be received in the Change of Control by holders of Common Stock is other than solely cash.

92.    As shown, the definition of the Common Stock Price by which the Conversion Rights are effectuated ***explicitly contemplates that Cedar must have publicly-traded shares of Common Stock***; otherwise it would be ***impossible*** to calculate the conversion ratio in connection with a Change of Control (unless the consideration paid was solely cash).

93.    The Publicly Traded Stock Exclusion in Section 5(j) of the Articles Supplementary excludes transactions from the definition of a Change of Control when the Preferred Stock will remain an obligation of a company with publicly-traded stock:

> For the purposes of this Section 5 [Redemption] and Section 7 [Conversion] below, a "Change of Control" is when, after the original

issuance of the Series C Preferred Stock, the following have occurred and are continuing (x) the acquisition by any person, including any syndicate or group deemed to be a "person" under section 13(d)(3) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of beneficial ownership, directly or indirectly, through a purchase, merger or other acquisition transaction or series of purchases, mergers or other acquisition transactions of shares of the Corporation entitling that person to exercise more than 50% of the total voting power of all shares of the Corporation entitled to vote generally in elections of directors . . . , and (y) *following the closing of any transaction referred to in clause (x), neither the Corporation nor the acquiring or surviving entity has a class of common securities* (or American Depositary Receipts ("ADRs") representing such securities) listed on the New York Stock Exchange (the "NYSE"), the NYSE American, LLC exchange (the "NYSE American"), or the NASDAQ Stock Market (the "NASDAQ"), or listed or quoted on an exchange or quotation system that is successor to the NYSE, the NYSE American or NASDAQ  . . . .

94.    The purpose of the Publicly Traded Stock Exclusion is to provide Cedar with a measure of flexibility to merge into or be acquired by another publicly traded entity without triggering a Change of Control and the corresponding Conversion Rights of the Preferred Stockholders.  However, if a transaction results in the Cedar Preferred Stock residing at a "surviving entity" that does *not* have publicly listed common stock, then the transaction qualifies as a Change of Control under the language above.

95.    That is precisely the situation here. The Wheeler Merger Agreement provides that Cedar shall become a wholly-owned subsidiary of Wheeler, and to that end, defines the "Surviving Entity" in the merger as Cedar. Further, Section 3.1(a)(iv) of the Wheeler Merger Agreement provides that the Preferred Stock will

remain an obligation of Cedar. Thus, after consummation of the Wheeler Merger, the Preferred Stock will reside with Cedar, and Cedar—the "surviving entity"—will no longer have publicly-traded stock. Therefore, the Proposed Transactions are not excluded from the definition of Change of Control by the Publicly Traded Stock Exclusion. To conclude otherwise would destroy the Conversion Right of Preferred Stockholders (and render Section 7(b)(i) of the Articles Supplementary a nullity) since after the Proposed Transactions close there will no longer be any publicly-traded Cedar Common Stock into which to convert.

96.     The fact that Wheeler's common stock is publicly-traded is irrelevant, since the Preferred Stock will not be an obligation of Wheeler, and ***there will be no mechanism by which Cedar Preferred Stock could be converted to Wheeler common stock***. Nor will Preferred Stockholders have any access to the assets of Wheeler.

97.     The conclusion that the Proposed Transactions constitute a Change of Control (because Cedar will be a wholly owned subsidiary of Wheeler and its common stock will no longer be publicly traded) is also compelled by fundamental rules of grammar. In Section 5(j), the verb after the phrase "neither the Corporation nor the acquiring or surviving entity," is "has" (singular), and not "have" (plural). Normally, when "neither" and "nor" link a singular term and a plural one, proper usage requires putting the singular term after the "neither," and the plural term after

41

the "nor," and using a plural verb after the "nor" phrase (e.g., "neither the car nor the trucks *are* available") (as per The New York Times Manual of Style and Usage).

98.    In the Articles Supplementary, however, two terms appear after the "nor" (i.e., "acquiring entity" and "surviving entity"), which is plural, and yet the subsequent verb is "has" (singular), and not "have" (plural). Therefore, the language in Section 5(j) instructs the reader to look at one entity to determine application of the exclusion, i.e., the entity at which the Preferred Stock will reside after the transaction closes. Since the Preferred Stock will remain an obligation of Cedar, as the "surviving" entity, that is the entity that matters for purposes of applying the Publicly Traded Stock Exclusion. Since Cedar will not have publicly-traded common stock, the Publicly Traded Stock Exclusion does not apply to the Proposed Transactions.

**Cedar Rejects Merger Overture by Wheeler in November 2017**

99.    In 2017, Wheeler made an unsolicited bid to Cedar to explore a merger. On November 27, 2017, Cedar rejected the bid in letter characterizing the offer as "unrealistic," and citing Wheeler's financial performance, dividend sustainability, portfolio quality and size mismatch as factors in determining that a merger with Wheeler was not in the best interests of Cedar's stockholders. The letter stated in relevant part:

> Cedar is a $1.35-billion company, with a current equity market capitalization of approximately $550 million. Wheeler is a $375-

million company with a current equity market capitalization of approximately $95 million. Although relative size differences may not matter in some cases, *in this instance they would be adversely consequential*.

Fast forward to 2022, and with Wheeler's market capitalization now slightly north of $20 million, the Board no longer maintains that merging with Wheeler (or, more precisely, Wheeler's Merger Sub) is "adversely consequential," and instead—now that Schanzer and its other members stand to earn tens of millions of dollars on their Common Stock from the Proposed Transactions—the Cedar Board inconsistently contends that a merger with Wheeler is in the best interests of Cedar stockholders.

**Wheeler's Oppressive Treatment of its Own Preferred Stockholders**

100.   In March 2018, shortly after its bid to merge with Cedar was rejected, and purportedly to retain cash flow to pay operating expenses and reduce debt, the Wheeler Board suspended dividend payments on its (i) common stock, and (ii) Series A, Series B, and Series D Preferred Stock (the latter suspension beginning with the three months ended December 31, 2018).

101.   As of December 31, 2020, Wheeler reported the following dividend arrears on its Preferred Stock: Series A (approximately $114,000), Series B (approximately $9.5 million), and Series D (approximately $20.9 million). Total dividend arrears on all Preferred Stock totaled $30.51 million.

102.   On December 23, 2020, Wheeler announced a tender offer to purchase up to $19 million worth of Series D Preferred Stock at a price not greater than $18.00

nor less than $15.50. The tender offer expired on March 12, 2021. Based on the final count, the Company accepted for purchase 387,097 Series D Preferred Stock at a purchase price of $15.50 per share at an aggregate cost of $6 million. Wheeler's Series D Preferred Stock closed at $18.06 per share on March 12, 2021.

103.   On May 15, 2021, Wheeler acquired an additional 103,513 Series D Preferred Stock at a purchase price of $18 per share at an aggregate cost of $1.86 million. Wheeler's Series D Preferred Stock closed at $18.00 per share on May 14, 2021.

104.   On August 23, 2021, Wheeler announced a special meeting of its common stockholders to vote on a proposal to amend the terms of the Company's Series A and B Preferred Stock to eliminate all of their accumulated and unpaid dividends, and remove their cumulative dividend rights so that no further dividends would accumulate on the Series A and B Preferred Stock. The press release stated that, as of June 30, 2021, there was an aggregate of $139,095 and $11,606,191 of accrued but unpaid dividends on the Series A and B Preferred Stock, respectively. The press release further stated that the "Company believes that removing the cumulative dividend from the [Series A and Series B] Preferred Stock will further optimize the capital structure of the Company."

105.   On November 3, 2021, Wheeler announced that the Company's common stockholders had overwhelmingly voted in favor of eliminating the accumulated and unpaid dividends and cumulative dividend rights of the Series A

and B Preferred Stock. The dividend arrears on the Series D Preferred Stock continued to accumulate, however, and as of December 31, 2021, the outstanding Series D Preferred Stock had aggregate accrued and unpaid dividends in the amount of approximately $26.16 million. This amount exceeds Wheeler's current market capitalization.

106.   Wheeler's aggressive moves to modify the rights of its Preferred Stockholders has led to litigation with its Preferred Stockholders, as reported in Wheeler's annual report on Form 10-K filed on February 28, 2022 (the "Wheeler 2021 10-K").

107.   First, on March 22, 2021, certain Series D Preferred Stockholders sued Wheeler and various individual defendants in the United States District Court for the District of Maryland alleging that Wheeler improperly amended provisions of its Articles Supplementary governing the Series D Preferred Stock to relax the requirements for maintaining a ratio of net assets over outstanding obligations to Series D Preferred Stockholders, and thereby caused Series D Preferred Stockholders to occupy a less secure position in connection with their interest in Wheeler. The action seeks to declare the amendment invalid, enjoin further unauthorized amendments, and either compel the Company to redeem the plaintiffs' shares or award damages. The Court denied the individual defendants' motion to dismiss, and the plaintiffs subsequently moved for partial summary judgment. That

summary judgment motion has been fully briefed and is currently *sub judice*.

108.   Second, on October 25, 2021, certain Preferred Stockholders sued Wheeler in the Circuit Court for Baltimore County, Maryland, contending that Wheeler's amendment of its charter to remove the cumulative nature of dividends from the Series B Preferred Stock could not be applied retroactively. It also alleged that that Wheeler's rights offering of convertible debt to common stockholders in July 2021, and the notes issued pursuant to the rights offering, breached the provisions of the Company's governing documents and violated the rights of the holders of the Series B and D Preferred Stock. The plaintiffs in that action seek to require Wheeler to pay all dividends accrued, as of the date of the rights offering, on the Series B and D Preferred, and prohibit the Company from paying interest on the notes held by the Company's common stockholders (upon exercise of the rights) until all accrued dividends on the Series B and D Preferred Stock are paid. The plaintiffs also seek a declaration that issuance of notes to common stockholders when accrued Series B Preferred dividends and Series D Preferred dividends had not been fully paid breached certain provisions of the Company's governing documents. A trial date is set for May 2023.

**Wheeler's History of Management Dysfunction**

109.   On January 30, 2018, Wheeler announced that it had terminated Jon Wheeler ("Mr. Wheeler") as the company's chairman, CEO and president. Mr. Wheeler also resigned from his position from the Wheeler Board. Effective

46

immediately, David Kelly ("Kelly") was appointed CEO and president. After the announcement, Wheeler stock dropped 6.85% to close at $6.39 per share on January 31, 2018, and then dropped another 11.74% to close at $5.64 per share on February 1, 2018, and finally dropped another 7.27% to close at $5.23 per share on February 2, 2018.

110.   Mr. Wheeler later sued Wheeler for breach of his employment contract and alleged that he was owed severance and bonus payments. Wheeler's 2021 10-K discloses that Mr. Wheeler's suit was ultimately settled for $685,000 after the trial court found that Mr. Wheeler's contract had been terminated without cause, and awarded him $520,000 in damages, but no attorneys' fees or prejudgment interest (which Mr. Wheeler appealed).

111.   On October 29, 2019, entities ("Stilwell Entities") affiliated with Joseph Stilwell ("Stilwell") issued a proxy statement advising that they owned securities representing approximately 9.8% of Wheeler's common stock, and seeking stockholder support to change the composition of the Wheeler Board to "ensure that the Company is being run in a manner consistent with the best interests of all stockholders." The Stilwell Entities nominated three individuals to stand for election to the Wheeler Board at the annual meeting: Stilwell, Paula J. Poskon ("Poskon") and Kerry G. Campbell ("Campbell").

112.   During the ensuing proxy fight, the existing Wheeler Board disclosed a

March 16, 2015 order of the SEC (i) finding that Stilwell had failed to adequately disclose conflicts of interest presented by inter-fund loans made between certain funds managed by Stilwell; (ii) suspending Stilwell from various investment and securities-related positions and affiliations for twelve (12) months; and (iii) fining Stilwell $100,000. The existing Wheeler Board also accused Stilwell of being a prominent member and supporter of a New York-based cult.

113.    The Stilwell Entities retaliated by, among other things, filing a lawsuit against Wheeler in connection with a related party loan to a real estate project in which the former CEO, Mr. Wheeler, had an interest. After all the mudslinging, Stilwell, Poskon and Campbell prevailed and were elected to the Wheeler Board at the annual meeting.

114.    Several months later, on April 13, 2020, Wheeler terminated the employment of Kelly, with immediate effect, and advised that Kelly would not receive any severance. Wheeler stock closed at $1.15 per share on April 14, 2020. Kelly later sued Wheeler alleging breach of his employment contract, and claiming that he is owed severance pay and related benefits.

115.    After Kelly's departure, Daniel Khoshaba ("Khoshaba"), a Wheeler director, was appointed CEO. Khoshaba agreed to serve without cash compensation, and instead received an incentive-based compensation package which would begin to vest if the common stock price hit $10 per share.

116.  On July 5, 2021, just over a year later, Wheeler announced that Khoshaba had tendered his resignation, for personal reasons, as the President and CEO and as a member of the Wheeler Board, and that Andrew Franklin had been appointed as the interim CEO with immediate effect.

117.  The announcement stated that Khoshaba oversaw a significant turnaround in Wheeler's operations and positioned it for further growth. Indeed, during Khoshaba's tenure as CEO, Wheeler's stock price rose from $1.15 per share on April 14, 2020, to $5.10 per share on July 2, 2021 (the last trading day before Khoshaba's resignation). The next trading day after Wheeler announced Khoshaba's resignation, Wheeler stock dropped 19.61% to close at $4.10 per share. Since then, Wheeler stock has further dropped to $2.00 per share (a market capitalization of $19.88 million) as of March 18, 2022, a loss of over 60% since Khoshaba's resignation.

118.  On December 14, 2021, Khoshaba filed a Schedule 13D disclosing ownership of 1,105,924 shares of Wheeler common stock, constituting an 11.4% stake in Wheeler. Attached to the filing is a letter from Khoshaba to the Wheeler Board accusing it of forcing him to resign on pretextual grounds ten (10) days before the annual stockholder meeting to renege on his compensation package. Khoshaba noted that Wheeler stockholders overwhelmingly voted in favor of his compensation package at the annual meeting, but because he was no longer with Wheeler, the

compensation agreement had become null and void. Khoshaba's letter detailed the operational improvements he had instituted at Wheeler, and observed that since his departure, the stock price had dropped by over 60%, while corporate, general and administrative expenses had increased by 62% in 3Q 2021 (as compared to 3Q 2020 when Khoshaba was CEO).

119.   On December 28, 2021, the Chair of the Wheeler Board responded to Khoshaba's letter stating, "[w]e are saddened by your recent public letters. While your short 16-month tenure as CEO had its pluses and minuses, we respected your written decision to resign for personal reasons when confronted with some of those minuses. We wish you the best in your retirement in Florida."

120.   As the foregoing paragraphs demonstrate, Wheeler has a history of management dysfunction, and oppressive treatment of its Preferred Stockholders, which has caused multiple litigations.

**The Cedar Directors Orchestrate a Series of Transactions in Bad Faith Intended to Deprive Preferred Stockholders of Their Liquidation Preference and Conversion Rights, and to Crash the Price of the Preferred Stock**

121.   On September 9, 2021, Cedar issued a press release ("September 2021 Press Release") announcing that the Cedar Board had initiated a dual-track process to review the Company's strategic alternatives in order to maximize stockholder value. As part of this process, the September 2021 Press Release advised that Cedar was exploring, among other alternatives, "a potential sale or merger involving the entire Company, and alternatively the potential sale of its core grocery-anchored

shopping center portfolio and its mixed-use redevelopment projects." The September 2021 Press Release quoted Schanzer, Cedar's Chief Executive Officer, President:

> We believe there is a profound disconnect between Cedar's share price and the underlying value of our real estate, as evidenced by recent transaction activity both within our portfolio and in our markets. The Board is **committed to maximizing value for _all_ our shareholders** and, accordingly, we believe that this dual-track strategic review process will enable us to achieve that.

122.    On March 3, 2022, Schanzer changed his tune and announced in a press release that the Proposed Transactions were the "best possible outcome for [Cedar's] common shareholders," but made no mention of Cedar's Preferred Stockholders:

> "We believe this combination of transactions represents the best possible outcome for our **common** shareholders and we are very pleased with the progress thus far of our dual-track review of strategic alternatives," said Bruce Schanzer, Cedar's President and Chief Executive Officer.

123.    Schanzer's statement that the Proposed Transactions is the "best possible outcome for our **common** shareholders" diverges from his earlier representation on September 9, 2021, that the "Board is committed to maximizing value for **all** our shareholders," which encompasses both Common and Preferred Stockholders. Schanzer thus concedes that the Proposed Transactions are **not** in the best interests of Preferred Stockholders.

### _The Grocery-Anchored Transaction_

124.    On March 3, 2022, Cedar caused a Form 8-K to be filed with the SEC

51

("March 2022 Cedar Form 8-K"). Therein, Cedar announced that it had entered into an Asset Purchase and Sale Agreement ("Grocery-Anchored Sale Agreement") with DRA Fund X-B LLC ("DRA") and KPR Centers LLC ("KPR," and together with DRA, the "Grocery-Anchored Purchasers") pursuant to which Cedar will sell a portfolio of 33 grocery-anchored shopping centers (the "Grocery-Anchored Properties") for a cash purchase price of $840 million (less the outstanding principal of any assumed mortgage debt) (the "Grocery-Anchored Transaction").[5]

125.  The terms of the Grocery-Anchored Sale Agreement further provide that to the extent specified redevelopment assets of Cedar are not sold by Cedar to third parties prior to the closing of the Grocery-Anchored Transaction, these assets will be acquired by the Grocery-Anchored Purchasers for an additional cash purchase price of up to $80.5 million.

126.  The net proceeds from the Grocery-Anchored Transaction will be distributed exclusively to Common Stockholders (with no distribution to Preferred Stockholders, except for any accrued but unpaid preferred dividends as of the closing).

### *The Wheeler Merger*

127.  In the March 2022 Cedar Form 8-K, Cedar also announced it had

---

[5] A list of the 33 properties included in the Grocery-Anchored Transaction, and their performance characteristics (i.e., square footage, rent per square foot) are annexed as Exhibit A to this Class Action Complaint.

entered into an agreement with Wheeler and certain of its affiliates, pursuant to which, following closing of the Grocery-Anchored Transaction, Wheeler will acquire control of the balance of Cedar's shopping center assets. Those assets consist of the nineteen Wheeler Properties, for which Wheeler will pay Cedar $130 million by way of a merger that purports to value these remaining properties at $291.3 million. Cedar has represented that the income from the Wheeler Properties will purportedly enable undisrupted payment of all required dividends on the Preferred Stock.[6] That representation, however, does not purport to account, at a minimum, for the significant cost of the debt incurred to finance the transaction, and Capital Expenditures ("Capex") the buildings may require.

128.    The agreement with Wheeler is in the form of an Agreement and Plan of Merger, dated March 2, 2022 (the "Wheeler Merger Agreement"), pursuant to which, Cedar will merge with a newly created, wholly owned subsidiary of Wheeler called "Merger Sub."  Merger Sub will then merge *into* Cedar, and cause Cedar to become a wholly owned subsidiary of Wheeler.  Thus, following the consummation of the Wheeler Merger, Cedar Common Stock will no longer be publicly traded. This is referred to as the "Wheeler Merger," which together with the "Grocery-Anchored Transaction," constitute the Proposed Transactions.

129.    If the Wheeler Merger is consummated, all of the issued and Common

---

[6] A list of the 19 Wheeler Properties, and their performance characteristics (i.e., square footage, rent per square foot) are annexed as Exhibit B to this Class Action Complaint.

Stock of Cedar would be cancelled and converted into the right to receive the $130 million in cash being paid by Wheeler for the Wheeler Properties ("$130 Million Distribution"). Wheeler is procuring that $130 million by borrowing it from KeyBank National Association ("KeyBank"), and securing the loan from KeyBank ("KeyBank Loan") with the Wheeler Properties.

130. The Wheeler Merger Agreement references distribution of the net proceeds from the Grocery-Anchored Transaction to Common Stockholders via a special divided. Specifically, it recites that on or before the close of business on the day immediately prior to the consummation of the Wheeler Merger, the Cedar Board will declare one or more special dividends payable to Common Stockholders ("Proposed Dividends") in an aggregate amount equal to the net proceeds available for distribution from the Grocery-Anchored Transaction (after deducting transaction expenses, payment of any accrued by unpaid dividends on Cedar's Common and Preferred Stock, and cash reserved to discharge all of Cedar's outstanding debts, liabilities, and other obligations)

131. Cedar anticipates that the Net Proceeds to Common Stockholders by way of (i) the Proposed Dividends payable from the proceeds of the Grocery-Anchored Transaction, and (ii) the $130 Million Distribution payable from the proceeds of the KeyBank Loan advanced in connection with the Wheeler Merger, will exceed $29.00 per share/unit (or approximately $396 million, based on

13,640,067 common stock issued and outstanding as of April 1, 2022), if the Proposed Transactions are consummated.

132.   In contrast to the bonanza being enjoyed by Common Stockholders in connection with the Proposed Transactions, none of the proceeds of the Grocery-Anchored Transaction or Wheeler Merger will be distributed to Preferred Stockholders (with the exception of any accrued but unpaid dividends owed as of the closing). Instead, after consummation of the Proposed Transactions, Cedar's Preferred Stock will remain outstanding and continue to be listed and traded on the New York Stock Exchange, and Cedar will continue to file periodic reports for the Preferred Stock with the Securities and Exchange Commission (the "SEC") under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

133.   But as noted above, Cedar will not have any *common* stock listed on the NYSE or any other national securities market.  Thus, Preferred Stockholders will have no ability, in the event of a future Change of Control as defined under the Articles Supplementary, to exercise their Conversion Rights.  That is because there will be no Cedar common stock publicly trading into which to convert. Nor is there any mechanism by which Cedar Preferred Stock could be converted to Wheeler common stock.

134.   Further, as noted, under the terms of the Wheeler Merger Agreement, Wheeler will pay $130 million to Cedar to obtain control over the Wheeler

Properties. While Cedar (as a wholly owned subsidiary of Wheeler) will purportedly use the income from the Wheeler Properties to pay future dividends on the Preferred Stock, control over the future treatment of Preferred Stockholders will reside with Wheeler, which will control the Wheeler Properties through its 100% ownership of Cedar.

135.    Tying the future treatment of Preferred Stockholders specifically to Wheeler (as opposed to another publicly-traded REIT with a better track record of performance) had the foreseeable effect of crashing the price of the Preferred Stock, particularly given Wheeler's dismal treatment of its own Preferred Stockholders, history of dysfunctional management, and terrible stock price performance. The goal of the Proposed Transactions is thus clearly to extract all of the value of Cedar's assets for the benefit of Cedar's *Common* Stock, while leaving Cedar's Preferred Stock behind in a corporate shell with assets that are heavily leveraged by the Key Bank Loan incurred to purchase them, and which represent the least desirable of Cedar's properties (*see* Exs. A and B).

136.    In addition to the naked self-interest driving the Proposed Transactions, the apparent strategy is to inflict maximum carnage on the Preferred Stock by linking their future to Wheeler, thereby setting up the Preferred Stock to be taken out by Wheeler in a future coercive tender offer and/or open market purchases at prices far below the Liquidation Preferences of $25.00 per share (as Wheeler has attempted in

the past with respect to its own Preferred Stockholders).

137.    As noted, Defendants' scheme thus far has worked as it was apparently intended: after Cedar announced the Wheeler Merger on March 2, 2022, the price of the Series B Preferred Stock tanked by 49.44%, from a close of $25.61 per share on March 2, 2022 to a close of $12.95 per share on March 3, 2022.  The price of the Series C Preferred Stock plummeted by 56.89%, from a close of $22.85 on March 2, 2022, to a close of $9.85 per share on March 3, 2022. All told, announcement of the Proposed Transactions caused losses to Preferred Stockholders in excess of $100 million in a single trading day.

138.    As further evidence of Defendants' bad faith, the Wheeler Properties from which the income to pay future preferred dividends will be generated are of plainly lower quality than the Grocery-Anchored Properties being sold to other third parties in the Grocery-Anchored Transaction. Based on disclosures in Cedar's Form 8-K filed with the SEC on March 3, 2022, and Cedar's 2021 Form 10-K filed with the SEC on March 10, 2022 ("2021 Cedar Form 10-K"), the Grocery-Anchored Properties boast an (i) average occupancy rate of 88.9%, and (ii) average base rent of $15.19 per square foot. (*See* Exhibit A) In contrast, the Wheeler Properties have (i) an average occupancy rate of only 83.7% (approximately six percent lower than the Grocery-Anchored Properties), and (ii) average base rent of only $10.70 per square foot (approximately 30% lower than the average base rent of the Grocery-

Anchored Properties). *See* Exhibit B.

139.   These metrics demonstrate that the Cedar Board deliberately allocated lower quality properties to Wheeler in connection with the Wheeler Merger, and further calls into question the credibility of Defendants' public statements that it has given serious consideration to—much less adequately protected—the rights of Preferred Stockholders in connection with the Proposed Transactions.

**The Terms of the Wheeler Merger Agreement Demonstrate That Cedar Is Liquidating and Winding Up.**

140.   If the Proposed Transactions are consummated, Cedar will (i) terminate its Board; (ii) terminate all of its officers and employees; (iii) dispose all of its debts, liabilities and obligations; (iv) cancel all of its stock and accelerate all of its outstanding stock awards; and (v) distribute all of the net proceeds from the asset sales. These elements are clear indicia of a dissolution, liquidation, and winding up.

141.   *First*, Section 2.4 of the Wheeler Merger Agreement specifies that, if the Wheeler Merger Agreement is consummated, directors appointed by Wheeler would be the directors of Cedar:

> Section 2.4 <u>Governing Documents; Directors and Officers</u>.
>
> (b) From and after the Effective Time, the directors and officers of [subsidiary wholly owned by Wheeler] immediately prior to the Effective Time shall be the initial directors and officers of [Cedar] and shall hold office until their respective successors are duly elected and qualified, or their earlier death, resignation or removal.

142.   As a result, if the Wheeler Merger is consummated, Cedar's current

directors would no longer serve as directors.

143. *Second*, Cedar is terminating all of its employees under Section 6.7(a) of the Wheeler Merger Agreement, ending the tenure of all of its officers under Section 6.14 of the Wheeler Merger Agreement, and ending the tenure of all its directors under Section 2.4 of the Wheeler Merger Agreement. Section 6.7(b) provides Wheeler with the right to make new offers of employment to Cedar's terminated employees in Wheeler's discretion.

144. *Third*, Cedar is discharging all of its debts, liabilities, and obligations using the proceeds of the Grocery-Anchored Transaction. In particular, Section 3.1(d) of the Wheeler Merger Agreement provides that prior to the closing of the merger with Wheeler, Cedar will pay a Closing Dividend to Common Stockholders. In turn, Section 1.1(a) of the Wheeler Merger Agreement defines the Closing Dividend Amount as:

> an amount equal to the net proceeds from the sale of the [properties sold pursuant to the Grocery-Anchored Transaction] reduced by . . . ***the cash amount reserved to pay off or otherwise discharge or satisfy all Other Remaining Liabilities***. The Closing Dividend Amount shall be calculated after the Company has provided payoff letters or other evidence reasonably satisfactory to Parent of the Company's repayment of ***all Liabilities of the Company***, including any Indebtedness of the Company, the Acquired Companies or securing the Company Properties.

145. Moreover, Cedar is also disposing of the debts, liabilities, and obligations that it owes to its employees and compensatory award recipients. For

example, Cedar "shall pay, prior to the Closing, any and all severance, accrued benefits and all other Liabilities associated with the termination of its employees, in each case as set forth on Section 6.7(a) of the Company Disclosure Schedule."

146.    Similarly, Section 3.3. of the Wheeler Merger Agreement provides that Cedar employees' restricted stock awards and performance restricted stock awards shall vest immediately (*i.e.*, ahead of schedule), thereby enabling the holders to receive a pro rata share of the $130 million being paid to Common Stockholders in connection with the merger with Wheeler:

> Section 3.3 <u>Treatment of Company Compensatory Awards</u>.
>
> (a) Immediately prior to the Excluded Asset Closings, and contingent upon the occurrence of the Effective Time, **each Company Restricted Stock Award shall become fully vested and nonforfeitable and the holder thereof shall have the right to receive the Merger Consideration** pursuant to Section 3.1 above.
>
> (b) Immediately prior to the Excluded Asset Closings, and contingent upon the occurrence of the Effective Time, **each Company Performance RSU Award shall fully vest in accordance with it terms and convert into the respective number of shares of Company Common Stock underlying such Company Performance RSU Award and the holder thereof shall have the right to receive the Merger Consideration** pursuant to Section 3.1 above.

147.    *Fourth*, upon consummation of the merger all Cedar's Common Stock shall cease to exist under Section 3.1(a)(ii) of the Wheeler Merger Agreement:

> Each share of Company Common Stock issued and outstanding immediately prior to the Effective Time ***shall be automatically canceled*** and converted into the right to receive [a pro rata share of] . . . $130,000,000 . . . At the Effective Time, ***all of the shares of Company Common Stock shall cease to be outstanding, shall automatically be***

***cancelled and shall cease to exist***, and each certificate (a "Company Stock Certificate") formerly representing any of such shares and each non-certificated share represented by book entry (a "Book EntryShare") shall thereafter represent only the right to receive [a pro rata share of the $130 million].

148.   Further, under Section 3.1(a)(v) of the Wheeler Merger Agreement, "any shares of Company Common Stock then held . . . in the Company's treasury shall be canceled and retired, and shall cease to exist . . . ."

149.   *Fifth*, Cedar is plainly liquidating its assets through the Proposed Transactions because it is selling all its properties in the Grocery-Anchored Transaction and the Wheeler Merger.

150.   *Sixth*, the whole point of the Proposed Transactions is for Cedar to distribute the net liquidation proceeds to the Common Stockholders. For example, Cedar's March 3, 2022 press release touts that the proceeds of the Proposed Transactions will be distributed to the Common Stock for a huge premium:

**Net Proceeds Estimated to be More Than $29 Per Share in Cash After Transaction Expenses**
**Massapequa, NY, March 2, 2022** — Cedar Realty Trust (NYSE: CDR) (the "Company") today announced that following its previously announced dual-track review of strategic alternatives, it has entered into definitive agreements for the sale of the Company and its assets in a series of related all-cash transactions:

- An agreement to sell a portfolio of 33 grocery-anchored shopping centers to a joint venture between a fund managed by DRA Advisors LLC and KPR Centers for $840.0 million.
- An agreement to sell the Revelry redevelopment project for $34.0 million. Cedar is negotiating the sale of the Northeast Heights redevelopment project for $46.5 million. (In the event the sale of the redevelopment projects is not completed prior to

61

closing of the grocery-anchored shopping center portfolio sale, the DRA-KPR joint venture has agreed to acquire these two projects at the aggregate price of $80.5 million.)

- An agreement to sell the Company and its remaining assets to Wheeler Real Estate Investment Trust, Inc. (NASDAQ: WHLR), after completion of the above-described transactions, in an all-cash merger transaction that values the assets at $291.3 million.

**The transactions,** which were unanimously approved by the Company's Board of Directors, are **estimated to generate total net proceeds, after all transaction expenses, of more than $29.00 per share in cash, which will be distributed to shareholders upon completion**. **The $29.00 per share of estimated net proceeds represent a 16.6% premium to Cedar's closing share price on March 2, 2022, and a 70.6% premium to the Company's closing share price on September 9, 2021, the last day of trading prior to the announcement of the dual-track review of strategic alternatives.**

151.   Indeed, Cedar designed the Wheeler Merger Agreement so as to make the Grocery-Anchored Transaction—referred to in the Wheeler Merger Agreement as the "Excluded Asset Closings"—a condition precedent to its obligations under the Wheeler Merger Agreement, thereby underscoring that the fundamental purpose of the Proposed Transactions is for Cedar to sell its assets for the sake of distributing the net liquidation proceeds to Common Stockholders:

Section 7.3 <u>Conditions to the Obligations of the Company</u>. The obligation of the Company to consummate the Mergers is subject to the satisfaction, at or prior to Closing, of the following conditions:

. . . .

(d) the Excluded Asset Closings shall have occurred; and

(e) the Closing Dividend shall have been paid in full. For the avoidance of doubt, the Closing Dividend to be received prior to the Closing by holders of the Company Common Stock and OP Units is in addition to

(and shall not reduce) their respective rights to receive the Merger Consideration in full hereunder.

152. Based on the foregoing facts and provisions of the Proposed Transactions concluding in the Wheeler Merger Agreement, Cedar is plainly undergoing a dissolution, liquidation, and winding up.

**The Terms of the Wheeler Merger Agreement Effect a "Change of Control," Entitling the Preferred Stockholders to Exercise Their Conversion Rights**

153. Even assuming the Proposed Transactions do not effect a dissolution liquidation, and winding up, the Proposed Transactions effect a Change of Control under the Articles Supplementary. As explained above, the Wheeler Merger Agreement (if consummated) would give Wheeler "more than 50% of the total voting power of all shares of the Corporation entitled to vote generally in elections of directors." Indeed, Cedar would become a wholly-owned subsidiary of Wheeler. And, following consummation of the Wheeler Merger Agreement, Cedar would remain a separate corporate entity but would not have "a class of common securities" listed on NYSE, NASDAQ, or any other national market. To the contrary, all of the Common Stock of Cedar will be *cancelled* pursuant to the Wheeler Merger Agreement.

154. Indeed, under the Wheeler Merger Agreement, Cedar will be the "surviving" entity following the Wheeler Merger. In any event, Merger Sub—the wholly owned subsidiary of Wheeler that is merging into Cedar—does not have a

class of common securities listed on NYSE, NASDAQ, or any other national securities market. Accordingly, it does not matter that Wheeler REIT, Inc. has a class of publicly listed common stock, because the Cedar Preferred Stock remains isolated at Cedar and has no recourse to Wheeler REIT, Inc. or the ability to convert (now or in the future) to shares of Wheeler common stock. The Wheeler Merger is therefore a Change of Control as defined in the Articles Supplementary.

155. Cedar has stated that it will not, prior to consummation of the Wheeler Merger, redeem the Preferred Stock. Accordingly, the Proposed Transactions culminating in the Wheeler Merger entitle the Preferred Stockholders to exercise their Conversion Rights under the Articles Supplementary to convert Preferred Stock into Common Stock according to the ratio determined by the Articles Supplementary (see *supra*).

**The Defendants Are Breaching The Contracts with the Preferred Stockholders Through the Proposed Transactions.**

156. Cedar is violating the express terms of the Preferred Stock Articles Supplementary in two ways. First, the Defendants are orchestrating a process that dissolves, liquidates, and/or winds up Cedar without honoring the priority of Preferred Stockholders and without releasing the Liquidation Preference to Preferred Stockholders before making distributions to Common Stockholders. Second, and in any event, the Proposed Transactions effect a Change of Control under the Articles Supplementary but do not allow the Preferred Stockholders to exercise their

Conversion Rights.

- *Failure to Honor the Liquidation Preference*

157.   While Section 4(e) of the Articles Supplementary ("Section 4(e) Carveout") provides that "[n]one of a . . . merger of the Corporation with or into another entity . . . or a sale . . . of all or substantially all of the Corporation's assets . . . shall be considered a liquidation . . . of the Corporation," the Section 4(e) Carveout instructs only that a "merger" or "sale of substantially all assets" standing alone without more does not qualify as a liquidation. The Section 4(e) Carveout, however, does not purport to preclude a transaction from qualifying as a liquidation and triggering the release of the Liquidation Preference where a "merger" or "sale of substantially all assets" is but one of several other steps indicative of a liquidation.

158.   Here, Cedar is not just selling its assets to unrelated third parties for cash and merging with Wheeler, but is also (i) discharging all of its debts, liabilities and obligations; (ii) distributing all of the net proceeds from its asset sales to Common Stockholders; (iii) cancelling all of its Common Stock; and (iv) terminating its Board, and all of its officers and employees. As such, Cedar is engaged in a dissolution, liquidation, and/or winding up, and there is no purpose for the Wheeler Merger other than to try and avoid payment of the Liquidation Preference in bad faith by attempting to elevate form over substance using legal formalities. As Raymond James analyst RJ Milligan observed in a March 8, 2022 analysis of the

Proposed Transactions, casting the Preferred Stockholders to "purgatory" is the "driving factor behind the deal structure" with Cedar and its advisors "patting themselves on the back for creative deal/legal gymnastics."

- _There Is Insufficient Equity Value in the Wheeler Properties to Satisfy The Liquidation Preference, and Insufficient Cash Flow from the Wheeler Properties to Pay Future Dividends on the Preferred Stock._

159.    The Wheeler Properties are unlikely have sufficient equity value equal to the Liquidation Preference owed to Preferred Stockholders and are unlikely to have sufficient cash flow to pay future dividends to Preferred Stockholders. Cedar reported that the Proposed Merger values the Proposed Merger Properties at $291.3 million. On March 2, 2022, Wheeler caused a Form 8-K to be filed with the SEC ("Wheeler 8-K"). In the Wheeler 8-K, Wheeler disclosed that the Proposed Merger will be financed with a loan of approximately $130 million from KeyBank, debt which will be secured by "first mortgage liens on substantially all of the properties owned by certain subsidiaries of Cedar OP." This leaves $161.3 million of _purported_ equity value in the Wheeler Properties, which is equal to the aggregate Liquidation Preference of the Preferred Stock of $161.3 million. But if there was sufficient equity value in the Wheeler Properties to fully cover the Liquidation Preference, then Cedar could have simply sold the Wheeler Properties, and used the proceeds to pay the Liquidation Preference in full. The fact that Cedar did not do so suggests that the Wheeler Properties could not fetch a price sufficient to pay the Liquidation

Preference in full.

160.   Moreover, there is no evidence that the cash flow from the Wheeler Properties will suffice to pay future dividends on the Preferred Stock after debt service on the KeyBank Loan used to finance the purchase of the Wheeler Properties, and payment of necessary capital expenditures. Indeed, since Wheeler will control the Wheeler Properties through its 100% ownership of Cedar post-merger, Wheeler will be in a position to divert cash flow from the Wheeler Properties for its own uses and simply stop paying future dividends on the Preferred Stock (as had been the case with Wheeler's own preferred stock).

161.   The fact that the price of the Preferred Stock collapsed far below the Liquidation Preference immediately after the announcement of the Proposed Transactions, and continues to trade far below the Liquidation Preference, shows market's consensus that the Wheeler Properties lack sufficient equity value to cover the Liquidation Preference:





162.    The Preferred Stock continues to trade at less than half the Liquidation Preference, thereby reflecting the consensus across the market that the Proposed Transactions will deprive the Preferred Stockholders of the Liquidation Preference.

- *Failure to Honor the Conversion Rights*

163.    For the reasons stated above, the Wheeler Merger will effect a Change of Control entitling the Preferred Stockholders to exercise their Conversion Rights. The Wheeler Merger Agreement, however, does not honor those Conversion Rights. To the contrary, that Agreement would leave the Preferred Stock outstanding at the surviving Cedar corporate entity, notwithstanding the cancellation of all of Cedar's Common Stock.   As noted above, however, the Conversion Rights entitle the Preferred Stockholders to convert each share of Preferred Stock into the number of shares of Common Stock necessary to equal $25.00 of value.

**The Contents of the Proxy Substantiate the Concerns of Preferred Stockholders**

164.  On April 21, 2022, Cedar filed the Proxy, which substantiates that (i) the Proposed Transactions are a liquidation triggering the obligation to pay the Liquidation Preference under the Articles Supplementary, (ii) the Board deliberately structured the Proposed Transactions as an asset sale and merger in an attempt to deprive Preferred Stockholders of the Liquidation Preference, and (iii) the representations in the March 2022 Cedar Form 8-K that the Wheeler Properties are worth $291.3 million, and will have cash flow sufficient to "pay all required dividends" on the Preferred Stock, are false, and thus the interests of Preferred Stockholders will not be protected if the Wheeler Merger is consummated.

165.  First, the Proxy confirms that the fairness opinion provided by Jones Lang LaSalle Securities LLC ("JLL Securities") to the Board only opined that the consideration to be paid in connection with the Proposed Transactions was fair from a financial standpoint to Common Stockholders, and expressly disclaimed opining on the fairness of the Proposed Transactions to Preferred Stockholders.

166.  *Second*, the Proxy confirms that Preferred Stockholders will not be entitled to vote at the stockholder meeting to approve the Proposed Transactions. Coupled with the fact that, as noted above, none of the Board members owned any Preferred Stock, the Preferred Stockholders did not have anyone advocating for their interests in connection with the negotiation and approval of the Proposed

Transactions, and will not have anyone advocating for their interests in connection with the stockholder vote on the Proposed Transactions.

167. *Third*, the Proxy discloses that (i) in July 2019, the Board considered a liquidation of the Company; (ii) in June 2021, Schanzer and Gonsalves discussed a "potential liquidation" with BofA Securities (the Company's financial advisor), and (iii) in June 2021, Company management estimated that "the liquidation value of the Company . . . might be as high as $28-$29 per share," which matches the estimated value of the Proposed Transactions—"more than $29 per share in cash"— set forth in the March 2022 Cedar Form 8-K. The convergence of liquidation value and the valuation of the Proposed Transactions in the March 2022 Cedar Form 8-K shows that the Proposed Transactions are, in fact, a liquidation. Defendants have simply relabeled the Proposed Transactions "sum-of-parts" transaction to avoid payment of the Liquidation Preference.

168. *Fourth*, the Proxy suggests that—contrary to the representations in the March 2022 Cedar Form 8-K— the Wheeler Properties (referred to as the "Remainco Properties" in the Proxy) are not worth $291.3 million, and thus will not have equity value equal to the Liquidation Preference after deducting the $130 million balance of the KeyBank Loan that will encumber the Wheeler Properties after consummation of the Wheeler Merger. Specifically, the Proxy discloses that on January 21, 2022, a bidder ("Party C") offered to acquire all of the Grocery-

71

Anchored Properties and the Wheeler Properties for $1.05 billion in cash. Party C's bid valued the Grocery-Anchored Properties at $810 million, and the Wheeler Properties at $240 million—over $50 million lower than the $291.3 million value assigned to the Wheeler Properties in connection with the Wheeler Merger.

169.   The value assigned to the Wheeler Properties in connection with the Wheeler Merger is not credible because Wheeler is not investing any of its own cash into the transaction, but is instead (i) borrowing $130 million from KeyBank to pay the $130 Million Distribution to Common Stockholders; and (ii) inflating the remaining equity value in the Wheeler Properties to purportedly match the value of the Liquidation Preference.

170.   *Fifth*, the Proxy indicates that—contrary to the representation in the March 2022 Cedar Form 8-K—the cash flow from the Wheeler Properties will not be sufficient to pay future dividends on the Preferred Stock after consummation of the Proposed Transactions. The Proxy compares the $19.1 million in so-called "net operating income" that the Wheeler Properties generated in 2021 to the $10.8 million in dividends payable to Preferred Stockholders to create the illusion that the operating income suffices to continue paying dividends to Preferred Stockholders. But "net operating income" is a GAAP metric that fails to account for (i) debt service on the KeyBank loan financing Wheeler's purchase of the Wheeler Properties (comprised of interest, which is a non-operating expense, and repayment of principal,

which is a cash flow item not captured in operating expenses), and (ii) capital expenditures necessary to maintain the Wheeler Properties in good condition (which is a cash flow item not captured in operating expenses). Only after the magnitude of those—and other relevant deductions (such as additional management fees that Wheeler may impose on the Wheeler Properties)—are accurately quantified, can the amount of net cash flow, if any, from the Wheeler Properties available to pay dividends to Preferred Stockholders be determined.

171. While neither Cedar nor Wheeler have yet disclosed the terms of the KeyBank Loan, the 2021 Cedar Form 10-K discloses that on May 5, 2021, Cedar "closed a non-recourse mortgage for $114.0 million . . . [with] a fixed-rate of 3.49% and . . . payment of interest only for the first five years followed by payments of principal and interest based on thirty-year amortization for the remainder of the term . . . [and] secured by five shopping centers consisting of Lawndale Plaza, The Shops at Suffolk Downs, Christina Crossing, Trexlertown Plaza, and The Point." Using this loan as a reasonable proxy for the KeyBank Loan yields annual interest payments of approximately $4.5 million per year (i.e., $130 million x 3.49%), which reduces the net operating income after debt service from $19.1 million to at least $14.6 million (or even lower if repayment of the KeyBank Loan includes any repayment of loan principal).  Over the past year, interest rates have *increased* substantially, so the actual rate of the Key Bank Loan is likely even higher than 3.49%.

172.   The annual dividends on the Preferred Stock are $10,752,000, which if deducted from $14.6 million, leaves only $3.8 million in cash flow for capital expenditures to maintain the condition of all 19 Wheeler Properties. Cedar has not disclosed the annual capital expenditures necessary to maintain the Wheeler Properties, but the 2021 Cedar Form 10-K discloses that, in 2021, Cedar spent $28.3 million on "expenditures for real estate improvements." Capex thus clearly represents a material obligation.[7]

173.   *Seventh*, while the Proxy represents that immediately following the Wheeler Merger, the Preferred Stock will remain senior to Wheeler and all of Wheeler's securityholders with respect to the cash generated from the Wheeler Properties, the Proxy does not refer to any agreement that establishes the seniority of the Preferred Stock as a contractual matter, and/or provides mechanisms to enforce that purportedly senior interest. Moreover, the Proxy makes clear that the Cedar Preferred Stock will not have any recourse to any assets of its corporate parent, (*i.e.*, Wheeler).  Nor will Cedar Preferred Stockholders have the right to convert their Preferred Stock into Wheeler common stock in the event of a future Change of

---

[7] The Proxy discloses that Cedar has agreed to pay at or prior to closing of the Proposed Transactions certain specified leasing costs, currently estimated at approximately $48.0 million, in the aggregate, with respect to certain properties being sold, "including unpaid leasing, brokerage or other commissions, **tenant improvement costs or allowances**, **landlord's work/base building work**, inducements or concessions and legal fees." This disclosure substantiates the materiality of capital expenditures.

Control at Cedar.

## COUNT I
### Breach of Contract – Liquidation Preference
### (Against Cedar, Cedar Operating Partnership, and the Board)

174.    Plaintiffs repeat and reallege all foregoing and following paragraphs as if fully set forth herein.

175.    The Articles Supplementary is a contract between Preferred Stockholders on the one hand, and Cedar, Cedar Operating Partnership, and the Board on the other hand.

176.    Under Sections 2 and 4 of the Articles Supplementary, Cedar, Cedar Operating Partnership, and/or the Board agreed to release a Liquidation Preference equal to at least $25 per share to Preferred Stockholders before paying any distributions to Common Stockholders, in the event of a dissolution, liquidation, and/or winding up of Cedar.

177.    The Proposed Transactions constitute a dissolution, winding up, and/or liquidation, as Cedar is (i) selling *all* of its properties to third parties; (ii) discharging *all* of its debts, liabilities and obligations; (iii) distributing *all* of the Net Proceeds from the Proposed Transactions to the Common Stockholders; (iv) terminating its Board, and all of its officers and employees; and (v) canceling all of its Common Stock. Accordingly, Sections 2 and 4 of the Articles Supplementary obligate Cedar, Cedar Operating Partnership, and/or the Board to pay the Liquidation Preference to Preferred Stockholders before paying any distributions to Common Stockholders in

connection with the Proposed Transactions.

178.   The Proposed Transactions negotiated and orchestrated by Cedar, Cedar Operating Partnership, and the Board contemplate that *all* of the Net Proceeds from the Proposed Transactions (totaling approximately $396 million) will be distributed *exclusively* to Common Stockholders, and *no* distributions will be paid to Preferred Stockholders.

179.   By arranging for distribution *all* of the Net Proceeds from the Proposed Transactions (totaling approximately $396 million) *exclusively* to Common Stockholders, and failing to arrange for the payment of *any* distributions to Preferred Stockholders, Cedar, Cedar Operating Partnership, and/or the Board have breached the contract with Plaintiffs and the Class embodied by the Articles Supplementary.

180.   Additionally, implied in the Articles Supplementary is an obligation upon Cedar, Cedar Operating Partnership, and the Board to exercise good faith in fulfilling their contractual obligations to Preferred Stockholders under the Articles Supplementary, and to deal fairly with Preferred Stockholders.

181.   Nevertheless, Cedar, Cedar Operating Partnership, and the Board have acted in bad faith, and breached their obligation to act in good faith, by entering into the Wheeler Merger Agreement with the sole intent and motivation of (i) trying to deprive Preferred Stockholders of the Liquidation Preference to which they are entitled under the Articles Supplementary; (ii) crashing the prices of the Preferred

Stock; and (iii) leaving the Wheeler Properties without sufficient equity value to cover the Liquidation Preference or sufficient cash flow to pay future dividends on the Preferred Stock. As the Raymond James analysis quoted *supra* observes, sending the Preferred Stock to "purgatory" is the "driving factor" behind the Proposed Transactions.

182.    As a direct result of the aforementioned breaches, Plaintiffs and the Class have suffered damages and other losses in an amount to be proven at trial. Further, if any of the Gross Proceeds of the Proposed Transactions are distributed to Common Stockholders before a determination on the merits of Plaintiffs' claim for breach of contract (including breach of the obligation of good faith and fair dealing), Plaintiffs and the Class will suffer irreparable injury for which there is no adequate remedy at law since it will be impossible to claw back distributions from tens of thousands of Common Stockholders in the event Preferred Stockholders prevail on their claims. Therefore, Plaintiffs and the Class are entitled to a preliminary injunction enjoining distribution of and escrowing the Gross Proceeds of the Proposed Transactions pending a determination on the merits of Plaintiffs' claim for breach of contract (including breach of the obligation of good faith and fair dealing).

## COUNT II
### Tortious Interference with Contract – Liquidation Preference (Against Wheeler)

183.    Plaintiffs repeat and reallege all foregoing and following paragraphs as

if fully set forth herein.

184.    As set forth above, Cedar, Cedar Operating Partnership, and the Board are breaching their contract with Preferred Stockholders.

185.    Wheeler is aware of that contract, and by agreeing to enter into the Merger Agreement, induced Cedar, Cedar Operating Partnership, and the Board to breach that contract.

186.    As a direct result of Wheeler tortious interference with the contact between Preferred Stockholders and Cedar, Cedar Operating Partnership, and the Board, Plaintiffs and the Class have suffered damages and other losses in an amount to be proven at trial. Further, if any of the Gross Proceeds of the Proposed Transactions are distributed to Common Stockholders before a determination on the merits of Plaintiffs' tortious interference claim, Plaintiffs and the Class will suffer irreparable injury for which there is no adequate remedy at law since it will be impossible to claw back distributions from tens of thousands of Common Stockholders in the event Preferred Stockholders prevail on their claims. Therefore, Plaintiffs and the Class are entitled to a preliminary injunction enjoining distribution of and escrowing the Gross Proceeds of the Proposed Transactions pending a determination on the merits of Plaintiffs' claim for tortious interference.

## COUNT III
### Breach of Contract – Conversion Rights
### (Against Cedar, Cedar Operating Partnership, and the Board)

187.    Plaintiffs repeat and reallege all foregoing and following paragraphs as

if fully set forth herein.

188.   The   Articles   Supplementary   is   a   contract   between   Preferred Stockholders on the one hand, and Cedar, Cedar Operating Partnership, and the Board on the other hand.

189.   Under Sections 5 and 7 of the Articles Supplementary, Cedar, Cedar Operating Partnership, and/or the Board agreed that the Preferred Stockholders are entitled to their Conversion Rights upon a Change of Control unless Cedar redeems the Preferred Stock for $25.00 before the Change of Control is consummated.

190.   The Proposed Transactions will (if consummated) effect a Change of Control as defined in Section 5(j) of the Articles Supplementary: (i) Wheeler will obtain total control over Cedar; (ii) Cedar will remain intact as the "surviving" entity following the Wheeler Merger; (iii) Cedar's Common Stock will be cancelled and Cedar will not have any class of common securities listed on NYSE, NASDAQ, or any other national securities market; (iv) Merger Sub, which is merging into Cedar, does not will not have a class of common securities publicly listed; and (v) Cedar's Preferred Stock will remain isolated at Cedar, without being converted into preferred stock of Wheeler, without recourse to Wheeler's assets, or without the right to convert into Wheeler common stock upon a future Change of Control at Cedar. Accordingly, Sections 5 and 7 of the Articles Supplementary obligate Cedar, Cedar Operating Partnership, and/or the Board to permit the Preferred Stockholders to

exercise their Conversion Rights in connection with the transactions, unless the Preferred Stock is redeemed for $25.00 per share prior to consummation of the transactions.

191.   The Proposed Transactions negotiated and orchestrated by Cedar, Cedar Operating Partnership, and the Board do not provide for (i) redemption of the Preferred Stock or (ii) the Preferred Stockholders' exercise of their Conversion Rights. To the contrary, all of the consideration (totaling approximately $396 million) will be distributed exclusively to Common Stockholders. Accordingly, Defendants have breached the Preferred Stockholders' contractual rights under the Articles Supplementary.

192.   Additionally, implied in the Articles Supplementary is an obligation upon Cedar, Cedar Operating Partnership, and the Board to exercise good faith in fulfilling their contractual obligations to Preferred Stockholders under the Articles Supplementary, and to deal fairly with Preferred Stockholders.

193.   Nevertheless, Cedar, Cedar Operating Partnership, and the Board have acted in bad faith, and breached their obligation to act in good faith, by entering into the Wheeler Merger Agreement with the sole intent and motivation of trying to deprive Preferred Stockholders of their Conversion Rights.

194.   As a direct result of the aforementioned breaches, Plaintiffs and the Class have suffered damages and other losses in an amount to be proven at trial.

Further, if any of the Gross Proceeds of the Proposed Transactions are distributed to Common Stockholders before a determination on the merits of Plaintiffs' claim for breach of contract (including breach of the obligation of good faith and fair dealing), Plaintiffs and the Class will suffer irreparable injury for which there is no adequate remedy at law since it will be impossible to claw back distributions from tens of thousands of Common Stockholders in the event Preferred Stockholders prevail on their claims. Therefore, Plaintiffs and the Class are entitled to a preliminary injunction enjoining distribution of and escrowing the Gross Proceeds of the Proposed Transactions pending a determination on the merits of Plaintiffs' claim for breach of contract (including breach of the obligation of good faith and fair dealing).

## COUNT IV
### Tortious Interference with Contract – Conversion Rights (Against Wheeler)

195.   Plaintiffs repeat and reallege all foregoing and following paragraphs as if fully set forth herein.

196.   As set forth above, Cedar, Cedar Operating Partnership, and the Board are breaching their contract with Preferred Stockholders.

197.   Wheeler is aware of that contract, and by agreeing to enter into the Wheeler Merger Agreement, induced Cedar, Cedar Operating Partnership, and the Board to breach that contract.

198.   As a direct result of Wheeler tortious interference with the contact

between Preferred Stockholders and Cedar, Cedar Operating Partnership, and the Board, Plaintiffs and the Class have suffered damages and other losses in an amount to be proven at trial. Further, if any of the Gross Proceeds of the Proposed Transactions are distributed to Common Stockholders before a determination on the merits of Plaintiffs' tortious interference claim, Plaintiffs and the Class will suffer irreparable injury for which there is no adequate remedy at law since it will be impossible to claw back distributions from tens of thousands of Common Stockholders in the event Preferred Stockholders prevail on their claims. Therefore, Plaintiffs and the Class are entitled to a preliminary injunction enjoining distribution of and escrowing the Gross Proceeds of the Proposed Transactions pending a determination on the merits of Plaintiffs' claim for tortious interference.

## COUNT V
### Breach of Fiduciary Duties
### (Against the Board)

199.  Plaintiffs repeat and reallege all foregoing and following paragraphs as if fully set forth herein.

200.  Under Section 2-405.1 of Maryland's Corporation Law, the Board owes Plaintiffs and the Class a fiduciary duty of good faith.

201.  In connection with the Proposed Transactions, the Board also owed Plaintiffs and the Class a duty to maximize the value of the Preferred Stock.

202.  By entering into the Merger Agreement with the intent and motivation to deprive Preferred Stockholders of the Conversion Rights to which they are entitled

under the Articles Supplementary, the Board acted in bad faith and breached the fiduciary duties they owed to Plaintiffs and the Class.

203.  As a direct result of the aforementioned breaches of fiduciary duty, Plaintiffs and the Class have suffered damages and other losses in an amount to be proven at trial. Further, if any of the Gross Proceeds of the Proposed Transactions are distributed to Common Stockholders before a determination on the merits of Plaintiffs' breach of fiduciary duty claim, Plaintiffs and the Class will suffer irreparable injury for which there is no adequate remedy at law since it will be impossible to claw back distributions from tens of thousands of Common Stockholders in the event Preferred Stockholders prevail on their claims. Therefore, Plaintiffs and the Class are entitled to a preliminary injunction enjoining distribution of and escrowing the Gross Proceeds of the Proposed Transactions pending a determination on the merits of Plaintiffs' claim for breach of fiduciary duty.

## <u>COUNT VI</u>
## Aiding and Abetting Breach of Fiduciary Duties (Against Wheeler)

204.  Plaintiffs repeat and reallege all foregoing and following paragraphs as if fully set forth herein.

205.  As set forth above, the Board owes fiduciary duties to Plaintiffs and the Class, and is breaching those duties in connection with the Proposed Transactions, including the Wheeler Merger Agreement.

206.  As evidenced by its execution of the Wheeler Merger Agreement,

Wheeler knowingly participated in the Board's breach of its fiduciary duties owed to Plaintiffs and the Class.

207.   As a direct result of Wheeler aiding and abetting the Board's breaches of fiduciary duty, Plaintiffs and the Class have suffered damages and other losses in an amount to be proven at trial. Further, if any of the Gross Proceeds of the Proposed Transactions are distributed to Common Stockholders before a determination on the merits of Plaintiffs' aiding and abetting breach of fiduciary duty claim, Plaintiffs and the Class will suffer irreparable injury for which there is no adequate remedy at law since it will be impossible to claw back distributions from tens of thousands of Common Stockholders in the event Preferred Stockholders prevail on their claims. Therefore, Plaintiffs and the Class are entitled to a preliminary injunction enjoining distribution of and escrowing the Gross Proceeds of the Proposed Transactions pending a determination on the merits of Plaintiffs' claim for aiding and abetting breach of fiduciary duty.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Certifying the Class as defined herein, appointing the Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

B.    Declaring that holders of Preferred Stock are entitled to the Liquidation Preference under the relevant Articles Supplementary in connection with the Proposed Transactions.

C.    Declaring that the Proposed Transactions constitute a Change of Control under the Articles Supplementary, and that accordingly, holders of Preferred Stock are entitled to exercise their Conversion Rights under the relevant Articles Supplementary in connection with the Proposed Transactions.

D.    An injunction enjoining distribution of any of the Gross Proceeds from the Proposed Transactions to any Common Stockholders pending a determination on the merits of Plaintiffs' claims;

E.    An injunction enjoining the Wheeler Merger;

F.    Imposing a constructive trust on all of the Gross Proceeds from the Proposed Transactions in favor of Plaintiffs and the Class, and holding the Gross Proceeds in escrow, pending a determination on the merits of Plaintiffs' claims (subject to such distributions ordered by the Court);

G.    Awarding compensatory damages as the Court deems appropriate;

H.    Directing Defendants to account to Plaintiffs for all damages suffered as a result of Defendants' wrongful conduct alleged herein, and to pay such damages in an amount to be proven at trial;

I.    Awarding pre-judgment interest and post-judgment interest;

J.    Awarding Plaintiffs the costs of this action, including reasonable Plaintiffs' attorneys' and experts' fees; and

K.    Granting such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Maryland Rule 2-325(a), Plaintiffs here demand a trial by jury on all issues so triable.

May 6, 2022

Respectfully submitted,

*/s/ Donald J. Enright*
Donald J. Enright
(Attorney ID: 9612170271)
denright@zlk.com

OF COUNSEL:

Brian Stewart
(Attorney ID: 1212130189)

**WOHL & FRUCHTER LLP**
Joshua E. Fruchter (*pro hac vice* to be requested)
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Telephone: (845) 290-6818
Facsimile: (718) 504-3773

LEVI & KORSINSKY, LLP
1101 30th Street, N.W., Suite 115
Washington, DC 20007
(202) 524-4290

*Counsel for Plaintiffs and [Proposed] Lead Counsel for Putative Class*

*Attorneys for Plaintiffs*

## <u>CERTIFICATION OF SIGNING ATTORNEY</u>

I, DONALD J. ENRIGHT, certify on this 6th day of May, 2022, as required by Rule 1-313 of the Maryland Rules, that I have been admitted to practice law in the State of Maryland and remain a member in good standing of the Maryland Bar.

*/s/ Donald J. Enright*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 6, 2022, a copy of the foregoing Amended Class Action Complaint was served on counsel of record for all parties via this Court's MDEC electronic filing system.

<u>*/s/ Donald J. Enright*</u>
(Attorney ID: 9612170271)