| | |
|---|---|
| DAVID SYDNEY, SWC PHOENIX FUND I, L.P, MARTIN NOVICK, J RENEE BRENNAN LIVING TRUST, SCOTT SCHROEPFER, KENNETH KAMHOLZ, JOE SPEISER, and ELBERT CAPITAL I LLC, Individually and On Behalf of All Others Similarly Situated,<br><br>     Plaintiffs,<br><br> v.<br><br>CEDAR REALTY TRUST, INC., CEDAR REALTY TRUST PARTNERSHIP, L.P., WHEELER REAL ESTATE INVESTMENT TRUST, INC., BRUCE J. SCHANZER, GREGG A. GONSALVES, ABE EISENSTAT, STEVEN G. ROGERS, SABRINA KANNER, DARCY D. MORRIS, RICHARD H. ROSS and SHARON STERN<br><br>     Defendants. | IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, MARYLAND<br><br>Case No.: C-15-CV-22-001527<br><br>Honorable Judge Cummins<br><br>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY <u>INJUNCTION</u> |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 3

APPLICABLE LEGAL STANDARD ................................................................................. 11

ARGUMENT ......................................................................................................................... 12

    I.    ABSENT AN INJUNCTION, PLAINTIFFS WILL SUFFER IRREPARABLE INJURY ................................................................................................................... 12

    II.    PLAINTIFFS' CLAIMS ARE LIKELY TO SUCCEED ON THE MERITS ......... 13

        A.    The Breach of Contract Claims Have a Strong Likelihood of Success ............ 13

            1. Section 4(a) of the Articles Supplementary Obligates Cedar to Pay the Liquidation Preference to Preferred Stockholders Before Any Distributions Are Made to Common Stockholders .......................................................................... 14

            2. Even If The Proposed Transactions Do Not Trigger the Liqudation Preference, They Effect a "Change of Control" Entitling Preferred Stockholders to Exercise their Conversion Rights. ......................................................................................... 16

            3. Cedar Breached the Covenant of Good Faith and Fair Dealing ...................... 19

        B.    The Tortious Interference Claim Has a Strong Likelihood of Success ........... 21

        C.    The Breach of Fiduciary Duty and Aiding and Abetting Claims Have a Strong Likelihood of Success. ..................................................................................... 22

    III.    THE BALANCE OF CONVENIENCE STRONGLY FAVORS A PRELIMINARY INJUNCTION ......................................................................................................... 24

    IV.    THE PUBLIC INTEREST FAVORS A PRELIMINARY INJUNCTION ............. 25

CONCLUSION ...................................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Case**                                                                                           **Page(s)**

*Bender v. Jordan*,
    439 F. Supp. 2d (D.D.C. 2006) .................................................................................25

*Clancy v. King*,
    954 A.2d 1092 (Md. 2008)……………………………………………………….. .......19,20

*Columbia Ass'n, Inc. v. Downtown Columbia Arts & Culture Comm'n, Inc.*,
    2021 WL 3127090 (Md. Ct. Spec. App. July 23, 2021) ...........................................13

*Comptroller Of Treasury v. Thompson Trailer Corp.*,
    121 A.2d 850 (Md. 1956) ........................................................................................14

*Della Ratta v. Larkin*,
    856 A.2d 643 (Md. 2004) ....................................................................................19,23

*DMF Leasing, Inc. v. Budget Rent-A-Car Of Maryland, Inc.*,
    871 A.2d 639 (Md. 2005) ........................................................................................12

*Dual Inc. v. Lockheed Martin Corp.*,
    857 A.2d 1095 (Md. 2004) ......................................................................................14

*Eisenberg v. Chicago Milwaukee Corp.*,
    537 A.2d 1051 (Del. Ch. 1987)........................................................................12,22,23

*Fraidin v. Weitzman*,
    611 A.2d 1046 (Md. Ct. Spec. App. 1992) ..............................................................21

*Gabhart v. Gabhart*,
    370 N.E.2d 345 (Ind. 1977) ....................................................................................20

*Impac Mortg. Holdings, Inc. v. Timm*,
    255 A.3d 89 (Md. 2021) .......................................................................................13,16

*In re FLS Holdings, Inc. S'holders Litig.*,
    No. CIV. A. 12623, 1993 WL 104562 (Del. Ch. Apr. 2, 1993)……………………………..22

*In re MultiPlan Corp. S'holders Litig.*,
    268 A.3d 784 (Del. Ch. 2022) .................................................................................24

*Lerner v. Lerner*,
    511 A.2d 501 (Md. 1986) ..................................................................................2,12,13

*Leviness v. Consol. Gas, Elec. Light & Power Co. of Baltimore*,
  80 A. 304 (Md. 1911) ..........................................................................................22

*Marcus v. W2007 Grace Acquisition I, Inc.*,
  203 F. Supp. 3d 332 (S.D.N.Y. 2016) ...............................................................21

*MAS Assocs., LLC v. Korotki*,
  214 A.3d 1076 (Md. 2019) .................................................................................20

*ODS Techs., L.P. v. Marshall*,
  832 A.2d 1254 (Del. Ch. 2003)......................................................................12,24

*Orkin v. Jacobson*,
  332 A.2d 901 (1975) ...........................................................................................16

*Plank, v. Cherneski*,
  231 A.3d 436 (Md. 2020) ...................................................................................22

*Savoie v. Merchant's Bank*,
   84 F.3d 52 (2d Cir. 1996)................................................................................2,13

*State Dep't of Health & Mental Hygiene v. Baltimore Cty.*,
  383 A.2d 51 (1977) ........................................................................................2,12

*Quadrangle Offshore (Cayman) LLC v. Kenetech Corp.*,
  1999 Del. Ch. LEXIS 213 (Del. Ch. Oct. 13, 1999)...................................... 14-21

*Vozzolo v. Air Canada*,
  No. 20-CV-03503 (PMH), 2021 WL 5113387 (S.D.N.Y. Nov. 3, 2021) ...............24

*WSC/2005 v. Trio Ventures Assocs.*,
  190 A.3d 255 (Md. 2018) ...............................................................................13,19

**Statue**                                                                        **Page(s)**

Md. Code. Ann., Rule 2-405.1..............................................................................20,21

Md. Code. Ann., Rule 15-502 ....................................................................................1

Md. Code Ann., Rule 15-503(c) ...............................................................................24

Md. Code. Ann., Rule 15-505.....................................................................................1

Pursuant to Maryland Rules 15-502 and 15-505, Plaintiffs David Sydney, SWC Phoenix Fund I, L.P., Martin Novick, J Renee Brennan Living Trust, Scott Schroepfer, Kenneth Kamholz, Joe Speiser, and Elbert Capital I LLC ("Plaintiffs"), on behalf of themselves and all other Preferred Stockholders of Defendant Cedar by their undersigned attorneys, respectfully move this Court for an order (i) enjoining distribution of any of the Gross Proceeds from the Proposed Transactions to any Common Stockholders pending a determination on the merits of Plaintiffs' claims; (ii) enjoining the Wheeler Merger; and (iii) imposing a constructive trust on all of the Gross Proceeds from the Proposed Transactions in favor of Plaintiffs and the Class, and escrowing the Gross Proceeds, pending a determination on the merits of Plaintiffs' claims.[1]

## PRELIMINARY STATEMENT

This action concerns a scheme orchestrated by Defendants in bad faith to attempt to deprive Preferred Stockholders of their Liquidation Preference of at least $25.00 per share (worth $161.3 million in the aggregate) and crash the price of the Preferred Stock ¶ 1.

The scheme arises out of the recently announced Proposed Transactions to (i) sell *all* of Cedar's properties to third parties via the Grocery-Anchored Transaction and the Wheeler Merger for over $1 billion (less assumed mortgage debt), (ii) discharge all of Cedar's liabilities, and (iii) distribute *all* of the net proceeds (totaling approximately $396 million) *exclusively* to Common Stockholders, despite the entitlement of Preferred Stockholders to priority payment of the Liquidation Preference and to exercise their rights to convert their Preferred Stock to Common Stock ("Conversion Rights") upon the occurrence of a Change of Control at Cedar. ¶ 2. The

---

[1] To the extent not otherwise defined herein, capitalized terms shall have the same meaning as in Plaintiffs' Amended Class Action Complaint. In all quotations, any emphasis is added unless otherwise noted, and all internal citations are omitted. Citations to "¶ __" are to paragraphs of Plaintiffs' Class Action Complaint (the "Complaint"). Citations to "Enright Aff. Ex." are to the Exhibits attached to the Affidavit of Donald J. Enright, dated May __, 2022, submitted herewith.

Board's motive for favoring Common Stockholders is transparent—the individual Board Defendants collectively stand to earn tens of millions of dollars on their Common Stock from the Proposed Transactions, but according to public records, do not own any Preferred Stock, and thus have no incentive to protect the interests of Preferred Stockholders. ¶¶ 20-27.

Irreparable injury should be "weighed *very heavily* in the trial court's evaluation of the request for interim injunctive relief." *State Dep't of Health & Mental Hygiene v. Baltimore Cty*., 383 A.2d 51, 58 (1977) (per curiam). Irreparable injury exists if, "in seeking redress at law," plaintiffs would need to initiate a "multiplicity of vexatious and unprofitable suits." *Smith v. Shiebeck*, 24 A.2d 795, 801 (1942); *see also Savoie v. Merchants Bank*, 84 F.3d 52, 58 (2d Cir. 1996) (irreparable injury exists if common fund distributed and prevailing plaintiffs would need to recover from hundreds of recipients; "a recourse [that] is so impractical as to be infeasible").

Here, declining to enjoin Defendant from distributing any of the Gross Proceeds to Common Stockholders before a determination on the merits will subject Plaintiffs to irreparable injury because if Plaintiffs ultimately prevail on the merits they will need to commence thousands of lawsuits across the country to "claw back" payments wrongfully distributed to Common Stockholders. Instead, the Court should maintain the status quo by holding all the Gross Proceeds in escrow until the case is resolved, and if Defendants prevail, it can distribute the proceeds to Common Stockholders. *See Lerner v. Lerner*, 511 A.2d 501, 512 (Md. 1986) ("complications can be avoided simply by maintaining the status quo until the merits are decided.").

Additionally, all of Plaintiffs' claims have a strong likelihood of success on the merits, and the balance of convenience and the public interest both favor an injunction. (Sections II-IV below). Therefore, Plaintiffs are entitled to the preliminary injunction requested.

## FACTUAL BACKGROUND

Plaintiffs are holders of Cedar's Series B and/or Series C Preferred Stock. ¶¶12-19. Defendant Cedar is a REIT that focuses primarily on ownership, operation and redevelopment of grocery-anchored shopping centers. ¶28. As of April 18, 2022, Cedar had issued and outstanding (i) 13,640,067 shares of Common Stock, (ii) 1,450,000 shares of Series B Preferred Stock, and (iii) 5,000,0000 shares of Series C Preferred Stock. ¶62. Cedar conducts substantially all of its business through Defendant Cedar Operating Partnership. ¶29; *see* Enright Aff., Ex. 8 at 4.

Defendant Wheeler is a Maryland corporation and publicly-traded REIT (ticker: WHLR) that also operates shopping centers and has three series of preferred stock outstanding. ¶¶31-32.

The individual Board Defendants in this action are the members of the Cedar Board who approved the Proposed Transactions. ¶¶20-27. The Proxy confirms that none of the Board Defendants owns any Preferred Stock, but either personally or through entities they manage or in which they have an ownership interest, they stand to earn tens of millions of dollars from their Common Stock upon consummation of the Proposed Transactions. *Id; see also* Enright Aff. Ex. 27 at 59, 85.[2] The Proxy also confirms that (i) Preferred Stockholders will not be entitled to vote on the Proposed Transactions or to exercise their Conversion Rights; and (ii) the fairness opinion of the Board's financial advisor focused exclusively on Common Stockholders, and did not opine on the fairness of the Proposed Transactions to Preferred Stockholders. *Id.* at 3, 40, 42. The Preferred Stockholders thus had no one advocating for their interests during negotiations, and will not have anyone advocating for their interests in connection with the vote.

---

[2] A copy of the Proxy issued by Cedar on April 21, 2022, in connection with the Proposed Transactions is attached as Exhibit 27 to the accompanying Affidavit of Donald J. Enright, dated May 6, 2022 ("Enright Aff.").

***The Cedar Preferred Articles Supplementary***

Cedar's Series B and C Preferred Stock are governed by Articles Supplementary to Cedar's Articles of Incorporation. ¶¶ 68-79; *see also* Enright Aff. Ex. 1 at 1-3; Ex. 2 at 1-4.[3]

***Background of Cedar's Proposed Liquidation***

The Proxy discloses that the Board first considered a liquidation of the Company in July 2019. *See* Enright Aff. Ex. 27 at 28. In June 2021, Defendants Schanzer and Gonsalves subsequently met with BofA Securities (the Company's financial advisor) "to discuss a potential liquidation versus a whole-company sale alternative." *Id.* at 31.

On September 9, 2021, Cedar issued a press release ("September 2021 Press Release") announcing that the Cedar Board had initiated a dual-track process to review the Company's strategic alternatives in order to maximize stockholder value. *See* Enright Aff. Ex. 3. In the September 2021 Press Release, Schanzer promised to maximize value for "***all*** shareholders" (i.e., both Common *and* Preferred Stockholders):

> We believe there is a profound disconnect between Cedar's share price and the underlying value of our real estate, as evidenced by recent transaction activity both within our portfolio and in our markets. ***The Board is committed to maximizing value for <u>all</u> our shareholders*** and, accordingly, we believe that this dual-track strategic review process will enable us to achieve that. *Id.*[4]

By late February 2022, Schanzer and the rest of the Board had completed negotiation of the Proposed Transactions, which they relabeled a "sum of the parts" transaction instead of calling it a liquidation (plainly in order to deprive Preferred Stockholders of the Liquidation Preference). Enright Aff. Ex. 27 at 38.

---

[3] The Series C Articles Supplementary are annexed as Exhibit 1 to the Enright Affidavit; the Series B Articles Supplementary are annexed as Exhibit 2 to the Enright Affidavit.

[4] A copy of the September 2021 Press Release is annexed as Exhibit 3 to the Enright Affidavit.

***The Proposed Transactions***

On March 3, 2022, Cedar filed a Form 8-K ("March 2022 Cedar 8-K") announcing that it had agreed to sell ***all*** of Cedar's properties via the Proposed Transactions, which are expected to close by the end of the Q2 2022, and generate Gross Proceeds of over $1 billion (less assumed mortgage debt). ¶¶ 107-112, *see also* Enright Aff. Ex. 4, 7.[5] The March 2022 Cedar Form 8-K estimates that the Net Proceeds from the Proposed Transactions will exceed $29.00 per share of common stock, which equals approximately $396 million based on 13,640,067 shares of Common Stock issued and outstanding as of April 18, 2022. ¶¶ 113-14; *see also* Enright Aff. Ex. 27 at 83.

Per Section 3.1 of the Wheeler Merger Agreement ("WMA") *all* of the $396 million in Net Proceeds from the Proposed Transactions will be distributed *exclusively* to *Common* Stockholders (with *no* distributions to *Preferred* Stockholders).[6] Moreover, the WMA also provides that all of Cedar's Common Stock will be cancelled, while the Preferred Stock will be orphaned at what remains of Cedar, which will become a wholly owned subsidiary of Wheeler. The Preferred Stockholders will not be permitted to exercise their Conversion Rights, nor will they have recourse to Wheeler's assets. As Schanzer conceded in the March 2022 press release, "this combination of transactions represents the best possible outcome for our ***common*** shareholders." (Emphases added) Enright Aff. Ex. 4 at Ex. 99.1. But it is the *worst* possible outcome for Preferred Stockholders.

Since Preferred Stockholders are not receiving any distributions from the Proposed Transactions and are being denied their Conversion Rights, the March 2022 Cedar Form 8-K seeks to reassure them by baldly representing that (i) the Wheeler Properties are worth $291.3 million,

---

[5] A copy of the March 2022 Cedar Form 8-K is annexed as Exhibit 4 to the Enright Affidavit.

[6] A copy of the Wheeler Merger Agreement is annexed as Exhibit 5 to the Enright Affidavit.

and thus purportedly have adequate equity to cover the $161.3 million Liquidation Preference (after subtracting the $130 million borrowed against the Wheeler Properties from KeyBank); (Enright Aff. Ex. 4), and (ii) the income from the Wheeler Properties will enable undisrupted payment of dividends on the Preferred Stock. *See* Enright Aff. Ex. 4. Neither representation is credible.

***The Wheeler Properties Are Not Worth $291.3 Million***

The claim that the Wheeler Properties are worth $291.3 million is not credible because Wheeler is not actually paying $291.3 million for the Wheeler Properties. Instead, Wheeler is (i) borrowing $130 million against the Wheeler Properties from KeyBank to finance Cedar's $130 Million Distribution to Common Stockholders (Enright Aff. Ex. 4), and (ii) through Cedar, assuming responsibility for the $161.3 million Liquidation Preference. (Enright Aff. Ex. 4). The total of those two numbers is $291.3 million.[7]

Absent a preliminary injunction, however, neither Cedar nor Wheeler reasonably expects that the Wheeler Properties could satisfy the full Liquidation Preference of $161.3 million. To the contrary, after Cedar announced that (i) Preferred Stockholders would receive *nothing* from the Proposed Transactions, and (ii) Wheeler—a tiny REIT worth $20 million with a history of shareholder oppression and management dysfunction (*see infra*)—would control the remnants of Cedar as a wholly owned subsidiary (albeit without any recourse to Wheeler's assets), the

---

[7] While the Preferred Stock will technically remain an obligation of Cedar, Wheeler will own 100% of Cedar after consummation of the Wheeler Merger (Enright Aff. Ex. 4), and thus as a practical matter, Wheeler will fully control Cedar and the Wheeler Properties.[8] Data from Cedar's website indicates that at least two of the Wheeler Properties—Oakland Commons and Fieldstone Marketplace—have substantially lower vacancy rates than publicly reported. For example, Cedar's latest Form 10-K filed on March 10, 2022 represents that Oakland Commons is 100% occupied, but the website and a call placed to a local retailer indicate that the space previously occupied by Walmart at that property—totaling about 60% of the rentable space—is now vacant.

Preferred Stock's value plummeted. The combined market value of the Series B and C Preferred Stock dropped from $151.3 million to $61.7 million over the next two trading days, causing Preferred Stockholders to lose nearly $90 million. ¶ 7 (charts depicting sharp price drops).

The current combined market value of the Preferred Stock is approximately $85 million—little more than half of their aggregate Liquidation Preference of $161.3 million. *See* Enright Aff. Ex. 20. This means that Wheeler can presently retire Preferred Stock at a sharp discount to the Liquidation Preference. Put another way, if Wheeler were to buy all of the Preferred Stock at this price, it would reduce the "value" of the Wheeler Properties to $215 million (i.e., $130 million + $85 million) from the inflated $291.3 million assigned in connection with the Proposed Transactions.

Indeed, if there was sufficient equity value in the Wheeler Properties to sell them for $291.3 million, Cedar could have simply sold the Wheeler Properties for cash, and used the proceeds to pay *both* the Liquidation Preference in full, *and* a $130 million distribution to Common Stockholders. The fact that Cedar did not do so means that the Wheeler Properties cannot fetch a price sufficient to pay the Liquidation Preference in full while still financing a $130 million distribution to Common Stockholders. Instead, it is clear that Cedar and Wheeler inflated the value of the Wheeler Properties in connection with the Wheeler Merger to equal the $130 million they want to pay to Common Stockholders, plus the Liquidation Preference.

Moreover, disclosures in the Proxy confirm that the Wheeler Properties (referred to as the "Remainco Properties" in the Proxy) are not worth $291.3 million. Specifically, the Proxy discloses that on January 21, 2022, a bidder ("Party C") offered to acquire all of the Grocery-Anchored Properties and the Wheeler Properties for $1.05 billion in cash. Party C's bid valued the Grocery-Anchored Properties at $810 million, and the Wheeler Properties at $240 million—more

7

than $50 million lower than the inflated $291.3 million value assigned to the Wheeler Properties in connection with the Wheeler Merger. *See* Enright Aff. Ex. 27 at 34.

***The Wheeler Properties Do Not Have The Cash Flow to Pay Dividends on the Preferred Stock***

The claim that the income from the Wheeler Properties will enable undisrupted payment of all required dividends on the Preferred Stock is also not credible. Preliminarily, the reference in the March 2022 Cedar Form 8-K to ensuring uninterrupted payment of "required" dividends is a red herring since the Articles Supplementary do not "require" payment of dividends to Preferred Stockholders. Instead, for example, the Series C Articles Supplementary provide that Preferred Stockholders are entitled to dividends only "when and as authorized by the Board of Directors, out of funds legally available for payment of dividends . . ." Enright Aff. Ex. 1 at 1. The Series B Articles Supplementary contain similar language. Enright Aff. Ex. 2 at 1. Since Wheeler will control Cedar, it can simply refuse to declare dividends, and/or divert cash flow from the Wheeler Properties so there are no funds legally available for payment of dividends. Wheeler's history of oppression of its own preferred shareholders (*see infra*) indicates that this is *exactly* what will happen.

Additionally, disclosures in the March 2022 Cedar Form 8-K and Cedar's Form 10-K filed with the SEC on March 10, 2022 ("Cedar 2021 10-K", attached to Enright Aff. as Ex. 8), reveal that the Wheeler Properties are lower-quality than the Grocery-Anchored Properties. Per Ex. 7 to the Enright Aff., the 33 Grocery-Anchored Properties boast an (i) average occupancy rate of 88.9%, and (ii) average base rent of $15.19 per square foot. In contrast, as per Ex. 8 to the Enright Aff., the Wheeler Properties have (i) an average occupancy rate of only 83.7% (approximately five percent lower than the Grocery-Anchored Properties), and (ii) average base rent of only $10.70 per square foot (approximately 30% lower than the average base rent of the Grocery-Anchored

Properties).[8] These metrics indicate that the Cedar Board deliberately allocated inferior properties to Wheeler, and that the operating cash flow from the Wheeler Properties will be *inadequate* to pay future dividends on the Preferred Stock after servicing the KeyBank Loan, and paying required capital expenditures for the Wheeler Properties.[9]

Third parties have seen right through Defendants' thinly disguised attempt to fleece Preferred Stockholders for the benefit of Common Stockholders. As an analyst at Raymond James—a global investment bank and financial services company—wrote after Cedar announced the Proposed Transactions:

> [c]ertainly other REIT preferred shares have been sent to purgatory in other M&A transactions*,* but they have been more of a byproduct of M&A, and not the driving factor behind the deal structure. CDR and its advisors may be patting themselves on the back for creative deal/legal gymnastics, but there could be other broader negative implications for the industry . . . We believe this [deal] sets a bad precedent for the sector.[10]

---

[8] Data from Cedar's website indicates that at least two of the Wheeler Properties—Oakland Commons and Fieldstone Marketplace—have substantially lower vacancy rates than publicly reported. For example, Cedar's latest Form 10-K filed on March 10, 2022 represents that Oakland Commons is 100% occupied, but the website and a call placed to a local retailer indicate that the space previously occupied by Walmart at that property—totaling about 60% of the rentable space—is now vacant.

[9] The Proxy discloses that the Wheeler Properties generated $19.1 million in "net operating income" in 2021, which it purports should be sufficient to cover the $10.8 million in annual dividends payable to Preferred Stockholders. But "net operating income" is a GAAP metric that does not account for (i) debt service on the KeyBank loan financing Wheeler's purchase of the Wheeler Properties (comprised of interest, which is a non-operating expense, and repayment of principal, which is a cash flow item not captured in operating expenses); and (ii) capital expenditures necessary to maintain the Wheeler Properties in good condition (which is a cash flow item not captured in operating expenses). *See* Enright Aff. Ex. 8 at 46 (Statement of Operations), 50 (Statement of Cash Flows). Only after the magnitude of those—and other relevant deductions (such as additional management fees that Wheeler may impose on the Wheeler Properties)—are accurately quantified, can the amount of net *cash flow*, if any, from the Wheeler Properties available to pay dividends to Preferred Stockholders be determined. Even under the most generous assumptions, Cedar's continued ability to pay the dividends is dubious at best.

[10] A copy of the Raymond James report ("RJ Report") is annexed as Exhibit 19 to the Enright Affidavit. The quote in the text appears at page 2 of the RJ Report.

***Cedar Rejects a Merger With Wheeler in November 2017 Based on Wheeler's Small Size***

Cedar's choice of Wheeler as a merger partner in early 2022 was odd given Cedar's quick rejection of Wheeler's unsolicited 2017 bid to merge with Cedar as "adversely consequential":

> Cedar is a $1.35-billion company, with a current equity market capitalization of approximately $550 million. Wheeler is a $375-million company **with a current equity market capitalization of approximately $95 million.** Although relative size differences may not matter in some cases, **in this instance they would be adversely consequential**. *See Cedar Nixes Merger Bid from Wheeler REIT* article excerpt, attached to Enright Aff. as Ex. 24.

Fast forward to 2022, and with Wheeler's market capitalization down to slightly above $20 million (a nearly *80%* drop), the Cedar Board now claims that merging with Wheeler is in the best interests of Cedar stockholders. The Board's change of heart is plainly driven by improper motivations (*i.e.*, to deprive Preferred Stockholders of the Liquidation Preference by relabeling Cedar's liquidation as a "merger" and denying the Preferred Stockholders' Conversion Rights).

***Wheeler's Oppression of its Own Preferred Stockholders***

Wheeler currently has three series of preferred stock outstanding: Series A Preferred, Series B Convertible Preferred ("Series B Preferred" or "Series B Preferred Stock"), and Series D Cumulative Convertible Preferred ("Series D Preferred" or "Series D Preferred Stock"). The Series B Preferred trade publicly on Nasdaq under the ticker WHLRP, and the Series D Preferred trade publicly on Nasdaq under the ticker WHLRD. *See* Wheeler Form 10-K for the fiscal year ended December 31, 2021 ("Wheeler 2021 10-K"), attached to Enright Aff. as Ex. 9.

In March 2018, shortly after its bid to merge with Cedar was rejected, and purportedly to retain cash flow to pay operating expenses and reduce debt, the Wheeler Board suspended dividend payments on its (i) common stock, and (ii) Series A, Series B and Series D Preferred stock (the latter suspension beginning with the three months ended December 31, 2018). As of December 31, 2020, Wheeler reported the following total dividend arrears on its preferred stock: Series A

(approximately \$114,000), Series B (approximately \$9.5 million), and Series D (approximately \$20.9 million). Total dividend arrears on all preferred stock totaled \$30.51 million. Subsequently, in December 2020, Wheeler announced a tender offer for its Series D Preferred stock and accepted for purchase nearly 500,000 preferred shares at prices below par. ¶¶84-85; *see also* Enright Aff. Ex. 10-12. Thereafter, in late 2021, Wheeler's common stockholders approved an amendment of the terms of the Company's Series A and B Preferred Stock eliminating all of their accumulated and unpaid dividends (totaling nearly \$12 million), and removing their cumulative dividend rights so that no further dividends would accumulate on the Series A and B Preferred Stock. ¶¶86-87; *see also* Enright Aff. Ex. 13-14. The dividend arrears on the Series D Preferred Stock continued to accumulate, however, and as of December 31, 2021, the outstanding Series D Preferred Stock had unpaid dividends in the amount of approximately \$26.16 million. *see also* Enright Aff. Ex. 9.

Wheeler's oppression of its preferred stockholders has spawned several litigations, as reported in the Wheeler 2021 10-K. ¶¶ 88-90; *see also* Enright Aff. Ex. 9.

***Wheeler Management and Board Dysfunction and Cratering Stock Price***

Wheeler also has a long history of management and board dysfunction. ¶¶ 91-102; *see also* Enright Aff. Ex.s 9, 15-18, 22, 26. That chaos has caused its stock price to crater in recent years. *See* Enright Aff. Ex. 21. Accordingly, there is little doubt that Cedar selected Wheeler as its merger partner in connection with the Proposed Transactions in bad faith.

## APPLICABLE LEGAL STANDARD

Maryland courts consider four factors when adjudicating a preliminary injunction motion: (i) the likelihood that the plaintiff will succeed on the merits; (ii) whether the plaintiff will suffer irreparable injury or lose the status quo without an injunction; (iii) the "balance of convenience," determined by whether greater injury would be done to the defendant by granting the injunction

than would result from its refusal; and, (iv) where appropriate, the public interest. *State Dep't*, 383 A.2d at 55 (ordering injunction and reversing trial court).

Plaintiffs need not prove each factor in isolation—*i.e.*, as a plaintiff "in a tort action [must] prove each of the elements of the tort." *Lerner*, 511 A.2d at 504. Rather, the Court should weigh all four factors together on a continuum in deciding whether injunctive relief is appropriate. For example, a stronger showing on one factor decreases the level of showing that needs to be made on another factor. *Lerner*, 511 A.2d at 507-08; *State Dep't*, 383 A.2d. at 58 (weighing second element, preservation of status quo, "very heavily"); *see also DMF Leasing, Inc. v. Budget Rent-A-Car Of Maryland, Inc.*, 871 A.2d 639, 644 (Md. 2005) (flexibility "remains one of the cornerstones of meting out the equitable remedy of an injunction"). Plaintiffs make a strong showing on all four factors—individually *and* in the aggregate.

## ARGUMENT

### I. ABSENT AN INJUNCTION, PLAINTIFFS WILL SUFFER IRREPARABLE INJURY.

Irreparable injury "weigh[s] ***very heavily*** in the trial court's evaluation of the request for interim injunctive relief." *State Dep't*, 383 A.2d at 58. It is therefore "quite clear" that "a preliminary injunction will lie when it is necessary to preserve the status quo . . . [and] the court's ability to render a meaningful decision on the merits[]." *Id.* at 57 (1977); *see also Lerner*, 511 A.2d at 511 (preliminary injunction should be granted "when one of the parties is committing an act that will . . . destroy the status quo of the controversy before a full hearing can be had"); *Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1062 (Del. Ch. 1987) (considering whether, absent injunction, the harm can "easily be undone"); *ODS Techs., L.P. v. Marshall*, 832 A.2d 1254, 1263 (Del. Ch. 2003) (preliminary injunction appropriate to obviate need to "unscramble the eggs").

Irreparable injury exists if, as here, "seeking redress at law" would require the Plaintiffs to initiate a "multiplicity of vexatious and unprofitable suits." *Smith*, 24 A.2d at 801; *accord Columbia Ass'n, Inc. v. Downtown Columbia Arts & Culture Comm'n, Inc.*, 2021 WL 3127090, at \*9 (Md. Ct. Spec. App. July 23, 2021); *see also Savoie*, 84 F.3d at 58 (irreparable injury exists if common fund distributed and prevailing plaintiffs will need to seek recovery from hundreds of trust customers who received distributions; "a recourse [that] is so impractical as to be infeasible").

Here, absent an injunction, Plaintiffs face irreparable injury because if Cedar distributes the Gross Proceeds and Plaintiffs later prevail on the merits, Plaintiffs would need to commence lawsuits against thousands of defendants across the country to "claw back" the money wrongfully distributed to Common Stockholders—"a recourse so impractical as to be infeasible." *Savoie*, 84 F.3d at 58. Rather than compel Plaintiffs to initiate a "multiplicity of vexatious and unprofitable suits" (*Smith*, 24 A.2d at 801), this Court should maintain the *status quo* by holding all the Gross Proceeds in escrow until the case is resolved. If, by some unlikely turn of events, Defendants ultimately prevail, the proceeds can simply be distributed to Common Stockholders at that time. *See Lerner*, 511 A.2d at 512 ("complications can be avoided simply by maintaining the status quo until the merits are decided.").

## II. PLAINTIFFS' CLAIMS ARE LIKELY TO SUCCEED ON THE MERITS

### A. The Breach of Contract Claims Have a Strong Likelihood of Success

Maryland contract law applies to a corporate charter, which is a contract between the corporation and its stockholders. *Impac Mortg. Holdings, Inc. v. Timm*, 255 A.3d 89, 94 (2021). Therefore, Maryland contract law also applies to "Articles Supplementary," which "are simply an amendment of the corporate charter." *Impac*, 255 A.3d at 94, 112. To prove a breach of contract, a plaintiff must show that the defendant owed plaintiff a contractual obligation and breached that obligation. *WSC/2005 v. Trio Ventures Assocs.*, 190 A.3d 255, 267 (Md. 2018).

1. **Section 4(a) of the Articles Supplementary Obligates Cedar to Pay the Liquidation Preference to Preferred Stockholders Before Any Distributions Are Made to Common Stockholders**

Section 4(a) of the Articles Supplementary clearly and unambiguously obligates Cedar to pay the Liquidation Preference—before making any distributions to Common Stockholders—in the event of a liquidation, dissolution, or winding up. (Enright Aff. Ex. 1 at 3 and Ex. 2).

The process of liquidating and winding up entails disposing of existing assets, debts and obligations; laying off officers and employees; and distributing remaining proceeds. *See Dual Inc. v. Lockheed Martin Corp.*, 857 A.2d 1095, 1103 (Md. 2004) (finding that company was not "winding up" because "nothing in the record indicates that Dual made any attempt to dispose of existing assets, debts, or obligations"); *Comptroller Of Treasury v. Thompson Trailer Corp.,* 121 A.2d 850, 856 (Md. 1956) ("'[t]he word 'liquidation' is synonymous with 'winding up or settlement with creditors.' . . . it means 'the act or operation of winding up the affairs of a firm or company by getting in the assets, settling with its debtors and creditors, and appropriating the amount of profit or loss.'"); *Quadrangle Offshore (Cayman) LLC v. Kenetech Corp.*, 1999 WL 893575, at *12 (Del. Ch. Oct. 13, 1999) (liquidation and winding up involves sale of assets, paying off creditors, laying off employees and officers, and distribution of remaining proceeds).

Here, there is no question that Cedar is liquidating and winding up its business. Cedar is selling *all* of its assets through the Proposed Transactions, using the proceeds to satisfy *all* of its liabilities, and then distributing the net proceeds exclusively to Common Stockholders. Enright Aff., Ex. 5 at §§ 1.1(a) & 3.1(d) (providing for payment of Closing Dividend to Common Stockholders after repayment of all Other Remaining Liabilities). Cedar is also terminating its Board and *all* of its officers and other employees; and canceling *all* of its Common Stock. Enright

Aff., Ex. 5 at §§ 2.4(b), 3.1(a)(ii)-(v), 6.7(a), and 6.14. Following the Proposed Transactions, Cedar will exist—quite literally—in name only.

Defendants will likely counter that Section 4(e) of the Articles Supplementary states that "[n]one of a consolidation or merger of the Corporation with or into another entity . . . or a sale, lease, transfers, or conveyance of all or substantially all of the Corporation's assets . . . shall be considered a liquidation, dissolution or winding up." But Plaintiffs are not arguing that an asset sale or merger *standing alone without more* would be considered a winding up or liquidation under Section 4(a). Rather, notwithstanding Section 4(e), the Proposed Transactions trigger the Liquidation Preference under Section 4(a) because the asset sales and merger comprising the Proposed Transactions are *accompanied by numerous other steps* characteristic of a liquidation and winding up such as discharging all debts, distributing all proceeds, dissolving the Board, and terminating all employees. ¶¶134-36.

Conversely, construing Section 4(e)—as Defendants apparently contend—to mean that a transaction can *never* qualify as a winding up or liquidation whenever a sale of all assets is part of the process would make it impossible for Preferred Stockholders to *ever* receive a Liquidation Preference under Section 4(a). That is because *every* liquidation and winding by definition involves a sale of all or substantially all of a company's assets. *See Quadrangle*, 1999 WL 893575, at *11 ("[t]he sale of assets is *such a fundamental or integral part of a liquidation* that it is almost impossible to give meaning to the term liquidation without considering this element."). For this very reason, when interpreting a provision similar to Section 4(e), *Quadrangle* concluded that the "asset sale exception was not designed to remove evidence of asset sales from an examination of [the company's] overall conduct, but to *exclude an asset sale alone* from being considered a

liquidation *without evidence of other conduct* falling within the meaning of that term." *Id.* The same interpretative logic applies here.

Plaintiffs' interpretation of Section 4(e) thus harmonizes it with Section 4(a), whereas Defendants' apparent interpretation of Section 4(e) renders Section 4(a) superfluous in violation of accepted rules of construction. *See Orkin v. Jacobson*, 332 A.2d 901, 904 (Md. 1975) ("An interpretation which gives reasonable meaning to all [of a contract's] provisions will be preferred to one which leaves a portion of the writing useless or inexplicable."). And if there is any remaining doubt about which interpretation is correct, the canon of construction known as *contra proferentem*—that ambiguous language in a contract is construed against the party that drafted it (*Impac*, 255 A.3d at 97)—would remove it. That is because the Articles Supplementary do not define the terms "liquidation" or "winding up" as used in Section 4. Thus, the most that Defendants could claim is that the language in Section 4 is ambiguous; that is, "susceptible of more than one meaning." *Impac*, 255 A.3d at 96. Absent extrinsic evidence to the contrary, *contra proferentum* requires resolving that ambiguity against Defendants. Thus, the Liquidation Preference is triggered where (as here) disposition of all or substantially all assets by sale and "merger" is coupled with numerous additional steps that are *quintessential* of a winding up/liquidation such as discharge of all debts, distributions of all proceeds to stockholders, termination of the board of directors and all officers and employees, and cancellation of all stock.

### 2. Even If The Proposed Transactions Do Not Trigger the Liquidation Preference, They Effect a "Change of Control" Entitling Preferred Stockholders to Exercise their Conversion Rights

The Articles Supplementary provide in Section 7 that, in the event Cedar undergoes a "Change of Control," the Preferred Stockholders have the right to convert their Preferred Stock

into Common Stock at a specified ratio ("Conversion Rights"), unless Cedar opts to pay them the Liquidation Preference. (Enright Aff. Ex. 1 and 7 § 7(b)(i) and Ex. 2).

Section 5(j) of the Articles Supplementary excludes transactions from the definition of a Change of Control when the Preferred Stock will remain an obligation of a company with publicly-traded stock:

> For the purposes of this Section 5 [Redemption] and Section 7 [Conversion] below, a "Change of Control" is when . . . the following have occurred . . . (x) the acquisition by any person . . . of beneficial ownership . . . through a purchase, merger or other acquisition transaction . . . of shares [Cedar] entitling that person to exercise more than 50% of the total voting power of all shares of [Cedar] . . . and (y) following the closing of any transaction referred to in clause (x), ***neither the Corporation nor the acquiring or surviving entity*** has a class of [publicly traded] ***common securities***. . . . (Enright Aff. Ex. __ at __, § 5(j).

The purpose of Section 5(j) is to provide Cedar with a measure of flexibility to merge into or be acquired by another publicly traded entity without triggering a Change of Control and Conversion Rights of Preferred Stockholders. However, if a transaction leaves the Cedar Preferred Stock residing at a "surviving entity" that does *not* have publicly listed common stock, then the transaction qualifies as a Change of Control under the language in Section 5(j) above.

That is precisely the situation here. The Wheeler Merger Agreement provides that Cedar will be a wholly-owned subsidiary of Wheeler, and to that end, defines the "Surviving Entity" in the merger as Cedar. Further, Section 3.1(a)(iv) of the Wheeler Merger Agreement provides that the Preferred Stock will remain an obligation of Cedar. Finally, Cedar—the "surviving entity"—will no longer have publicly-traded stock. Thus, the Proposed Transactions *do not* leave a "class of [publicly traded] common securities" at the same corporate level where the Preferred Stock

resides. Therefore, the Proposed Transactions are not excluded from the definition of Change of Control by Section 5(j).[11]

It is no answer, as Cedar appears likely to contend, that the Preferred Stock is "expected to remain listed on the [NYSE]" and that "the Surviving Company"—*i.e.*, Cedar—"will continue to be an independent filer of periodic reports with the [SEC]." [8-K at 2]. The bottom line is ***there will be no class of publicly-traded common securities*** from the corporate entity to which the Preferred Stock is tied (Cedar), and into which the Preferred Stock could be converted. Nor does Section 5(j) exclude the Proposed Transactions from qualifying as a Change of Control because ***Wheeler*** has publicly listed common stock. As noted above, the Preferred Stock remains an obligation of ***Cedar*** (not Wheeler). Nor can the Preferred Stock convert into Wheeler preferred stock or Wheeler common stock, or access Wheeler's assets. Moreover, the "acquiring entity" with which Cedar will "merge" to become a wholly-owned subsidiary is not Wheeler itself, but rather another wholly owned ***subsidiary*** of Wheeler called "Merger Sub," ***which has no publicly listed common stock***.

To illustrate the absurdity of Defendants' anticipated position, suppose that Cedar undergoes another Change of Control sometime ***after*** consummation of the Proposed Transactions.

---

[11] As a matter of grammar, the verb after the phrase "neither the Corporation nor the acquiring or surviving entity," is "has" (singular), and not "have" (plural). Normally, when "neither" and "nor" link a singular term and a plural one, proper usage requires putting the singular term after the "neither," and the plural term after the "nor," and using a plural verb after the "nor" phrase (e.g., "neither the car nor the trucks *are* available") (as per The New York Times Manual of Style and Usage). In the Articles Supplementary, however, two terms appear after the "nor" (i.e., acquiring entity and surviving entity), which is plural, and yet the verb is "has" (singular), and not "have" (plural). Therefore, the language in Section 5(j) instructs the reader to look at *one* entity to determine application of the exclusion, i.e., the entity at which the Preferred Stock will reside after the transaction closes. Since the Preferred Stock will remain an obligation of Cedar, as the "surviving" entity, that is the entity that matters for purposes of applying the exclusion in Section 5(j), and since Cedar will not have publicly-traded common stock, the exclusion does not apply.

How would Preferred Stockholders exercise their Conversion Rights?  Per Section 7(b)(vii) of the Articles Supplementary, the definition of "Common Stock Price" used to determine the ratio at which Preferred Stock converts references "the average of the closing prices per share of Common Stock on the NYSE for the ten days immediately preceding" (if the deal is not all-cash).  But if, as the Proposed Transactions contemplate, all of the Common Stock has been *cancelled*, this provision simply cannot function.  It follows that the Change of Control definition did not intend to exclude transactions that maroon Preferred Stock at Cedar or another entity that lacks a "class of common securities" that are publicly traded.[12]

At a minimum, the Change of Control definition is ambiguous, and for the reasons explained above, the canon of *contra proferentem* requires interpreting it against the drafter.

### 3.  Cedar Breached the Covenant Of Good Faith and Fair Dealing.

Implied in every contract is an obligation to act in good faith. *Clancy v. King*, 954 A.2d 1092, 1106 (Md. 2008).  This obligation requires contracting parties to "exercise good faith in fulfilling their contractual obligations," and "deal fairly with the other party or parties to a contract." *WSC/2005*, 190 A.3d at 267. A contracting party acts in bad faith when it undertakes any discretionary acts "that will have the effect of injuring or frustrating the right of the other party to receive the fruits of the contract between them." *WSC/2005*, 190 A.3d at 268. A contracting party also acts in bad faith when a "primary motivation" for asserting specific contractual rights is to injure the other party. *Clancy*, 954 A.2d at 1108 (citing *Della Ratta v. Larkin*, 856 A.2d 643,

---

[12] If the text, structure, context, and common sense were not enough, prior statements by the Company accord with this understanding. For example, when issuing the Preferred Stock, the company identified the following risk factor: "***Other than in connection with a Change of Control***, the Series C Preferred Stock does not contain provisions that are intended to protect you if our common stock is delisted from the NYSE." Prospectus Supplement at S-12 (emphasis added) (Enright Aff. Ex. 28). This statement recognizes that the Change in Control provision **would be** triggered if a merger results in the Common Stock being delisted. That is precisely the case here.

657 (Md. 2004), finding bad faith where a "significant motivation for . . . issuing the capital call was to squeeze out some of the limited partners" and the party "advanced the date of the capital call in order to 'out-maneuver' the Withdrawing Partners and block them from exercising their statutory right to withdraw.").[13]

The Delaware Chancery Court's reasoning in *Quadrangle*, *supra*, is directly on point, and should be followed here because the Maryland courts "frequently look[] to Delaware courts for guidance on issues of corporate law." *Oliveira*, 152 A.3d at 736; *see also MAS Assocs., LLC v. Korotki*, 214 A.3d 1076, 1089 n.11 (Md. 2019) (same). *Quadrangle* identified five factors that made a series of transactions a *de facto* liquidation in violation of the covenant of good faith and fair dealing: "(1) sale of assets; (2) paying off of creditors; (3) winding up of business affairs; (4) distribution of remaining proceeds to shareholders; and (5) abandonment of corporate form." *Quadrangle*, 1999 Del. Ch. LEXIS 213, at *28-31. Importantly, a preferred stockholder need not establish each and every one of these five factors to successfully characterize a series of transactions as a liquidation. *See id.* Instead, using the above factors as signposts, a preferred stockholder need only show by a "preponderance of the evidence" that defendants intentionally embarked upon a course of action tantamount to a liquidation in bad faith with the intent of dishonoring the preferred stockholders' liquidation preference. *Id.* at *9-10. If a preferred stockholder makes that showing, then the covenant of good faith implied in all contracts protects the preferred stockholder from a *de facto* liquidation designed to frustrate its right to a liquidation preference. *Id.* at *10. *See also Gabhart v. Gabhart*, 370 N.E.2d 345, 356 (Ind. 1977) ("a proposed merger which has no valid purpose, which we construe to mean a purpose intended to advance a

---

[13] While *Del Ratta* is a breach of fiduciary duty case, "[t]he requirements of good faith in contract law are similar to the good faith doctrine in partnership law." *Clancy*, 954 A.2d at 1108.

corporate interest, and which merger would eliminate or reduce a minority shareholder's equity, may be challenged, as a *de facto* dissolution"); *Marcus v. W2007 Grace Acquisition I, Inc*., 203 F. Supp. 3d 332, 339 (S.D.N.Y. 2016) (adopting the *Quadrangle* factors).

So too here, Cedar embarked upon a *de facto* liquidation. Cedar could have sold the Wheeler Properties for cash and paid the Liquidation Preference, but instead deliberately structured the Proposed Transactions as a merger in bad faith to: (i) frustrate the right of Preferred Stockholders to receive the Liquidation Preference (and thereby maximize the proceeds for Common Stockholders, including Defendants); and (ii) given Wheeler's history of dysfunction and oppression, crash the price of the Preferred Stock (seeking to facilitate a tender offer and/or purchases at prices far below the $25.00 per share Liquidation Preference). Because Defendants acted in bad faith and were improperly motivated by a desire to deprive Preferred Stockholders of their contractual rights, their gambit violates the covenant of good faith implied in all contracts and fair dealing.[14]

**B. The Tortious Interference Claim Has a Strong Likelihood of Success.**

"The elements of tortious interference with contract are: 1) existence of a contract between plaintiff and a third party; 2) defendant's knowledge of that contract; 3) defendant's intentional interference with that contract; 4) breach of that contract by the third party; 5) resulting damages to the plaintiff." *Fraidin v. Weitzman*, 611 A.2d 1046, 1057 (Md. Ct. Spec. App. 1992). Given that Wheeler is a sophisticated REIT and engaged in substantial due diligence prior to agreeing to the Proposed Wheeler Merger, it would or should have been aware of the terms of the Articles Supplementary governing the Preferred Stock. Nevertheless, Wheeler negotiated a plan that would

---

[14] The good faith and fair dealing claim based on destruction of the Conversion Rights is likely to succeed for similar reasons. Defendants engineered the Proposed Transactions as a nominal "merger" in a bad-faith attempt to circumvent those rights.

allow it to take out the Preferred Stock (if any value is ever to flow that way) at prices far below the Liquidation Preference. The Proposed Transactions, culminating in the Wheeler Merger, will cause Cedar to breach the Articles Supplementary by liquidating without paying the Liquidation Preference and eviscerating the Preferred Stockholders' Conversion Rights.

### C. The Breach of Fiduciary Duty and Aiding and Abetting Claims Have a Strong Likelihood of Success.

Maryland has long recognized that a preferred stockholder is "a member of the corporation . . . expressly invested with all the incidents, rights, privileges, immunities and liabilities of a stockholder." *Leviness v. Consol. Gas, Elec. Light & Power Co. of Baltimore*, 80 A. 304, 306 (Md. 1911). Therefore, the Cedar Board owed fiduciary duties to Preferred Stockholders. *See Eisenberg*, 537 A.2d at 1062 (directors owe fiduciary duties to preferred stockholders); *accord In re FLS Holdings, Inc. S'holders Litig*., No. CIV. A. 12623, 1993 WL 104562, at *4 (Del. Ch. Apr. 2, 1993).

The Maryland Court of Appeals recently confirmed that breach of fiduciary duty is an independent cause of action in Maryland. *Plank, v. Cherneski*, 231 A.3d 436, 465 (Md. 2020). Under Section 2-405.1(c)(1) of Maryland's General Corporation Law, directors owe stockholders a duty of good faith. Directors also owe stockholders a duty to maximize the value of their shares in connection with any change in control. *See Plank*, 231 A.3d at 456 (finding duty to maximize value notwithstanding Section 2-405.1(i)).

Here, as discussed above, Defendants acted in bad faith conduct by orchestrating a merger designed to deprive Preferred Stockholders of their Liquidation Preference, destroy their Conversion Rights, and crash the price of the Preferred Stock. Defendants' selection of Wheeler as a merger partner only magnifies their bad faith, given (i) Wheeler's history of dysfunction and oppression of its own preferred shareholders, and (ii) Cedar's conclusion in November 2017 that

it would be "adversely consequential" to merge with Wheeler because of Wheeler's small size (when Wheeler was worth $95 million—*nearly five time what it is worth today*). *See* Enright Aff., Ex. 9 p. 56; Ex. 24. Far from maximizing the value of the Preferred Stock (as Schanzer promised in September 2021 when he acknowledged a duty to maximize value for "***all our shareholders***"), the Proposed Transactions have decimated the value of the Preferred Stock (as Schanzer tacitly conceded in the March 2, 2022 press release announcing the Proposed Transactions when he stated that "this combination of transactions represents the ***best possible outcome for our common shareholders***."). (Enright Aff. Ex. 4 at Ex. 99.1).

Preferred Stockholders thus have a strong direct claim for breach of fiduciary duty. *See Della Ratta*, 856 A.2d at 657 (affirming injunction enjoining enforcement of capital call where defendant breached fiduciary duty and acted in bad faith given that a "significant motivation for . . . issuing the capital call was to squeeze out some of the limited partners" and defendant "advanced the date of the capital call in order to 'out-maneuver' the Withdrawing Partners and block them from exercising their statutory right to withdraw."); *Eisenberg*, 537 A.2d at 1057-63 (preliminarily enjoining tender offer where preferred stockholder had shown a reasonable probability that the defendants breached a fiduciary duty, and a reasonable probability of irreparable harm outweighing whatever harm might result from the injunction); *Cf. FLS*, 1993 WL 104562, at *4 (rejecting settlement upon objection of preferred stockholder where directors owned large amounts of common stock, and no independent adviser or independent directors' committee was appointed to represent the interests of the preferred stockholders who did not have a right to vote on the transaction or allocation of proceeds, and who were in a conflict of interest situation with the common).

Likewise, the Plaintiffs have a strong claim against Wheeler for aiding and abetting the Cedar Board's breach of fiduciary duty because Wheeler is aware of the fiduciary duties owed by the Cedar Board to Preferred Stockholders, and is knowingly participating in a breach of those duties. *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 818 (Del. Ch. 2022)

## III. THE BALANCE OF CONVENIENCE STRONGLY FAVORS A PRELIMINARY INJUNCTION.

In balancing the equities, the Court must weigh the potential harm to the Plaintiffs and other Preferred Stockholders if the injunction is not issued against the potential harm to the Defendants and Common Stockholders if injunctive relief is granted. Here, the equities weigh decidedly in favor of granting the preliminary injunction. As noted, if the Court declines to grant a preliminary injunction, and Plaintiffs prevail, they will almost certainly be unable to recover in full because distribution of the Proposed Dividends cannot be undone, and the fair value of Wheeler Properties is uncertain and may decrease over time. In contrast, if the Court grants a preliminary injunction, and Defendants somehow prevail, the escrowed Proceeds can immediately be distributed in full to Common Stockholders. *See DMF Leasing*, 871 A.2d at 645 (balance of convenience tipped strongly in favor of plaintiff where not granting injunction will result in far greater burden to plaintiff than burden to defendant from granting injunction).[15]

---

[15] Since Plaintiffs are individual investors (primarily retirees) suing in a representative capacity to redress breaches of contract and fiduciary duties, they respectfully submit that no bond (or only a nominal bond) be required. *See* Md. Code Ann., Rule 15-503(c) (court may dispense with bond requirement); *ODS*, 832 A.2d at 1264 (preliminarily enjoining corporate transaction on $5,000 bond); *Vozzolo v. Air Canada*, No. 20-CV-03503 (PMH), 2021 WL 5113387, at *8 & n.6 (S.D.N.Y. Nov. 3, 2021) (requiring no bond for preliminary injunction sought by class action plaintiff).

## IV. THE PUBLIC INTEREST FAVORS A PRELIMINARY INJUNCTION.

As the Raymond James analyst recognized, the Proposed Transactions establish "a bad precedent for the [REIT] sector," and are expected to cause "broader negative implications for the [REIT] industry," if Preferred Stockholders "are not made whole." (Enright Aff. Ex. 19 at 2). Thus, a preliminary injunction in this case serves the broader public interest.

Additionally, class actions in general serve the public interest by ensuring effective enforcement of applicable laws that individual investors would find uneconomical to pursue on their own. *See Bender v. Jordan*, 439 F. Supp. 2d 139, 178 (D.D.C. 2006) (private actions by investors to enforce the securities laws "perform a vital public service"). Similarly, if the Defendants were to block the Plaintiffs' preliminary injunction, Plaintiffs could likely only recover on their claims by consuming judicial resources through litigating thousands of lawsuits against Common Stockholders in courts around the country. The public interest of preserving judicial resources by resolving the merits of the Preferred Stockholders' claims in a single class action lawsuit confirms that the public interest supports Plaintiffs' preliminary injunction.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs respectfully move this Court for an order (i) enjoining distribution of any of the Gross Proceeds from the Proposed Transactions to any Common Stockholders pending a determination on the merits of Plaintiffs' claims; (ii) enjoining the Wheeler Merger; and (iii) imposing a constructive trust on all of the Gross Proceeds from the Proposed Transactions in favor of Plaintiffs and the Class, and escrowing the Gross Proceeds, pending a determination on the merits of Plaintiffs' claims.

Dated: May 6, 2022                    Respectfully submitted,

*/s/ Donald J Enright* _____

OF COUNSEL:

**WOHL & FRUCHTER LLP**
Joshua E. Fruchter
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Telephone: (845) 290-6818
Facsimile: (718) 504-3773

*Attorneys for Plaintiffs*

Donald J. Enright
(Attorney ID: 9612170271)
LEVI & KORSINSKY LLP
1101 30th Street, NW, Suite 115
Washington, DC 20007
Telephone: (202) 524-4290
denright@zlk.com

*Counsel for Plaintiffs and [Proposed] Lead Counsel for Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 6, 2022, a copy of the foregoing Memorandum of Law In Support of Plaintiffs' Motion for Preliminary Injunction was served on counsel of record for all parties via this Court's MDEC electronic filing system.

*/s/ Donald J. Enright*
(Attorney ID: 9612170271)
