**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| DAVID SYDNEY, et al., Individually and On Behalf of All Others Similarly Situated, | Case No.: 8:22-cv-1142-GLR |
| *Plaintiffs*, | MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR <u>TEMPORARY RESTRAINING ORDER</u> |
| v. | |
| CEDAR REALTY TRUST, INC., et. al., | |
| *Defendants*. | |

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................................. 1

**FACTUAL BACKGROUND** .................................................................................... 3

**PROCEDURAL BACKGROUND** .......................................................................... 11

**APPLICABLE LEGAL STANDARD** ................................................................... 12

**ARGUMENT** ........................................................................................................... 13

    I.    ABSENT THE TRO, PLAINTIFFS WILL SUFFER IRREPARABLE INJURY ... 13

    II.   PLAINTIFFS HAVE NOT ONE, BUT MULTIPLE CLAIMS WITH A
        LIKELIHOOD OF SUCCESS ON THE MERITS ..................................................... 15

        A.    Plaintiffs Have Several Breach of Contract Claims With a Likelihood of
            Success on the Merits .................................................................................... 15

            1.The Proposed Transactions Effect a "Change of Control" Entitling Preferred
            Stockholders to Exercise their Conversion Rights .................................................. 15

            2. The Articles Supplementary Obligates Cedar to Release the Liquidation
            Preference Before Making Distributions to Common Stockholders. ................... 19

            3. Cedar Breached the Covenant of Good Faith and Fair Dealing ...................... 21

        B.    The Breach of Fiduciary Duty Claim Has a Likelihood of Success on the
            Merits ................................................................................................................. 23

    III.  THE BALANCE OF EQUITIES FAVOR THE TRO ............................................. 25

    IV.  THE PUBLIC INTEREST FAVORS THE TRO ................................................... 26

**CONCLUSION** ...................................................................................................... 27

## TABLE OF AUTHORITIES

**Case**                                                                                    **Page(s)**

*Amazon.com v. WDC Holdings LLC*,
  2021 U.S. App. LEXIS 26226, 2021 WL 3878403 (4th Cir. Aug. 31, 2021) ...................13,14

*Ass'n of Cmty. Cancer Ctrs. v. Azar*,
  509 F. Supp. 3d 482 (D. Md. 2020)..................................................................................12

*Bender v. Jordan*,
  439 F. Supp. 2d (D.D.C. 2006)........................................................................................27

*Buffalo Wings Factory, Inc. v. Mohd*, No. 1:07cv612 (JCC),
  2008 U.S. Dist. LEXIS 86360, 2008 WL 4699803 (E.D. Va. 2008).......................................14

*Clancy v. King*,
  954 A.2d 1092 (Md. 2008)…………………………………………………….. ........21,22

*Comptroller Of Treasury v. Thompson Trailer Corp.*,
  121 A.2d 850 (Md. 1956) .................................................................................................19

*Deckert v. Independence Shares Corp.*,
  311 U.S. 282 (1940)........................................................................................................14

*Della Ratta v. Larkin*,
  856 A.2d 643 (Md. 2004) ...........................................................................................22,25

*DMF Leasing, Inc. v. Budget Rent-A-Car Of Maryland, Inc.*,
  871 A.2d 639 (Md. 2005) ...............................................................................................26

*Dodocase VR, Inc. v. MerchSource, LLC*,
  2018 U.S. Dist. LEXIS 48654 (N.D. Cal. Mar. 23, 2018)........................................................14

*Doe v. Pittsylvania Cty., Va.*,
  842 F. Supp. 2d 927 (W.D. Va. 2012) ...............................................................................26

*Dual Inc. v. Lockheed Martin Corp.*,
  857 A.2d 1095 (Md. 2004) ..............................................................................................19

*Eisenberg v. Chicago Milwaukee Corp.*,
  537 A.2d 1051 (Del. Ch. 1987)....................................................................................23,25

*Gabhart v. Gabhart*,
  370 N.E.2d 345 (Ind. 1977) .............................................................................................22

*Hughes Network Sys. v. Interdigital Communications Corp.*,
   17 F.3d 691 (4th Cir. 1994) ..........................................................................13

*Impac Mortg. Holdings, Inc. v. Timm*,
   255 A.3d 89 (Md. 2021) ........................................................................ 15-27

*In re FLS Holdings, Inc. S'holders Litig.*,
    No. CIV. A. 12623, 1993 WL 104562 (Del. Ch. Apr. 2, 1993)………………………….23

*In re Microsoft Corp. Antitrust Litig.*,
   333 F.3d 517 (4th Cir. 2003). .......................................................................12

*Lerner v. Lerner*,
   511 A.2d 501 (Md. 1986) ..............................................................................15

*Ledo Pizza Sys. v. Singh*,
   2013 U.S. Dist. LEXIS 146938 (D. Md. Oct. 10, 2013)........................................26

*Leviness v. Consol. Gas, Elec. Light & Power Co. of Baltimore*,
   80 A. 304 (Md. 1911) ...................................................................................23

*Lonza Walkersville, Inc. v. Adva Biotechnology Ltd.*,
   No. 8:20-CV-03099-PX, 2022 WL 204396 (D. Md. Jan. 21, 2022). ......................13

*Marcus v. W2007 Grace Acquisition I, Inc.*,
   203 F. Supp. 3d 332 (S.D.N.Y. 2016) .............................................................23

*MAS Assocs., LLC v. Korotki*,
   214 A.3d 1076 (Md. 2019) ............................................................................22

*ODS Techs., L.P. v. Marshall*,
   832 A.2d 1254 (Del. Ch. 2003)......................................................................26

*Orkin v. Jacobson*,
   332 A.2d 901 (1975)....................................................................................21

*Plank, v. Cherneski*,
   231 A.3d 436 (Md. 2020) .............................................................................24

*Productos Carnic, S.A. v. Central Am. Beef & Seafood Trading Co.*,
   621 F.2d 683 (5th Cir. 1980) ........................................................................13

*Sachs Capital Fund I LLC v. Em Grp. LLC*,
   2020 Md. Cir. Ct. LEXIS 2 (Md. Cir. Ct. May 22, 2020) .....................................15

*Savoie v. Merchant's Bank*,

84 F.3d 52 (2d Cir. 1996) ..........................................................................14

*Smith v. Shiebeck*,
24 A.2d 795 (Md. 1942) ............................................................................14

*Sprint Nextel Corp. v. Wireless Buybacks Holdings*,
938 F.3d 113 (4th Cir. 2019) ....................................................................18

*Teradyne, Inc. v. Mostek Corp.*,
797 F.2d 43 (1st Cir. 1986) ......................................................................13

*Quadrangle Offshore (Cayman) LLC v. Kenetech Corp.*,
1999 Del. Ch. LEXIS 213 (Del. Ch. Oct. 13, 1999) ..........................19-23

*United States ex rel. Taxpayers Against Fraud v. Singer Co.*,
889 F.2d 1327 (4th Cir. 1989) ..................................................................13

*Vozzolo v. Air Canada*,
No. 20-CV-03503 (PMH), 2021 WL 5113387 (S.D.N.Y. Nov. 3, 2021) ..............................26

*Wachit Techs., Inc. v. Big Apple Consulting USA, Inc.*,
2008 U.S. Dist. LEXIS 34363 (D. N.C. Apr. 25, 2008) ............................26

*Winter v. NRDC, Inc.*,
555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) ......................13

*WSC/2005 v. Trio Ventures Assocs.*,
190 A.3d 255 (Md. 2018) ...................................................................15,21

**Statue**                                                                **Page(s)**

Fed. R. Civ. P. 65(b) ...................................................................................1

Md. Code. Ann., Rule 2-405.1 ....................................................................24

Md. Code Ann., Rule 15-503(c) ..................................................................26

Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, Plaintiffs David Sydney, SWC Phoenix Fund I, L.P, Martin Novick, J Renee Brennan Living Trust, Scott Schroepfer, Kenneth Kamholz, Joe Speiser, and Elbert Capital I LLC ("Plaintiffs"), on behalf of themselves and all other Preferred Stockholders of Defendant Cedar by their undersigned attorneys, respectfully move this Court for a temporary restraining order (the "TRO") on notice to Defendants, that pending a determination of Plaintiffs' motion for a preliminary injunction, (i) enjoins distribution to Cedar common stockholders of any of the proceeds ("Proceeds") from (a) Cedar's proposed merger with Wheeler Real Estate Investment Trust, Inc. ("Proposed Wheeler Merger") and (b) any sale of Cedar's properties to DRA Fund X-B LLC, KPR Centers LLC, or any other purchaser ("Cedar Asset Sale"); (ii) enjoins consummation of the Proposed Wheeler Merger; (iii) imposes a constructive trust on all of the Proceeds from the Cedar Asset Sale and Proposed Wheeler Merger in favor of Plaintiffs and other Cedar preferred stockholders; and (iv) directs that all of the Proceeds from the Cedar Asset Sale and Proposed Wheeler Merger be deposited into the Court's registry to be held in escrow.[1]

## PRELIMINARY STATEMENT

This action concerns a scheme orchestrated by Defendants in bad faith to attempt to deprive Preferred Stockholders of their Liquidation Preference of at least $25.00 per share (worth $161.3 million in the aggregate) and crash the price of the Preferred Stock. ¶ 1.

---

[1] To the extent not otherwise defined herein, capitalized terms shall have the same meaning as in Plaintiffs' Amended Class Action Complaint, which is available at Dkt. No. 1-116-18 ("Complaint"). In all quotations, any emphasis is added unless otherwise noted, and all internal citations are omitted. Citations to "¶ __" are to paragraphs of the Complaint. Citations to "Enright Aff. Ex." are to the Exhibits attached to the Affidavit of Donald J. Enright, dated May 13, 2022, submitted herewith.

The scheme arises out of the recently announced Proposed Transactions to (i) sell *all* of Cedar's properties to third parties via the Grocery-Anchored Transaction and the Wheeler Merger for over $1 billion (less assumed mortgage debt), (ii) discharge all of Cedar's liabilities, and (iii) distribute *all* of the net proceeds (totaling approximately $396 million) *exclusively* to Common Stockholders, despite the entitlement of Preferred Stockholders to priority payment of the Liquidation Preference and to exercise their rights to convert their Preferred Stock to Common Stock ("Conversion Rights") upon the occurrence of a Change of Control at Cedar. ¶ 2. The Board's motive for favoring Common Stockholders is transparent—the individual Board Defendants collectively stand to earn tens of millions of dollars on their Common Stock from the Proposed Transactions, but according to public records, do not own any Preferred Stock, and thus have no incentive to protect the interests of Preferred Stockholders at the expense of Common Stockholders. ¶¶ 20-27.

Here, declining to issue a temporary restraining order enjoining Defendants from distributing any of the Gross Proceeds to Common Stockholders pending a determination of Plaintiffs' motion for preliminary injunction will subject Plaintiffs to irreparable injury. That is because if a TRO is not entered and Defendants distribute the Gross Proceeds to Common Stockholders, and Plaintiffs ultimately prevail on the merits against the Defendants, Plaintiffs would need to commence thousands of lawsuits across the country to "claw back" payments wrongfully distributed to Common Stockholders. (*See* Point I below).

To avoid that inequitable outcome, the Court should maintain the status quo by holding all the Gross Proceeds in escrow in the Court's registry until the case is resolved, and if Defendants prevail, the Court can distribute the proceeds to Common Stockholders. Additionally, Plaintiffs have not one, but multiple claims that have a likelihood of success on the merits, and the balance

of convenience and the public interest both favor the TRO. (Sections II-IV below). Thus, Plaintiffs

are entitled to the TRO.

## FACTUAL BACKGROUND

Plaintiffs are holders of Cedar's Series B and/or Series C Preferred Stock. ¶¶12-19. Cedar's

Series B and C Preferred Stock are governed by Articles Supplementary to Cedar's Articles of

Incorporation. ¶¶ 68-79; *see also* Enright Aff. Ex. 1 at 1-3; Ex. 2 at 1-4.[2] Defendant Cedar is a

REIT that focuses primarily on ownership, operation and redevelopment of grocery-anchored

shopping centers. ¶28. As of April 18, 2022, Cedar had issued and outstanding (i) 13,640,067

shares of Common Stock, (ii) 1,450,000 shares of Series B Preferred Stock, and (iii) 5,000,0000

shares of Series C Preferred Stock. ¶62. Cedar conducts substantially all of its business through

Defendant Cedar Operating Partnership. ¶29; *see* Enright Aff., Ex. 8 at 4. Defendant Wheeler is a

Maryland corporation and publicly-traded REIT (ticker: WHLR) that also operates shopping

centers and has three series of preferred stock outstanding. ¶¶31-32.

The individual Board Defendants in this action are the members of the Cedar Board who

approved the Proposed Transactions. ¶¶20-27. The Proxy confirms that none of the Board

Defendants owns any Preferred Stock, but either personally or through entities in which they have

an ownership interest, they stand to earn tens of millions of dollars from their Common Stock upon

consummation of the Proposed Transactions. *Id; see also* Enright Aff. Ex. 27 at 59, 85.[3] The Proxy

also confirms that (i) Preferred Stockholders will not be entitled to vote on the Proposed

Transactions or to exercise their Conversion Rights; and (ii) the fairness opinion of the Board's

---

[2] The Series C Articles Supplementary are annexed as Exhibit 1 to the Enright Affidavit; the
Series B Articles Supplementary are annexed as Exhibit 2 to the Enright Affidavit.

[3] A copy of the Proxy issued by Cedar on April 21, 2022, in connection with the Proposed
Transactions is attached as Exhibit 27 to the accompanying Affidavit of Donald J. Enright.

financial advisor focused exclusively on Common Stockholders, and did not opine on the fairness of the Proposed Transactions to Preferred Stockholders. *Id.* at 3, 40, 42.

***Background of Cedar's Proposed Liquidation***

The Proxy discloses that the Board first considered a liquidation of the Company in July 2019. *See* Enright Aff. Ex. 27 at 28. In June 2021, Defendants Schanzer and Gonsalves subsequently met with BofA Securities (the Company's financial advisor) "to discuss a potential liquidation versus a whole-company sale alternative." *Id.* at 31.

On September 9, 2021, Cedar issued a press release ("September 2021 Press Release") announcing that the Board initiated a dual-track process to review the Cedar's strategic alternatives in order to maximize stockholder value. *See* Enright Aff. Ex. 3. Therein, Schanzer promised to maximize value for "***all*** shareholders" (i.e., both Common *and* Preferred Stockholders):

> We believe there is a profound disconnect between Cedar's share price and the underlying value of our real estate, as evidenced by recent transaction activity both within our portfolio and in our markets. ***The Board is committed to maximizing value for <u>all</u> our shareholders*** and, accordingly, we believe that this dual-track strategic review process will enable us to achieve that.

*Id.*[4]

By late February 2022, Schanzer and the Board had completed the Proposed Transactions negotiation, which they relabeled a "sum of the parts" transaction instead of a "liquidation" (to deprive Preferred Stockholders of the Liquidation Preference). Enright Aff. Ex. 27 at 38.

***The Proposed Transactions***

On March 3, 2022, Cedar filed a Form 8-K ("March 2022 Cedar 8-K") announcing that it had agreed to sell ***all*** of Cedar's properties via the Proposed Transactions, which are expected to close by the end of the Q2 2022, and generate Gross Proceeds of over $1 billion (less assumed

---

[4] A copy of the September 2021 Press Release is annexed as Exhibit 3 to the Enright Affidavit.

mortgage debt). ¶¶ 107-112, *see also* Enright Aff. Ex. 4, 7.[5] The March 2022 Cedar Form 8-K estimates that the Net Proceeds from the Proposed Transactions will exceed $29.00 per share of common stock, which equals approximately $396 million based on 13,640,067 shares of Common Stock issued and outstanding as of April 18, 2022. ¶¶ 113-14; *see also* Enright Aff. Ex. 27 at 83.

Pursuant to the Wheeler Merger Agreement ("WMA") *all* of the $396 million in Net Proceeds from the Proposed Transactions will be distributed *exclusively* to *Common* Stockholders (with *no* distributions to *Preferred* Stockholders).[6] The WMA also provides that all of Cedar's Common Stock will be cancelled and be delisted from the New York Stock Exchange, while the Preferred Stock will remain publicly traded and a direct obligation of Cedar, which will become a wholly owned subsidiary of Wheeler. The Preferred Stockholders will not be permitted to exercise their Conversion Rights, nor will they have recourse to Wheeler's assets. As Schanzer conceded in the March 2022 press release, "this combination of transactions represents the best possible outcome for our ***common*** shareholders." (Emphases added) Enright Aff. Ex. 4 at Ex. 99.1. But it is the *worst* possible outcome for Preferred Stockholders.

Because Preferred Stockholders are not receiving any distributions from the Proposed Transactions and are being denied their Conversion Rights, the March 2022 Cedar Form 8-K seeks to reassure them by baldly representing that (i) the Wheeler Properties are worth $291.3 million, and thus purportedly have adequate equity to cover the $161.3 million Liquidation Preference (after subtracting the $130 million borrowed against the Wheeler Properties from KeyBank); (Enright Aff. Ex. 4), and (ii) the income from the Wheeler Properties will enable undisrupted Preferred Stock dividend payments. *See* Enright Aff. Ex. 4. Neither representation is credible.

---

[5] A copy of the March 2022 Cedar Form 8-K is annexed as Exhibit 4 to the Enright Affidavit.

[6] A copy of the Wheeler Merger Agreement is annexed as Exhibit 5 to the Enright Affidavit.

***The Wheeler Properties Are Not Worth $291.3 Million***

The claim that the Wheeler Properties are worth $291.3 million is not credible because Wheeler is not actually paying $291.3 million for the Wheeler Properties. Instead, Wheeler is (i) borrowing $130 million against the Wheeler Properties from KeyBank to finance Cedar's $130 Million Distribution to Common Stockholders (Enright Aff. Ex. 4), and (ii) through Cedar, assuming responsibility for the $161.3 million Liquidation Preference. Enright Aff. Ex. 4. The total of those two numbers is $291.3 million.[7]

Absent the TRO, however, neither Cedar nor Wheeler reasonably expects that the Wheeler Properties could satisfy the full Liquidation Preference of $161.3 million. To the contrary, after Cedar announced that (i) Preferred Stockholders would receive *nothing* from the Proposed Transactions, and (ii) and Cedar would become a wholly-owned subsidiary of Wheeler—a tiny REIT worth $20 million with a history of shareholder oppression and management dysfunction (*see infra*)—the combined market value of the Series B and C Preferred Stock dropped from $151.3 million to $61.7 million over the next two trading days, causing Preferred Stockholders to lose nearly $90 million. ¶ 7 (charts depicting sharp price drops).

The Preferred Stock's current combined market value is approximately $85 million—little more than half of their aggregate Liquidation Preference of $161.3 million. *See* Enright Aff. Ex. 20. Thus, Wheeler can presently retire Preferred Stock at a sharp discount to the Liquidation Preference. That is, if Wheeler were to buy all of the Preferred Stock at this price, it would reduce the "value" of the Wheeler Properties to $215 million (i.e., $130 million + $85 million) from the inflated $291.3 million assigned in connection with the Proposed Transactions.

---

[7] While, as noted, the Preferred Stock will technically remain a direct obligation of Cedar, Wheeler will own 100% of Cedar after consummation of the Wheeler Merger (Enright Aff. Ex. 4), and thus as a practical matter, Wheeler will fully control Cedar and the Wheeler Properties.

6

Indeed, if there was sufficient equity value in the Wheeler Properties to sell them for $291.3 million, Cedar could have simply sold the Wheeler Properties for cash, and used the proceeds to pay *both* the Liquidation Preference in full, *and* a $130 million distribution to Common Stockholders. The fact that Cedar did not do so means that the Wheeler Properties cannot fetch a price sufficient to pay the Liquidation Preference in full while still financing a $130 million distribution to Common Stockholders. Instead, it is clear that Cedar and Wheeler inflated the value of the Wheeler Properties in connection with the Wheeler Merger to equal the $130 million they want to pay to Common Stockholders, plus the Liquidation Preference (which they do not intend to ever pay).

Moreover, disclosures in the Proxy confirm that the Wheeler Properties (referred to as the "Remainco Properties" in the Proxy) are not worth $291.3 million. Specifically, the Proxy discloses that on January 21, 2022, a bidder ("Party C") offered to acquire all of the Grocery-Anchored Properties and the Wheeler Properties for $1.05 billion in cash. Party C's bid valued the Grocery-Anchored Properties at $810 million, and the Wheeler Properties at $240 million—more than $50 million lower than the inflated $291.3 million value assigned to the Wheeler Properties in connection with the Wheeler Merger. *See* Enright Aff. Ex. 27 at 34.

**The Wheeler Properties Do Not Have The Cash Flow to Pay Dividends on the Preferred Stock**

The claim that Wheeler Properties income will enable undisrupted payment of all required dividends on the Preferred Stock is also not credible. Preliminarily, the reference in the March 2022 Cedar Form 8-K to ensuring uninterrupted payment of "required" dividends is a red herring since the Articles Supplementary do not "require" payment of dividends to Preferred Stockholders. Instead, for example, the Series C Articles Supplementary provide that Preferred Stockholders are entitled to dividends only "when and as authorized by the Board of Directors, out of funds legally

available for payment of dividends . . ." Enright Aff. Ex. 1 at 1. The Series B Articles Supplementary contain similar language. Enright Aff. Ex. 2 at 1. Since Wheeler will control Cedar, it can simply refuse to declare dividends, and/or divert cash flow from the Wheeler Properties so there are no funds legally available for payment of dividends. Wheeler's history of oppression of its own preferred shareholders (*see infra*) indicates that this is *exactly* what will happen.

Additionally, disclosures in the March 2022 Cedar Form 8-K and Cedar's Form 10-K filed with the SEC on March 10, 2022 ("Cedar 2021 10-K", attached to Enright Aff. as Ex. 8), reveal that the Wheeler Properties are lower-quality than the Grocery-Anchored Properties. Per Ex. 7 to the Enright Aff., the 33 Grocery-Anchored Properties boast an (i) average occupancy rate of 88.9%, and (ii) average base rent of $15.19 per square foot. In contrast, as per Ex. 8 to the Enright Aff., the Wheeler Properties have (i) an average occupancy rate of only 83.7% (approximately five percent lower than the Grocery-Anchored Properties), and (ii) average base rent of only $10.70 per square foot (approximately 30% lower than the average base rent of the Grocery-Anchored Properties).[8] These metrics indicate that the Cedar Board deliberately allocated inferior properties to Wheeler, and that the operating cash flow from the Wheeler Properties will be *inadequate* to pay future dividends on the Preferred Stock after servicing the KeyBank Loan, and paying required capital expenditures for the Wheeler Properties.[9]

---

[8] Data from Cedar's website indicates that at least two of the Wheeler Properties—Oakland Commons and Fieldstone Marketplace—have substantially lower vacancy rates than publicly reported. For example, Cedar's latest Form 10-K filed on March 10, 2022 represents that Oakland Commons is 100% occupied, but the website and a call placed to a local retailer indicate that the space previously occupied by Walmart at that property—totaling about 60% of the rentable space—is now vacant.

[9] The Proxy discloses that the Wheeler Properties generated $19.1 million in "net operating income" in 2021, which it purports should be sufficient to cover the $10.8 million in annual dividends payable to Preferred Stockholders. But "net operating income" is a GAAP metric that does not account for (i) debt service on the KeyBank loan financing Wheeler's purchase of the

Third parties have seen right through Defendants' thinly disguised attempt to fleece Preferred Stockholders for the benefit of Common Stockholders.  As an analyst at Raymond James, wrote after Cedar announced the Proposed Transactions:

> [c]ertainly other REIT preferred shares have been sent to purgatory in other M&A transactions**,** but they have been more of a byproduct of M&A, and not the driving factor behind the deal structure. CDR and its advisors may be patting themselves on the back for creative deal/legal gymnastics, but there could be other broader negative implications for the industry . . . We believe this [deal] sets a bad precedent for the sector.[10]

### *Cedar Rejects a Merger With Wheeler in November 2017 Based on Wheeler's Small Size*

Cedar's choice of Wheeler as a merger partner in early 2022 was odd given Cedar's quick rejection of Wheeler's unsolicited 2017 bid to merge with Cedar as "adversely consequential":

> Cedar is a $1.35-billion company, with a current equity market capitalization of approximately $550 million. Wheeler is a $375-million company *with a current equity market capitalization of approximately $95 million.* Although relative size differences may not matter in some cases, *in this instance they would be adversely consequential*. *See Cedar Nixes Merger Bid from Wheeler REIT* article excerpt, attached to Enright Aff. as Ex. 24.

Fast forward to 2022, and with Wheeler's market capitalization down to slightly above $20 million (a nearly *80%* drop), the Cedar Board now claims that merging with Wheeler is in the best interests of Cedar stockholders. The Board's change of heart since rejecting Wheeler as a merger partner in 2017 was plainly driven by improper motivations (*i.e.*, to deprive Preferred Stockholders

---

Wheeler Properties (comprised of interest, which is a non-operating expense, and repayment of principal, which is a cash flow item not captured in operating expenses); and (ii) capital expenditures necessary to maintain the Wheeler Properties in good condition (which is a cash flow item not captured in operating expenses). *See* Enright Aff. Ex. 8 at 46 (Statement of Operations), 50 (Statement of Cash Flows). Only after the magnitude of those—and other relevant deductions (such as additional management fees that Wheeler may impose on the Wheeler Properties)—are accurately quantified, can the amount of net *cash flow*, if any, from the Wheeler Properties available to pay dividends to Preferred Stockholders be determined. Even under the most generous assumptions, Cedar's continued ability to pay the dividends is dubious at best.

[10] A copy of the Raymond James report ("RJ Report") is annexed as Exhibit 19 to the Enright Affidavit. The quote in the text appears at page 2 of the RJ Report.

of the Liquidation Preference by relabeling Cedar's liquidation as a "merger" and denying the Preferred Stockholders' Conversion Rights).

***Wheeler's Oppression of its Own Preferred Stockholders***

Wheeler currently has three series of preferred stock outstanding: Series A Preferred, Series B Convertible Preferred ("Series B Preferred" or "Series B Preferred Stock"), and Series D Cumulative Convertible Preferred ("Series D Preferred" or "Series D Preferred Stock").

In March 2018, shortly after its bid to merge with Cedar was rejected, and purportedly to retain cash flow to pay operating expenses and reduce debt, the Wheeler Board suspended dividend payments on its (i) common stock, and (ii) Series A, Series B and Series D Preferred stock (the latter suspension beginning with the three months ended December 31, 2018).  As of December 31, 2020, Wheeler reported the following total dividend arrears on its preferred stock: Series A (approximately $114,000), Series B (approximately $9.5 million), and Series D (approximately $20.9 million). Total dividend arrears on all preferred stock totaled $30.51 million. Subsequently, in December 2020, Wheeler announced a tender offer for its Series D Preferred stock and accepted for purchase nearly 500,000 preferred shares at prices below par. ¶¶84-85; *see also* Enright Aff. Ex. 10-12. Thereafter, in late 2021, Wheeler's common stockholders approved an amendment of the terms of the Company's Series A and B Preferred Stock eliminating all of their accumulated and unpaid dividends (totaling nearly $12 million), and removing their cumulative dividend rights so that no further dividends would accumulate on the Series A and B Preferred Stock. ¶¶86-87; *see also* Enright Aff. Ex. 13-14. The dividend arrears on the Series D Preferred Stock continued to accumulate, however, and as of December 31, 2021, the outstanding Series D Preferred Stock had unpaid dividends in the amount of approximately $26.16 million. *see also* Enright Aff. Ex. 9.

Wheeler's oppression of its preferred stockholders has spawned several litigations, as reported in the Wheeler 2021 10-K. ¶¶ 88-90; *see also* Enright Aff. Ex. 9.

***Wheeler Management and Board Dysfunction and Cratering Stock Price***

Wheeler also has a long history of management and board dysfunction. ¶¶ 91-102; *see also* Enright Aff. Exs. 9, 15-18, 22, 26. That chaos has caused its stock price to crater in recent years. *See* Enright Aff. Ex. 21. Accordingly, there is little doubt that Cedar selected Wheeler as its merger partner in connection with the Proposed Transactions in bad faith (*i.e.*, to "spook" Preferred Stockholders and drive down the price of the Preferred Stock).

## PROCEDURAL BACKGROUND

On April 12, 2022, Plaintiffs filed their Class Action Complaint with the Montgomery Country Circuit Court (Dkt. No. 1-3, Ex.3), and on April 21, 2022, filed their Motion to Expedite Discovery ("Motion to Expedite"), Memorandum of Law in Support of Plaintiffs' Motion to Expedite Discovery, and Motion to Assign Case to Business & Technology Program ("B&T Motion"). (Dkt. No. 7). Shortly after filing, Judge Cummins was assigned to the case.

On April 21, 2022, Cedar filed its Proxy with the SEC. (Enright Aff. Ex. 27). Therein, Cedar disclosed some of the contents of Plaintiffs' Class Action Complaint. Additionally, in response to the allegation in the initial complaint that Cedar would lose its Charter through the Wheeler Merger, the Proxy disclosed that Cedar had amended Section 2.4(a) of the WMA to keep its Charter after the Wheeler Merger. (*Id.* at B-69).

On May 5, 2022, all Defendants except Wheeler filed a line joining Plaintiffs' Motion to Assign Case to Business & Technology Program (of Maryland state court). Enright Aff., Ex. 30. On May 6, 2022, Wheeler filed a line joining Plaintiffs' Motion to Assign Case to Business & Technology Program. Enright Aff., Ex. 31.

On May 6, 2022, counsel for all parties met and conferred to discuss Plaintiffs' anticipated motion for preliminary injunction. Defendants failed to indicate that they intended to remove the case to federal court.

On May 6, 2022—without having the benefit of any ruling or hearing on their Motion to Expedite and after having conferred with Defendants' counsel—Plaintiffs filed their Amended Class Action Complaint, Motion for Preliminary Injunction, and corresponding papers in Maryland state court. (Dkt. No. 116 and 118). Shortly thereafter, counsel for Cedar and the Board Defendants informed Plaintiffs' counsel that they would review the preliminary injunction papers over the weekend and "then will be back to [Plaintiffs' counsel] to work out a schedule for responses/hearing."

On May 11, 2022, within hours after a judge in the Montgomery County Circuit Court Business & Technology program was finally assigned to the case, Defendants removed the case to federal court. (Dkt. No. 1).

## APPLICABLE LEGAL STANDARD

The purpose of a temporary restraining order or a preliminary injunction is to "protect the status quo and to prevent irreparable harm during the pendency of the lawsuit, ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). The standards for evaluating a temporary restraining order are the same as those for a preliminary injunction. *E.g., Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 493 n.8 (D. Md. 2020) (granting temporary restraining order).

The Fourth Circuit Court of Appeals has specifically stated that "'[a] plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities

12

tips in his favor, and [4] that an injunction is in the public interest.'" *Amazon.com v. WDC Holdings LLC*, 2021 U.S. App. LEXIS 26226, at *21-22 (4th Cir. Aug. 31, 2021) (per curiam) (brackets in *Amazon*) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)). To prevail on a motion for a temporary restraining order, movants must demonstrate these four well-established factors by a bare "preponderance of the evidence". *Lonza Walkersville, Inc. v. Adva Biotechnology Ltd.*, No. 8:20-CV-03099-PX, 2022 WL 204396, at *2 (D. Md. Jan. 21, 2022) (emphasis added). Here, Plaintiffs satisfy each element.

## ARGUMENT

### I.     ABSENT THE TRO, PLAINTIFFS WILL SUFFER IRREPARABLE INJURY.

The Fourth Circuit Court of Appeals and other federal courts around the country find that irreparable harm exists when absent injunctive relief, plaintiff will be unable to obtain the relief sought even if it prevails on the merits. *See e.g.*, *Amazon.com v. WDC Holdings LLC*, 2021 U.S. App. LEXIS 26226, 2021 WL 3878403 (4th Cir. Aug. 31, 2021) (per curiam) (affirming district court's grant of preliminary injunction because, *inter alia*, irreparable injury was satisfied when plaintiff needed preliminary injunction to stop "dissipation" of defendant's assets); *Hughes Network Sys. v. Interdigital Communications Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) (stating that courts issue preliminary injunctions in cases to "preserve the plaintiff's opportunity to receive an award of money damages at judgment"); *United States ex rel. Taxpayers Against Fraud v. Singer Co.*, 889 F.2d 1327, 1328 (4th Cir. 1989) (upholding district court's finding of irreparable harm where the principal defendant's assets were "in danger of dissolution and depletion"); *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 53 (1st Cir. 1986) (noting that "preliminary injunction can be granted when it is necessary to protect the damages remedy"); *Productos Carnic, S.A. v. Central Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980) (stating that even if remedy

13

is "limited to damages, an injunction may issue to protect that remedy"); *Buffalo Wings Factory, Inc. v. Mohd*, No. 1:07cv612 (JCC), 2008 U.S. Dist. LEXIS 86360, 2008 WL 4699803, at *4 (E.D. Va. 2008) (finding irreparable harm where, without a TRO, the plaintiff would have had "little to no opportunity to collect the money it [was] owed"); *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 290 (1940) (affirming injunction when allegations were made that the defendant's assets were "in danger of dissipation or depletion").[11]

Irreparable injury also exists if "seeking redress at law" would require the Plaintiffs to initiate a "multiplicity of vexatious and unprofitable suits." *Smith v. Shiebeck*, 24 A.2d 795, 801 (Md. 1942); *see Savoie v. Merchants Bank*, 84 F.3d 52, 58 (2d Cir. 1996) (irreparable injury exists if common fund distributed and prevailing plaintiffs will need to seek recovery from hundreds of trust customers who received distributions; "a recourse [that] is so impractical as to be infeasible"); *cf. Dodocase VR, Inc. v. MerchSource, LLC*, 2018 U.S. Dist. LEXIS 48654, at *35-36 (N.D. Cal. Mar. 23, 2018) ("irreparable harm caused by requiring Plaintiff to simultaneously litigate on two fronts with different attorneys and under different rules instead of preventing Plaintiff from obtaining the benefit of its contracted-for exclusive dispute resolution process.").

Here, Plaintiffs would suffer irreparable injury without the TRO, because if Defendants are allowed to distribute the proceeds of the Proposed Transactions to Common Stockholders, and Plaintiffs later prevail on the merits, Plaintiffs will need to commence lawsuits against thousands of Common Stockholders across the country in attempt to "claw back" the wrongfully distributed and dissipated funds—"a recourse so impractical as to be infeasible." *Savoie*, 84 F.3d at 58; *cf.*

---

[11] "In such a case, preliminary relief securing assets may fulfill the 'traditional office of a preliminary injunction . . . to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits.'" *Amazon.com*, 2021 U.S. App. LEXIS 26226, at *23 (*quoting In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)).

*Sachs Capital Fund I LLC v. Em Grp. LLC*, 2020 Md. Cir. Ct. LEXIS 2, at *9-10 (Md. Cir. Ct. May 22, 2020) (issuing temporary restraining order to prevent money from changing hands when plaintiffs, the preferred members, claimed they were entitled to distributions due to "liquidity event"). Rather than compel Plaintiffs to initiate a "multiplicity of vexatious and unprofitable suits" (*Smith*, 24 A.2d at 801), this Court should maintain the *status quo* by holding all the Gross Proceeds in escrow in the Court's registry until the case is resolved to avoid the dissipation of the Gross Proceeds. Conversely, if Defendants prevail, the proceeds can simply be distributed to Common Stockholders at that time. *Cf. Lerner v. Lerner*, 511 A.2d 501, 512 (Md. 1986) ("[C]omplications can be avoided simply by maintaining the status quo until the merits are decided.").[12]

## II.     PLAINTIFFS HAVE NOT ONE, BUT MULTIPLE CLAIMS WITH A LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.  Plaintiffs Have Several Breach of Contract Claims With a Likelihood of Success on the Merits.

Maryland contract law applies to a corporate charter (which is a contract between the corporation and its stockholders), and to "Articles Supplementary," which "are simply an amendment of the corporate charter." *Impac Mortg. Holdings, Inc. v. Timm*, 255 A.3d 89, 94, 112 (2021). To plead a breach of contract, a plaintiff must plead that the defendant breached a contractual obligation owed to plaintiff. *WSC/2005 v. Trio Ventures Assocs.*, 190 A.3d 255, 267 (Md. 2018).

#### 1.  The Proposed Transactions Effect a "Change of Control" Entitling Preferred Stockholders to Exercise their Conversion Rights.

---

[12] Plaintiffs presume the D&O insurance of the individual directors would also serve as a source of recovery, but the amount of such insurance is unknown at this time, and would in any event presumably be depleted by defense costs.

The Articles Supplementary provide in Section 7 that, in the event Cedar undergoes a "Change of Control," the Preferred Stockholders have the right to convert their Preferred Stock into Common Stock at a specified ratio ("Conversion Rights"), unless Cedar opts to pay them the Liquidation Preference. Enright Aff. Ex. 1 and 7 § 7(b)(i) and Ex. 2.

Section 5(j) of the Articles Supplementary excludes transactions from the definition of a Change of Control when the Preferred Stock will remain an obligation of a company with publicly-traded stock:

> For the purposes of this Section 5 [Redemption] and Section 7 [Conversion] below, a "Change of Control" is when . . . the following have occurred . . . (x) the acquisition by any person . . . of beneficial ownership . . . through a purchase, merger or other acquisition transaction . . . of shares [Cedar] entitling that person to exercise more than 50% of the total voting power of all shares of [Cedar] . . . and (y) following the closing of any transaction referred to in clause (x), ***neither the Corporation nor the acquiring <u>or</u> surviving entity*** has a class of [publicly traded] ***common securities***. . . .

Enright Aff. Ex. 1 at § 5(j).

The purpose of Section 5(j) is to provide Cedar with a measure of flexibility to merge into or be acquired by another publicly traded entity without triggering a Change of Control and Conversion Rights of Preferred Stockholders.  However, if a transaction leaves the Cedar Preferred Stock residing at a "surviving entity" that does *not* have publicly listed common stock, then the transaction qualifies as a Change of Control under the language in Section 5(j) above.

That is precisely the situation here. Both the preamble and Section 2.1(b) of the WMA provide that Cedar will become a wholly-owned subsidiary of Wheeler, and to that end, defines the "Surviving Entity" in the merger as Cedar. Enright Aff. Ex. 5 at 1 (Preamble) and § 2.1(b). Further, Section 3.1(a)(iv) of the WMA provides that the Preferred Stock will remain an obligation of Cedar. Finally, Cedar—the "surviving entity"—will no longer have publicly-traded stock. *Id.* Thus, the Proposed Transactions *do not* leave a "class of [publicly traded] common securities" at

16

the "surviving entity" where the Preferred Stock resides, and  the Proposed Transactions are not

excluded from the definition of Change of Control by Section 5(j).[13]

It is no answer that the Preferred Stock is "expected to remain listed on the [NYSE]" and

that "the Surviving Company"—*i.e.*, Cedar—"will continue to be an independent filer of periodic

reports with the [SEC]."   Enright Aff. Ex. 27 at 8.  The bottom line is ***there will be no class of***

***publicly-traded common securities*** from the corporate entity to which the Preferred Stock is tied

(Cedar), and into which the Preferred Stock could be converted. Nor does Section 5(j) exclude the

Proposed Transactions from qualifying as a Change of Control because ***Wheeler*** has publicly listed

common stock. As noted above, the Preferred Stock remains an obligation of ***Cedar*** (not Wheeler).

Nor can the Preferred Stock convert into Wheeler preferred stock or Wheeler common stock, or

access Wheeler's assets.  Moreover, the "acquiring entity" with which Cedar will "merge" to

become a wholly-owned subsidiary is not Wheeler itself, but rather another wholly owned

***subsidiary*** of Wheeler called "Merger Sub," ***which has no publicly listed common stock***. Enright

Aff. Ex. 5 at 1 (Preamble) and § 2.1(b).

---

[13] As a matter of grammar, the verb after the phrase "neither the Corporation nor the acquiring or surviving entity," in Section 5(j) is "has" (singular), and not "have" (plural). Normally, when "neither" and "nor" link a singular term and a plural one, proper usage requires putting the singular term after the "neither," and the plural term after the "nor," and using a plural verb after the "nor" phrase (e.g., "neither the car nor the trucks *are* available") (as per The New York Times Manual of Style and Usage). In the Articles Supplementary, however, two terms appear after the "nor" (i.e., acquiring entity and surviving entity), which is plural, and yet the verb is "has" (singular), and not "have" (plural). Thus, the language in Section 5(j) instructs the reader to look at *one* entity to determine application of the exclusion, i.e., the entity at which the Preferred Stock will reside after the transaction closes. The Preferred Stock will remain an obligation of Cedar, as the "surviving" entity, so that is the entity that matters for purposes of applying the exclusion in Section 5(j), and Cedar will not have publicly-traded common stock, so the exclusion does not apply.

To illustrate the absurdity of Defendants' anticipated position, suppose that Cedar undergoes another Change of Control *after* the Proposed Transactions.  How would Preferred Stockholders exercise their Conversion Rights?  Per Articles Supplementary Section 7(b)(vii), the definition of "Common Stock Price" used to determine the ratio at which Preferred Stock converts references "the average of the closing prices per share of Common Stock on the NYSE for the ten days immediately preceding" (if the deal is not all-cash).  But if, as the Proposed Transactions contemplate, all of the Common Stock has been *cancelled*, this provision simply cannot function. Thus, the Change of Control definition cannot exclude transactions that maroon Preferred Stock at Cedar or another entity that lacks a "class of common securities" that are publicly traded.

If the text, structure, context, and common sense were not enough, prior statements by the Company accord with this understanding. For example, when issuing the Preferred Stock, the company identified the following risk factor: "***Other than in connection with a Change of Control***, the Series C Preferred Stock does not contain provisions that are intended to protect you if our common stock is delisted from the NYSE." Prospectus Supplement at S-12 (Enright Aff. Ex. 28). This statement recognizes that the Change in Control provision ***would be*** triggered if a merger results in Cedar's Common Stock being delisted. That is precisely the case here.

At a minimum, the Change of Control definition is ambiguous, and the canon of *contra proferentem* requires interpreting it against the drafter. *See e.g.*, *Sprint Nextel Corp. v. Wireless Buybacks Holdings*, 938 F.3d 113, 131 (4th Cir. 2019) ("Maryland courts apply the *contra proferentem* rule: if the contract remains ambiguous even after examining all available extrinsic evidence, then the ambiguity is resolved against the drafter.");  *Impac*, 255 A.3d 89, 119 ("Even if one were to conclude that the Voting Provision remained ambiguous after consideration of

extrinsic evidence, the relevant language would be construed against the drafter - i.e., Impac — with the same ultimate result.").

### 2. The Articles Supplementary Obligates Cedar to Release the Liquidation Preference Before Making Distributions to Common Stockholders.

Section 4(a) of the Articles Supplementary clearly and unambiguously obligates Cedar to pay the Liquidation Preference—before making any distributions to Common Stockholders—in the event of a liquidation, dissolution, or winding up. (Enright Aff. Ex. 1 at 3 and Ex. 2 at 4).

The process of liquidating and winding up entails disposing of existing assets, debts and obligations; laying off officers and employees; and distributing remaining proceeds. *See Dual Inc. v. Lockheed Martin Corp*., 857 A.2d 1095, 1103 (Md. 2004) (finding that company was not "winding up" because "nothing in the record indicates that Dual made any attempt to dispose of existing assets, debts, or obligations"); *Comptroller Of Treasury v. Thompson Trailer Corp.,* 121 A.2d 850, 856 (Md. 1956) ("'[t]he word 'liquidation' is synonymous with 'winding up or settlement with creditors.' . . . it means 'the act or operation of winding up the affairs of a firm or company by getting in the assets, settling with its debtors and creditors, and appropriating the amount of profit or loss.'"); *Quadrangle Offshore (Cayman) LLC v. Kenetech Corp.*, 1999 WL 893575, at *12 (Del. Ch. Oct. 13, 1999) (liquidation and winding up involves sale of assets, paying off creditors, laying off employees and officers, and distribution of remaining proceeds).

Here, there is no question that Cedar is liquidating and winding up its business. Cedar is selling *all* of its assets through the Proposed Transactions, using the proceeds to satisfy *all* of its liabilities, and then distributing the net proceeds exclusively to Common Stockholders. Enright Aff., Ex. 5 at §§ 1.1(a) & 3.1(d) (providing for payment of Closing Dividend to Common Stockholders after repayment of all Other Remaining Liabilities). Cedar is also terminating its Board and *all* of its officers and other employees; and canceling *all* of its Common Stock. Enright

19

Aff., Ex. 5 at §§ 2.4(b), 3.1(a)(ii)-(v), 6.7(a), and 6.14. Following the Proposed Transactions, Cedar will exist—quite literally—in name only.

Defendants will likely counter that Section 4(e) of the Articles Supplementary states that "[n]one of a consolidation or merger of the Corporation with or into another entity . . . or a sale, lease, transfers, or conveyance of all or substantially all of the Corporation's assets . . . shall be considered a liquidation, dissolution or winding up." Enright Aff. Ex. 1 at 3, Ex. 2 at 4. But Plaintiffs are not arguing that an asset sale or merger *standing alone without more* would be considered a winding up or liquidation under Section 4(a). Rather, notwithstanding Section 4(e), the Proposed Transactions trigger the Liquidation Preference under Section 4(a) because the asset sales and merger comprising the Proposed Transactions are *accompanied by numerous other steps* characteristic of a liquidation and winding up such as discharging all debts, distributing all proceeds, dissolving the Board, and terminating all employees. ¶¶134-36.

Conversely, construing Section 4(e) to mean that a transaction can *never* qualify as a winding up or liquidation whenever a sale of all assets is part of the process would make it impossible for Preferred Stockholders to *ever* receive a Liquidation Preference under Section 4(a). That is because *every* liquidation and winding by definition involves a sale of all or substantially all of a company's assets. *See Quadrangle*, 1999 WL 893575, at *11 ("[t]he sale of assets is *such a fundamental or integral part of a liquidation* that it is almost impossible to give meaning to the term liquidation without considering this element."). For this very reason, when interpreting a provision similar to Section 4(e), *Quadrangle* concluded that the "asset sale exception was not designed to remove evidence of asset sales from an examination of [the company's] overall conduct, but to *exclude an asset sale alone* from being considered a liquidation *without evidence of other conduct* falling within the meaning of that term." *Id.* The same logic applies here.

Plaintiffs' interpretation of Section 4(e) thus harmonizes it with Section 4(a), whereas Defendants' apparent interpretation of Section 4(e) renders Section 4(a) superfluous in violation of accepted rules of construction. *See Orkin v. Jacobson*, 332 A.2d 901, 904 (Md. 1975) ("An interpretation which gives reasonable meaning to all [of a contract's] provisions will be preferred to one which leaves a portion of the writing useless or inexplicable."). And if there is any remaining doubt about which interpretation is correct, the canon of construction known as *contra proferentem*—that ambiguous language in a contract is construed against the party that drafted it (*Impac*, 255 A.3d at 97)—would remove it. That is because the Articles Supplementary do not define the terms "liquidation" or "winding up" as used in Section 4. Thus, the most that Defendants could claim is that the language in Section 4 is ambiguous; that is, "susceptible of more than one meaning." *Impac*, 255 A.3d at 96. Absent extrinsic evidence to the contrary, *contra proferentum* requires resolving that ambiguity against Defendants. Thus, the Liquidation Preference is triggered where (as here) disposition of all or substantially all assets by sale and "merger" is coupled with numerous additional steps that are *quintessential* of a winding up/liquidation such as discharge of all debts, distributions of all proceeds to stockholders, termination of the board of directors and all officers and employees, and cancellation of all stock.

### 3. Cedar Breached the Covenant Of Good Faith and Fair Dealing.

Implied in every contract is an obligation to act in good faith. *Clancy v. King*, 954 A.2d 1092, 1106 (Md. 2008). This obligation requires parties to "exercise good faith in fulfilling their contractual obligations," and "deal fairly with the other party or parties to a contract." *WSC/2005*, 190 A.3d at 267. A party acts in bad faith when it undertakes any discretionary act "that will have the effect of injuring or frustrating the right of the other party to receive the fruits of the contract between them." *WSC/2005*, 190 A.3d at 268. A party also acts in bad faith when a "primary

21

motivation" for asserting specific contractual rights is to injure the other party. *Clancy*, 954 A.2d at 1108 (citing *Della Ratta v. Larkin*, 856 A.2d 643, 657 (Md. 2004), finding bad faith when "significant motivation for . . . issuing the capital call was to squeeze out some of the limited partners" and party "advanced the date of the capital call in order to 'out-maneuver' the Withdrawing Partners and block them from exercising their statutory right to withdraw").[14]

The Delaware Chancery Court's reasoning in *Quadrangle*, *supra*, is directly on point, and should be followed here because the Maryland courts "frequently look[] to Delaware courts for guidance on issues of corporate law." *Oliveira*, 152 A.3d at 736; *see also MAS Assocs., LLC v. Korotki*, 214 A.3d 1076, 1089 n.11 (Md. 2019) (same). *Quadrangle* identified five factors that made a series of transactions a *de facto* liquidation in violation of the covenant of good faith and fair dealing: "(1) sale of assets; (2) paying off of creditors; (3) winding up of business affairs; (4) distribution of remaining proceeds to shareholders; and (5) abandonment of corporate form." *Quadrangle*, 1999 Del. Ch. LEXIS 213, at *28-31. Importantly, a preferred stockholder need not establish each and every one of these five factors to successfully characterize a series of transactions as a liquidation. *See id.* Instead, using the above factors as signposts, a preferred stockholder need only show by a "preponderance of the evidence" that defendants intentionally embarked upon a course of action tantamount to a liquidation in bad faith with the intent of dishonoring the preferred stockholders' liquidation preference. *Id.* at *9-10. If a preferred stockholder makes that showing, then the covenant of good faith implied in all contracts protects the preferred stockholder from a *de facto* liquidation designed to frustrate its right to a liquidation preference. *Id.* at *10. *See also Gabhart v. Gabhart*, 370 N.E.2d 345, 356 (Ind. 1977) ("a proposed

---

[14] While *Del Ratta* is a breach of fiduciary duty case, "[t]he requirements of good faith in contract law are similar to the good faith doctrine in partnership law." *Clancy*, 954 A.2d at 1108.

merger which has no valid purpose, which we construe to mean a purpose intended to advance a corporate interest, and which merger would eliminate or reduce a minority shareholder's equity, may be challenged, as a *de facto* dissolution"); *Marcus v. W2007 Grace Acquisition I, Inc.*, 203 F. Supp. 3d 332, 339 (S.D.N.Y. 2016) (adopting the *Quadrangle* factors).

So too here, Cedar embarked upon a *de facto* liquidation. Cedar could have sold the Wheeler Properties for cash and released the Liquidation Preference, but instead deliberately structured the Proposed Transactions as a merger in bad faith to: (i) frustrate Preferred Stockholders' right to the Liquidation Preference (thereby maximizing the dividends for themselves and the Common Stockholders); and (ii) given Wheeler's history of dysfunction and oppression, crash the Preferred Stock price (seeking to facilitate a tender offer and/or purchases at prices far below the $25.00 Liquidation Preference). Because Defendants acted in bad faith and were improperly motivated by a desire to deprive Preferred Stockholders of their contractual rights, their gambit violates the covenant of good faith implied in all contracts and fair dealing.[15]

### B.   The Breach of Fiduciary Duty Claim Has a Likelihood of Success on the Merits

Maryland has long recognized that a preferred stockholder is "a member of the corporation . . . expressly invested with all the incidents, rights, privileges, immunities and liabilities of a stockholder." *Leviness v. Consol. Gas, Elec. Light & Power Co. of Baltimore*, 80 A. 304, 306 (Md. 1911). Thus, the Cedar Board owed fiduciary duties to Preferred Stockholders. *See Eisenberg v. Chicago Milwaukee Corp.,* 537 A.2d 1051, 1062 (Del. Ch. 1987) (directors owe fiduciary duties to preferred stockholders); *accord In re FLS Holdings, Inc. S'holders Litig.*, No. CIV. A. 12623, 1993 WL 104562, at *4 (Del. Ch. Apr. 2, 1993). Breach of fiduciary duty is an independent cause

---

[15] The good faith and fair dealing claim based on destruction of the Conversion Rights is likely to succeed for similar reasons. Defendants engineered the Proposed Transactions as a nominal "merger" in a bad-faith attempt to circumvent those rights.

of action. *Plank, v. Cherneski*, 231 A.3d 436, 465 (Md. 2020). Maryland's General Corporation Law specifies that directors owe stockholders a duty of good faith. 2-405.1(c)(1). Directors also owe stockholders a duty to maximize the stock value in connection with any change in control. *See Plank*, 231 A.3d at 456 (finding duty to maximize value notwithstanding Section 2-405.1(i)).

Here, Defendants, in bad faith, orchestrated a merger to deprive Preferred Stockholders of their Liquidation Preference, destroy their Conversion Rights, and crash the Preferred Stock price. Defendants' selection of Wheeler as the Preferred Stock destination only magnifies their bad faith, given (i) Wheeler's history of dysfunction and oppression of its own preferred shareholders, and (ii) Cedar's conclusion in November 2017 that it would be "adversely consequential" to merge with Wheeler because of Wheeler's small size (when Wheeler was worth $95 million—*nearly five time what it is worth today*). *See* Enright Aff., Ex. 9 p. 56; Ex. 24.

Moreover, on May 5, 2022, Cedar provided property updates for the period ended March 31, 2022 indicating that five properties increased their occupancy rates and/or average base rent per leased sq. ft. since the Cedar 2021 10-K update and two properties decreased those values.[16] Not coincidentally, all five of the properties with increased occupancy and/or base rents were among the properties sold to the Grocery-Anchored Purchasers, while the two properties with decreased occupancy rates and/or base rents were among the properties sold to Wheeler, thereby further substantiating that the Defendants intentionally structured the Proposed Transactions in

---

[16] With respect to occupancy rates: (i) New London Mall increased from 88.3% to 96.4%; (ii) Yorktowne Plaza increased from 57.7% to 66.9%; (iii) Valley Plaza increased from 27.9% to 38%; (iv) Norwood Shopping Center increased from 85.9% to 94%; and (iv) The Point increased from 87.8% to 97.3%. *See* Enright Aff., Ex. 29. With respect to average base rent per leased sq. ft., (i) New London Mall increased from $12.85 to $13.55; (ii) Yorktowne Plaza increased from $13.49 to $13.91; (iii) Valley Plaza increased from $10.16 to $10.95; and (iv) Norwood Shopping Center increased from $8.84 to $15.10. *See id*. Conversely, Washington Center Shoppes decreased from 93.1% to 92% and from $11.81 to $11.71 and Coliseum kept its same occupancy rate while decreasing its average base rent per. leased sq ft. from $15.15 to $14.27. *See id*.

bad faith to allocate inferior properties to Wheeler to support future payment of dividends to the Preferred Stockholders. Far from maximizing Preferred Stock value (as Schanzer promised in September 2021 when he acknowledged a duty to maximize value for "***all our shareholders***"), the Proposed Transactions have decimated the Preferred Stock value (as Schanzer tacitly conceded in the March 2, 2022 press release when he stated that "this combination of transactions represents the ***best possible outcome for our <u>common</u> shareholders***."). (Enright Aff. Ex. 4 at Ex. 99.1).

Preferred Stockholders thus have a strong direct breach of fiduciary duty claim. *See Della Ratta*, 856 A.2d at 657 (affirming injunction enjoining enforcement of capital call where defendant breached fiduciary duty and acted in bad faith given that "significant motivation for . . . issuing the capital call was to squeeze out some of the limited partners" and defendant "advanced the date of the capital call in order to 'out-maneuver' the Withdrawing Partners and block them from exercising their statutory right to withdraw."); *Eisenberg*, 537 A.2d at 1057-63 (preliminarily enjoining tender offer when preferred stockholder had shown reasonable probability that defendants breached fiduciary duty, and reasonable probability of irreparable harm outweighing harm resulting from injunction); *cf. FLS*, 1993 WL 104562, at *4 (rejecting settlement upon objection of preferred stockholder where directors owned large amounts of common stock, and no independent adviser or independent directors' committee was appointed to represent the interests of the preferred stockholders who did not have right to vote on the transaction or allocation of proceeds, and who were in conflict of interest situation with the common).

**III. THE BALANCE OF EQUITIES FAVOR THE TRO.**

Here, the equities weigh decidedly in favor of granting the TRO. If the Court declines to grant the TRO, and Defendants distribute the Gross Proceeds to Common Stockholders, and Plaintiffs later prevail on the merits, they would need to commence thousands of lawsuits across the country to "claw back" payments wrongfully distributed to Common Stockholders. In contrast,

if the Court grants the TRO, and Defendants prevail, the escrowed Proceeds can immediately be distributed in full to Common Stockholders. *See Wachit Techs., Inc. v. Big Apple Consulting USA, Inc*., 2008 U.S. Dist. LEXIS 34363, at *13 (D. N.C. Apr. 25, 2008) ("Plaintiff appears to be facing destruction if the preliminary injunction does not issue, whereas such an injunction would merely cause Defendants a delay. Thus, under the sliding scale described in *Microsoft*, the balance of hardships weighs heavily in Plaintiff's favor. . . ."); *DMF Leasing, Inc. v. Budget Rent-A-Car Of Maryland, Inc*., 871 A.2d 639, 645 (Md. 2005) (balance of convenience tipped strongly in favor of plaintiff where not granting injunction will result in far greater burden to plaintiff than burden to defendant from granting injunction); *see also Ledo Pizza Sys. v. Singh*, 2013 U.S. Dist. LEXIS 146938, at *14 (D. Md. Oct. 10, 2013) (granting temporary restraining order even though "defendant will suffer serious economic harm" because "defendant's hardship appears self-inflicted").[17]

### IV. THE PUBLIC INTEREST FAVORS THE TRO.

As the Raymond James analyst recognized, the Proposed Transactions establish "a bad precedent for the [REIT] sector," and are expected to cause "broader negative implications for the [REIT] industry," if Preferred Stockholders "are not made whole." (Enright Aff. Ex. 19 at 2); *cf. Wachit Techs., Inc*., 2008 U.S. Dist. LEXIS 34363, at *13 ("Finally, as to the fourth factor -- public interest considerations -- the evidence indicates that Plaintiff is a publicly traded company, and therefore, any alleged attempts to unfairly influence its share price may be expected to impact the

---

[17] Plaintiffs are individual investors (primarily retirees) suing in a representative capacity to redress breaches of contract and fiduciary duties, so they respectfully submit that no bond (or a nominal bond) be required.  *See* Md. Code Ann., Rule 15-503(c) (court may dispense with bond requirement); *ODS Techs., L.P. v. Marshall*, 832 A.2d 1254 (Del. Ch. 2003) (preliminarily enjoining corporate transaction on $5,000 bond); *Doe v. Pittsylvania Cty., Va*., 842 F. Supp. 2d 927, 937 (W.D. Va. 2012) (setting bond at zero dollars); *Vozzolo v. Air Canada*, No. 20-CV-03503 (PMH), 2021 WL 5113387, at *8 & n.6 (S.D.N.Y. Nov. 3, 2021) (requiring no bond for preliminary injunction sought by class action plaintiff).

public. On the basis of these considerations, the Court concludes that entry of a preliminary injunction is proper in this case.").

Also, class actions serve the public interest by ensuring effective enforcement of laws that individual investors would find uneconomical to pursue on their own. *See Bender v. Jordan*, 439 F. Supp. 2d 139, 178 (D.D.C. 2006) (private actions by investors to enforce the securities laws "perform a vital public service"). Similarly, without a TRO, Plaintiffs would be compelled to consume judicial resources through litigating thousands of lawsuits against Common Stockholders in courts around the country. The public interest of preserving judicial resources by resolving the merits of the Preferred Stockholders' claims in a single class action lawsuit confirms that the public interest supports Plaintiffs' TRO.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully move this Court for a TRO, that pending a determination of Plaintiffs' motion for preliminary injunction, (i) enjoins distribution to Cedar common stockholders of any of the Proceeds from (a) Cedar's Proposed Wheeler Merger and (b) the Cedar Asset Sale; (ii) enjoins consummation of the Proposed Wheeler Merger; (iii) imposes a constructive trust on all of the Proceeds from the Cedar Asset Sale and Proposed Wheeler Merger in favor of Plaintiffs and other Cedar preferred stockholders; and (iv) directs that all of the Proceeds from the Cedar Asset Sale and Proposed Wheeler Merger be deposited into the Court's registry to be held in escrow.

Dated:  May 13, 2022                                 Respectfully submitted,

                                                                 */s/ Donald J Enright*

                                                                 **LEVI & KORSINSKY LLP**
                                                                 Donald J. Enright (Bar Number: 13551)
OF COUNSEL:                                     Jordan A. Cafritz (Bar Number: 20908)
                                                                 1101 30th Street, NW, Suite 115

27

**WOHL & FRUCHTER LLP**
Joshua E. Fruchter
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Telephone: (845) 290-6818
Facsimile: (718) 504-3773

*Attorneys for Plaintiffs*

Washington, DC 20007
Telephone: (202) 524-4290
Fax: (212) 363-7171
denright@zlk.com
jcafritz@zlk.com

*Counsel for Plaintiffs and [Proposed]*
*Lead Counsel for Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2022, service required by Fed. R. Civ. P. 5(a) has been made of the foregoing Memorandum of Law In Support of Plaintiffs' Emergency Motion Temporary Restraining Order.

*/s/  Donald J. Enright*
(Bar. No. 13551)