**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| DAVID SYDNEY, et al., Individually and On Behalf of All Others Similarly Situated, | Case No.: 8:22-cv-1142-GLR |
| *Plaintiffs*, | REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION |
| v. | |
| CEDAR REALTY TRUST, INC., et. al., | |
| *Defendants*. | |

## **TABLE OF CONTENTS**

**INTRODUCTION**...................................................................................................... 1

**ARGUMENT** ............................................................................................................. 3

    I.    PLAINTIFFS' CLAIMS ARE LIKELY TO SUCCEED ........................................... 3

        A.    Defendants Have Breached the Implied Duty of Good Faith and Fair Dealing. 3

        B.    Defendants Have Breached the Articles Supplementary Because the Proposed Transactions Constitute a Change of Control...................................................... 8

        C.    Defendants Have Breached the Articles Supplementary Because the Proposed Transactions Constitute a *De Facto* Winding Up and Liquidation. ................. 10

        D.    Defendants Have Breached Their Fiduciary Duties........................................ 12

    II.    THE PREFERRED STOCKHOLDERS WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION ....................................................... 13

    III.  THE BALANCE OF CONVENIENCE AND PUBLIC INTEREST FACTORS FAVOR THE PRELIMINARY INJUNCTION........................................................ 15

    IV.  THE COURT HAS THE DISCRETION TO SET A NOMINAL BOND................ 17

**CONCLUSION** ....................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Case**                                                                                          **Page(s)**

*Amazon.com v. WDC Holdings LLC*,
   2021 U.S. App. LEXIS 26226, 2021 WL 3878403 (4th Cir. Aug. 31, 2021) .........................15

*Arkansas Best Corp. v. Carolina Freight Corp.*,
   60 F. Supp. 2d 517(W.D.N.C. 1999)……………………………………………………………19

*Clancy v. King*,
   954 A.2d 1092 (Md. 2008)………………………………………………………….. ......3, 7, 12

*Coreas v. Bounds,*
   458 F. Supp. 3d 352 (D. Md. 2020)........................................................................................17

*Creel v. Lilly*,
   729 A.2d 385 (Md. 1999).  ....................................................................................................11

*Defy Ventures, Inc. v. U.S. Small Bus. Admin.*,
   469 F. Supp. 3d 459 (D. Md. 2020)........................................................................................17

*Di Biase v. SPX Corp.*,
   872 F.3d 224 (4th Cir. 2017). ................................................................................................14

*Dixon v. Cost Plus*,
   2012 WL 2499931 (N.D. Cal. June 27, 2012) ........................................................................16

*Donalds v. Ethicon, Inc.*,
   2021 WL 6126297 (D. Md. Dec. 28, 2021)............................................................................20

*Frederick Hsu Living Tr. v. ODN Holding Corp.*,
   2017 WL 1437308 (Del. Ch. Apr. 14, 2017). ........................................................................13

*George Sink PA Inj. Laws. v. George Sink II L. Firm LLC*,
   2019 WL 6318778 (D.S.C. Nov. 26, 2019) ............................................................................19

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
   174 F.3d 411 (4th Cir. 1999) ................................................................................................17

*In re FLS Holdings, Inc. S'holders Litig.*,
    No. CIV. A. 12623, 1993 WL 104562 (Del. Ch. Apr. 2, 1993)……………………………..13

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
   2022 WL 1323139 (D. Md. May 3, 2022)……………………………………………………20

*Jolly Roger Fund, LP v. Prime Group Realty Trs*,
   2007 Md. Cir. Ct. Lexis 10 (Md. Cir. Ct. Aug 16, 2007)……………………………………..5-12

*Kimeldorf v. First Union Real Est. Equity & Mortg. Invs*.,
   764 N.Y.S.2d 73, 74 (1ˢᵗ Dept. 2003). ............................................................................... 10-12

*L & H Enterprises, Inc. v. Allied Bldg. Prod. Corp*.,
   596 A.2d 672, 676 (1991) ......................................................................................................12

*Leviness v. Consol. Gas, Elec. Light & Power Co. of Baltimore*,
   80 A. 304 (Md. 1911) ............................................................................................................12

*Malon v. Franklin Fin. Corp*.,
   2014 WL 6791611 (E.D. Va. Dec. 2, 2014) ........................................................................16

*Morgan Keegan & Co. v. Louise Silverman Tr*.,
   2012 WL 113400 (D. Md. Jan. 12, 2012) .............................................................................18

*Nokia Corp. v. Interdigital, Inc.,*
   645 F.3d 553 (2d Cir. 2011) ..................................................................................................18

*Orlando v. CFS Bancorp, Inc*.,
   2013 WL 5797624 (N.D. Ind. Oct. 28, 2013) ......................................................................16

*Parshall v. HCSB Fin. Corp*.,
   2017 WL 3130479 (D.S.C. July 24, 2017) ...........................................................................16

*Pashby v. Delia*,
   709 F.3d 307 (4th Cir. 2013) ................................................................................................17

*Plank, v. Cherneski*,
   231 A.3d 436 (Md. 2020) ......................................................................................................12

*Quadrangle Offshore (Cayman) LLC v. Kenetech Corp.*,
   1999 Del. Ch. LEXIS 213 (Del. Ch. Oct. 13, 1999)........................................................ 8-12

*Roizen v. Multivest, Inc*.,
   No. 6535, 1981 WL 7631(Del. Ch. Sept. 25, 1981) .............................................................18

*Sardis v. Overhead Door Corp*.,
   10 F.4th 268 (4th Cir. 2021) .................................................................................................20

*Torres v. Zamanizadeh*,
   No. 3:17-CV-1270-AC, 2018 WL 738957 (D. Or. Feb. 6, 2018) ...........................................20

*Rigby v. Allstate Indem. Co.*,

123 A.3d 592 (2015) ..................................................................................................12

*Whitfield v. Liberty Mut. Grp. Inc.*,
   2019 WL 1099077 (D. Md. Mar. 8, 2019) ............................................................7

*WSC/2005 v. Trio Ventures Assocs.*,
   190 A.3d 255 (Md. 2018) ...................................................................................3,7

**Statue**                                                                                                   **Page(s)**

26 U.S. Code § 857(b)(3)(A)-(C) ...............................................................................19


Fed. R. Civ. P. 65(c) ..................................................................................................18

Plaintiffs respectfully submit this memorandum of law in reply to Defendants' opposition (Dkt. No. 30) to Plaintiffs' Motion for a TRO ("Motion") (Dkt. No. 13) (converted by so-ordered stipulation into a motion for a preliminary injunction; Dkt. No. 24).[1]

## **INTRODUCTION**

Far more than just a contract case, this action features ***overwhelming*** evidence that Defendants have acted in bad faith, first by structuring the Wheeler Merger with the intent of depriving Preferred Stockholders of contractual rights, and then by misleading the Court about the economics of that transaction. In particular, Defendants claim that the properties being transferred to Wheeler ("Wheeler Properties") are worth $291.3 million.  However, the ***only credible*** evidence in the record concerning the actual value of those properties—the $240 million all-cash bid by Party C on January 21, 2022 (Dkt. No. 13-2 at 711)—indicates that the Proposed Transactions would leave only $110 million of equity in those properties (after deducting the $130 million KeyBank loan secured by those properties from $240 million).  This amount would be far short of the $161.3 million required to pay the Liquidation Preference.  Under Defendants' own authority— the *Jolly Roger* case—a transaction that renders a defendant unable to pay a liquidation preference is alone evidence of bad faith. *See* Section I.A, *infra*.

Even worse, Defendants also (i) specifically selected Wheeler as a merger partner despite having previously refused to merge with Wheeler in November 2017, and notwithstanding Wheeler's history of shareholder abuse and management dysfunction, (ii) allocated inferior

---

[1] All capitalized terms shall have the meanings given to them in the Amended Complaint. (Dkt. 4). All internal citations and quotations are omitted, and all emphasis in quotes is added. Page cites to Docket No. 13-2, the Affidavit of Donald J. Enright, and the exhibits thereto, are to pages of the PDF file; otherwise, all page cites are to the pages in the relevant document. "Def. Mem." refers to Defendants' Memorandum of Law at Dkt. No. 30, and "Enright Reply Aff." refers to the Reply Affidavit of Donald Enright, dated June 3, 2022, submitted herewith.

properties to Wheeler, and (iii) have refused to substantiate that the Wheeler Properties' cash flow suffices to pay the annual preferred dividends. All of this evidence of bad faith means that Plaintiffs' claims for breach of the implied duty of good faith and fair dealing, and breach of fiduciary duty, are likely to succeed. *See* Sections I.A and I.D, *infra*. Further evidencing their merit, these claims are corroborated by the comments of a neutral analyst who opined that relegating the Preferred Stockholders to "purgatory" was "the driving factor behind the deal structure," and that the Proposed Transactions set a "bad precedent for the REIT industry." Dkt. No. 13-2 at 616-617.

Similarly, Plaintiffs' claims for breach of Sections 4(a) and 7 of the Articles Supplementary are likely to succeed because Plaintiffs' interpretations of those provisions are comport with the facts and the law, while Defendants' arguments ignore key facts and principles of contractual interpretation. Indeed, if the Court finds that either of those provision are ambiguous, Defendants concede that the doctrine of *contra proferentem* applies (Def. Mem. at 15), and the Court must construe those provisions against Defendants as the drafters. *See* Sections I.B-C, *infra*.

In terms of irreparable injury, the touchstone in the 4th Circuit is the adequacy of a legal remedy. Here, given the $51.3 million gap between the $161.3 million Liquidation Preference and the $110 million of equity in the Wheeler Properties—and the lack of insurance to cover that shortfall—an award of monetary damages would be an inadequate remedy, and Plaintiffs will need to commence "clawback" actions against thousands of former Common Stockholders if the Gross Proceeds are distributed. Plaintiffs have cited numerous binding precedents holding that this constitutes irreparable injury. *See* Dkt. No. 13-1 at 14-15.

In contrast, the Defendants are not threatened by any significant harm from entry of an injunction, and have no need for additional security. Per the revised Proposed Order submitted herewith, Plaintiffs are withdrawing their request to enjoin the Wheeler Merger so long as the $130

million in consideration for the sale of the Wheeler Properties is also held in escrow. Consequently, if an injunction is entered pending a determination on the merits, ***the Wheeler deal will still close*** and Common Stockholders will be protected by (i) $396 million in Gross Proceeds sitting in an interest-bearing account (Dkt. No. 4 at ¶ 131), and (ii) the equity in the Wheeler Properties (at least $110 million, according to Plaintiffs' more conservative valuation). Defendants' arguments to the contrary are premised on distortions of 4th Circuit case law and the self-serving and a conclusory declaration of Cedar's own lawyer, which has absolutely no evidentiary value. *See* Sections II – IV, *infra*.

For these reasons, as more fully set forth in Plaintiffs' opening brief and below, the Court should grant the Motion, enter the Proposed Order filed herewith, and enjoin the distribution of the proceeds from the Proposed Transactions.

## ARGUMENT

### I.       PLAINTIFFS' CLAIMS ARE LIKELY TO SUCCEED.

#### A.  Defendants Have Breached the Implied Duty of Good Faith and Fair Dealing.

Despite Defendants' insistence to the contrary, ***this is not just a contract case***. While Plaintiffs' claims for breach of the Articles Supplementary invoke principles of contract construction (I.B-C, *infra*), Defendants' ***bad faith motives*** for orchestrating the Wheeler Merger are relevant to Plaintiffs' claims for breach of the implied duty of good faith and fair dealing (as well as breach of fiduciary duty, as discussed in Section I.D, *infra*).

Maryland law implies an obligation to act in good faith to every contract. *Clancy v. King*, 954 A.2d 1092, 1106 (Md. 2008). A party acts in bad faith when a "significant motive" for its exercise of contractual rights is to deprive its counterparty of the "fruits of the contract between them." *Clancy*, 954 A.2d at 1109; *accord WSC/2005 v. Trio Ventures Assocs.*, 190 A.3d 255, 268

(Md. 2018). Here, there is **overwhelming** evidence that Defendants have acted in bad faith, first by engineering the Wheeler Merger with the intent of depriving Preferred Stockholders of contractual rights, and then by misleading the Court about the economics of that transaction.

In November 2017, the Cedar Board refused to merge with Wheeler on the ground that doing so would be "adversely consequential" given Wheeler's small size. Dkt. No. 13-2 at 636-37. At the time, Wheeler was worth $95 million. *Id.*. Presently, Wheeler is only worth about $22 million—a nearly 80% drop in value. Enright Reply Aff., Ex. A. Yet, Defendants now disingenuously insist that merging with Wheeler is a good deal for Preferred Stockholders. Def. Mem. at 2. But Defendants are misrepresenting the Wheeler Properties' cash flow and value.

Defendants contend that, in 2021, the Wheeler Properties generated $19.1 million in net operating income, purportedly enough to pay the $10.8 million annual preferred dividends. Def. Mem. at 6. But according to Cedar's own financial statements, **net operating income excludes** at minimum: (i) repayment of principal and interest on the KeyBank loan used to finance Wheeler's purchase of the Wheeler Properties; and (ii) capital expenditures ("capex") required to adequately maintain the properties. Dkt. No. 13-2 at 213, 230, 234. To date, Defendants have refused to produce documents that would substantiate the net cash flow available from the Wheeler Properties to pay preferred dividends. Dkt. No. 36. Plaintiffs expect those documents will ultimately show there is **insufficient cash flow** from the Wheeler Properties to pay those dividends. If those documents demonstrated otherwise, Defendants would have presented them to Plaintiffs and the Court by now. **It is telling that they have not**.

More significantly, Defendants claim the Wheeler Properties are worth $291.3 million because "Wheeler will acquire Cedar for $130 million [in] cash," and the Preferred Stock will remain outstanding with a Liquidation Preference of $161.3 million. Def. Mem. at 6. This assertion

begs the question, and is demonstrably false.  In fact, ***Wheeler is not investing any of its own cash***, but rather is borrowing $130 million from KeyBank. Dkt. No. 13-2 at 156. And there is no credible evidence in the record (such as an expert appraisal) that the equity remaining in Wheeler Properties after deducting the $130 million KeyBank loan equals the $161.3 million Liquidation Preference. Indeed, if the Wheeler Properties were worth $291.3 million, Defendants could have sold those properties for that price, paid the Liquidation Preference, and distributed the balance to Common Stockholders. The fact that they did not do so further confirms that the Wheeler Properties are actually worth far less. Instead, Defendants extracted as much cash from the Wheeler Properties for Common Stockholders as KeyBank was willing to lend, without regard for whether the remaining equity protected Preferred Stockholders, and Wheeler plainly assumed that after the price of the Preferred Stock crashed after the Proposed Transactions were announced, it would buy out the Preferred Stock for much less than $161.3 million in a tender offer like it had done with its own preferred stock. *See* Dkt. No. 13-1 at 6.

Presently, ***the only credible evidence*** of the Wheeler Properties' true market value is Party C's January 21, 2022 $240 million all-cash bid to purchase them. Dkt. No. 13-2 at 711. To date, Defendants have refused to produce any documents that would shed further light on the Wheeler Properties' value (such as the Commitment Letter, which might disclose the value KeyBank attributed to the Wheeler Properties when it loaned $130 million against them). Dkt. Nos. 32-1 at 10; 36. Thus, at this stage, ***the only reasonable conclusion is that the Wheeler Properties are worth no more than $240 million***—over $50 million less than the fictional "value" assigned by Defendants. Therefore, the Wheeler Properties' remaining equity (*i.e.,* $240M-$130M, or $110M) cannot cover the $161.3 million Liquidation Preference. This is evidence of bad faith. *See Jolly*

*Roger Fund, LP v. Prime Group Realty Trs*, 2007 Md. Cir. Ct. Lexis 10, at *13 (Md. Cir. Ct. Aug 16, 2007).[2]

As further evidence of bad faith, SEC filings show that Defendants allocated inferior properties to Wheeler with lower average occupancy rates and lower average base rent per square foot – and that was before taking into account that the Oakwood Commons property is no longer 100% occupied after Walmart vacated. Dkt. Nos. 4-2 (Ex. A), 4-3 (Ex. B), and 13-1 at 8 n.8.

Defendants also claim that Preferred Stockholders are protected because "they will retain their rights under the Articles" and "their interest in Cedar's assets will be senior to the interests of [Wheeler stockholders]." Def. Mem. at 23-24. But the Articles Supplementary would invest Wheeler with unfettered discretion over whether to pay preferred dividends. Dkt. No. 13-2 at 6, § 3(a); at 23, § 3(a). This would enable Wheeler to abuse Preferred Stockholders (*e.g.,* not paying dividends because cash flow from the Wheeler Properties is needed for "management fees") just like it has historically abused its own preferred stockholders. *See* Dkt No. 4 at ¶¶ 100-08; Dkt. No. 13-2 at 352, 544. Indeed, Defendants concede that Wheeler will have the right to engage in financial transactions that would impact the payment of preferred dividends. Def. Mem. at 30.

Cedar could have chosen a different merger partner. But it selected Wheeler with its history of (i) shareholder abuse and (ii) management dysfunction (*e.g.,* Dkt. No. 4 ¶¶ 109-11; *e.g.,* Dkt. No. 13-2 at 554, 563, 608), which predictably crashed the price of the Preferred Stock when the merger was announced. Dkt. No. 13-2 at 626. Defendant Schanzer knew this would happen, having

---

[2] Further evidence that Defendants structured the Proposed Transactions in bad faith is the fact that, on June 3, 2021, Cedar management reported that "the ***liquidation value*** of [Cedar], if successfully executed, might be as high as $28 or $29 per share." Dkt. No. 13-2 at 708. That range matches the $29 per share Defendants anticipate from the Proposed Transactions. *Id.* at 51. Thus, the Proposed Transactions mirror the liquidation envisioned by Defendants in June 2021, and ***Defendants obviously structured the Proposed Transactions as an asset sale and merger to avoid payment of the Liquidation Preference***.

stated in September 2021 that Cedar would maximize value for "**_all_** our shareholders" (*id.* at 46), but then conceding in March 2022, that the Proposed Transactions represent "the best possible outcome for our **common** shareholders." *Id.* at 59. Yet more evidence of bad faith.

Defendants' authorities (Def. Mem. at 22-25) do not dictate a different outcome. In particular, Maryland law is **_not solely_** concerned with one party "prevent[ing] the other party from performing his obligations under the contract" (as assumed in *dicta* in *Whitfield v. Liberty Mut. Grp. Inc.*, 2019 WL 1099077, at \*6 n. 12 (D. Md. Mar. 8, 2019) (Russell, J.)). Instead, it is also concerned with "the manner in which a party may exercise the discretion accorded to it by the terms of the agreement." *WSC*, 190 A.3d at 267. That is, a party can exercise contractual rights, but if—like here—it exercises those rights in bad faith, it breaches the implied duty of good faith and fair dealing. *See Clancy*, 954 A.2d at 1108 ("In matters of personal discretion in contract, the party with the discretion **_is limited to exercising that discretion in good faith_**.").

*Jolly Roger* does not hold to the contrary. There, in finding a lack of bad faith, the court found "[o]f special significance . . . that [defendant] **_is currently able, if necessary, to pay plaintiffs their liquidation preference_**. This fact alone defeats plaintiff's argument that [defendant] has effectively prevented plaintiffs from receiving the benefits and entitlements of the agreement." *Jolly Roger*, at \*13. Here, the **_only_** credible evidence of the Wheeler Properties' value is Party C's $240 million bid. Therefore, the Wheeler Properties **_lack sufficient equity_** to pay the Liquidation Preference, which constitutes evidence of bad faith under *Jolly Roger*.

Moreover, in *Jolly Roger*, the REIT had not "fired all of its employees, set up severances for its officers, discontinued board meetings, settled with creditors, or otherwise abandoned the form of Trust;" in short, the REIT was *not* rendered an "empty shell." *Id.* at \*10, 13. Here, in contrast, **_Cedar has done all of those things, and been rendered an empty shell_**, thus evidencing

bad faith. Dkt. No. 4 ¶¶ 140-52 (all Board members, executives and employees terminated; all debts paid; and REIT form abandoned) (citing provisions of Wheeler Merger Agreement at Dkt. No. 13-2 at 64).[3]

Defendants' efforts to distinguish *Quadrangle* are unavailing. Def. Mem. at 24. The court there found insufficient evidence of bad faith because the Board's actions could be interpreted as a good faith "attempt to pay off the note holders and avoid the consequence of an involuntary liquidation." *Quadrangle Offshore (Cayman) LLC v. Kenetech Corp.*, 1999 WL 893575, at *13 (Del. Ch. Oct. 13, 1999), *aff'd*, 751 A.2d 878 (Del. 2000). Here, by contrast, no such extenuating circumstances are present, and there is overwhelming evidence of bad faith.

**B. Defendants Have Breached the Articles Supplementary Because the Proposed Transactions Constitute a Change of Control.**

Defendants deny that the Proposed Transactions constitute a "Change of Control" under the Articles Supplementary, but their arguments fail. Def. Mem. at 17-22. Most notably, Defendants do not deny that ***their interpretation of Section 5(j) will destroy the Preferred Stockholders' Conversion Right*** because there will be no publicly traded common stock of Cedar into which to convert once Cedar is delisted. Dkt. No. 13-1 at 16-18. Instead, Defendants respond that "there is simply nothing in the Articles that suggests Preferred Stockholders must always have the right to convert into a publicly traded class of common stock." Def. Mem. at 20. That answer, however, dodges the question of whether it makes any sense to interpret Section 5(j) (as Defendants do) to ***destroy the Conversion Right instead of triggering it*** when the "surviving

---

[3] Likewise, in *Kimeldorf*, there was no evidence of bad faith because—unlike here— preferred shareholders were *not* being excluded from distributions. Instead, in that case, preferred shares were being converted into common shares, and thus preferred shareholders were "entitled to receive, as conversion rights, whatever shares, securities and other property that is due to the holder of the number of shares of common stock into which the preferred shares are convertible." *Kimeldorf v. First Union Real Est. Equity & Mortg. Invs.*, 764 N.Y.S.2d 73, 74 (1st Dept. 2003).

entity" with which the Preferred Stock resides does not have publicly-traded stock. As the Prospectus language quoted on page 18 of Plaintiffs' opening brief indicates, the "Change in Control" provision was designed to protect against delisting, and it must be a Change in Control when the "surviving entity" at which the Preferred Stock resides has been delisted. Dkt. No. 13-1 at 18; Dkt. No. 29-1 at S-12. The observation that the Change in Control would also provide protection in a hypothetical scenario that Defendants have conjured up (Def. Mem. at 21) does not mean the provision does not also provide protection in the specific scenario—delisting—for which it was intended.

Defendants also claim that Section 5(j) protects the right of Preferred Stockholders to receive periodic reports and financial information when there is no publicly-traded company at any level. Def. Mem. at 21. Their point is unclear, but at any rate, the right to receive reports and information is already protected in all circumstances under Articles Supplementary Section 9 (Dkt. No. 13-2 at 19, 42), and so *that cannot be the purpose of Section 5(j).*

Desperate to avoid the dictates of *contra proferentem* (which they concede applies when language is ambiguous; Def. Mem. at 15), Defendants devote substantial verbiage to arguing that the language in Section 5(j) is not ambiguous. Def. Mem. at 18-19. But insisting a provision is unambiguous does not make it so. To the contrary, the phrase "neither the Corporation nor the acquiring *or* surviving entity has a class of [publicly traded] common securities" is certainly susceptible to an interpretation that looks at whether *either* the "surviving entity" *or* the "acquiring entity" has publicly-traded stock, and if one of them does not, then the transaction constitutes a "Change of Control."[4] That outcome makes even more sense when, like here, the entity that does

---

[4] Similarly, by eschewing an Oxford comma between the second and third elements in Section 5(j), it is reasonable to conclude that the drafters of the Articles Supplementary meant to group

not have publicly-traded stock is the entity at which the Preferred Stock resides. In contrast, Defendants' interpretation—that there is no Change of Control if *any* of the entities has publicly-traded stock—does not fit the language because if that interpretation was the intent, the provision would have read, "*neither* the Corporation *nor* the acquiring entity *nor* the surviving entity has [publicly-traded stock]." *See* Bonnie Mills, *Quick and Dirty Tips*, April 9, 2021 (https://www.quickanddirtytips.com/education/grammar/when-use-nor) ("You can also use "nor" if you're talking about more than two items, but you have to repeat "nor" after each element. So if you want to add mustard to your list of dislikes, you have to say: "I like *neither* hot dogs *nor* ketchup *nor* mustard.").[5]

## C. Defendants Have Breached the Articles Supplementary Because the Proposed Transactions Constitute a *De Facto* Winding Up and Liquidation.

Relying primarily on *Jolly Roger* and *Kimeldorf*, Defendants argue that the Proposed Transactions do not constitute a liquidation or winding up under Section 4(a) of the Articles Supplementary. Def. Mem. at 13-14. Both decisions are distinguishable, and actually support Plaintiffs. As noted in Section I.A, the *Jolly Roger* plaintiffs could not allege that defendants were unable to pay the liquidation preference if ordered do so, or that the REIT was rendered an empty shell by terminating its Board, executives and employees, repaying its debts, and otherwise

---

"the acquiror or the surviving entity" as a single category. Because the Oxford comma is repeatedly used throughout the Articles Supplementary, that implies an intentional difference between when it is used and when it is not. Dkt. No. 13-2 at Sections 5(g)(ii) and 6(c). At a minimum, this issue presents and ambiguity which must be construed against the drafters.

[5] Defendants criticize the textual analysis in footnote 13 of Plaintiffs' brief (Dkt. No. 13-1) observing that the singular "has" (instead of the grammatically correct plural "have") follows the phrase "nor the acquiring or surviving entity," which indicates that a Change of Control is triggered if only one of those entities is not publicly-traded. But in their brief, Defendant use a plural verb in a "neither/nor" clause, thus proving Plaintiffs' point about the deviation. (Def. Mem. at 22 ("*neither* the Preferred Stockholders' liquidation *nor* their conversion rights *are* triggered.").

abandoning its form. Here, in contrast, ***all of those circumstances are present***, because Defendants (i) ***could not pay the Liquidation Preference*** (because there is insufficient equity left in the Wheeler Properties if the Proposed Transactions close), and (ii) have rendered Cedar an empty shell by ***terminating the Board and all executives and employees, discharging all debts, and delisting the common stock***.

Likewise, in *Kimeldorf*, preferred shareholders were entitled to convert and receive the same treatment as common shareholders. *See* Section I.A n.3, *supra*. Moreover, the evidence in that case only showed that defendants were changing their line of business and repaying high-interest debt. 764 N.Y.S.2d at 76-77. In sum, here—unlike in *Jolly Roger* and *Kimeldorf*—Defendants have plainly crossed the line into a liquidation and winding up that triggers priority payment of the Liquidation Preference under Articles Supplementary Section 4(a), notwithstanding Section 4(e). Sure, "Cedar will still exist" (Def. Mem. at 15)[6], but as nothing more than an empty shell at the complete mercy of Wheeler, its 100% owner.

*Quadrangle* supports Plaintiffs' interpretation of Sections 4(a) and (e). There, the court held that (i) a provision similar to Section 4(e) did *not* "preclude a claim for a constructive liquidation that *included* asset sales," and (ii) a deal featuring "more" than asset sales such as "paying off creditors" and "winding up business affairs" (e.g., laying off workers and paying severance to executives) would qualify as a constructive liquidation. 1999 WL 893575 at *9, 12. Thus, *Quadrangle* ruled against the plaintiffs *not* because their interpretation was wrong, but because plaintiffs lacked sufficient evidence of bad faith. 1999 WL 893575, at *11-13. Here, there is overwhelming evidence of bad faith, and the Court should rule against Defendants.

---

[6] In addition, "winding up" is widely known to be a "process", not a final outcome, so Cedar's continued existence and operations cannot rebut Plaintiffs' winding up claim. *E.g., Creel v. Lilly*, 729 A.2d 385, 391 (Md. 1999).

At a minimum, Defendants concede that the doctrine of *contra proferentem* applies where a provision is ambiguous. (Def. Mem. at 15). Here, precisely because the terms "winding up" and "liquidation" are ***not defined***, the Court "cannot unequivocally state that no ambiguity exists." *L & H Enterprises, Inc. v. Allied Bldg. Prod. Corp.*, 596 A.2d 672, 676 (1991). Instead, those terms are at least susceptible to the interpretation advanced in *Quadrangle*—*i.e.*, only a merger or asset sale ***without more*** is excluded from the definition of winding up and liquidation. Thus, even if the Court finds that the meaning of Section 4(e) is also susceptible to the interpretation adopted in *Jolly Roger* and *Kimeldorf*, there is ambiguity, and under the doctrine of *contra proferentem*, the Court should choose the interpretation adopted in *Quadrangle* against the drafter.[7]

### D.  Defendants Have Breached Their Fiduciary Duties.

Maryland's General Corporation Law specifies that directors owe stockholders a duty of good faith (2-405.1(c)(1)), and the Court of Appeals has held there is a duty to maximize value when selling a company. *Plank v. Cherneski*, 231 A.3d 436, 465 (Md. 2020). The Court of Appeals has also long held that preferred stockholders are entitled to all "rights" and "privileges." *Leviness v. Consol. Gas, Elec. Light & Power Co. of Baltimore*, 80 A. 304, 306 (Md. 1911). Therefore, directors owe fiduciary duties of good faith and value maximization to preferred shareholders.[8]

---

[7] *Rigby v. Allstate Indem. Co.*, 123 A.3d 592 (2015) is not on point because the issue here is not different "dictionary definitions" of the terms "winding up" and "liquidation." Instead, the interpretative issue presented is how broad is the exception that Section 4(e) carves out from Section 4(a). The *Jolly Roger* approach concludes quite unreasonably that the carveout is 100%, while the *Quadrangle* approach assumes more plausibly that the carveout is limited to mergers and asset sales *without more*.

[8] On this issue, the *Jolly Roger* decision is no longer good law since it held incorrectly that no claim for breach of fiduciary duty exists under Maryland law. *Id.* at *16 n.7. As the Court of Appeals has since made explicitly clear, Maryland recognizes an independent claim for breach of fiduciary duty. *Plank*, 231 A.3d at 465.

A fiduciary breaches its duties when a "primary motivation" for its exercise of contractual rights is to harm its constituents' interests. *Clancy*, 954 A.2d at 1107-08. Thus, the same bad faith conduct that establishes a breach of the implied duty of good faith and fair dealing (*see* Section I.A, *supra*) establishes a breach of fiduciary duty.

Plaintiffs' contractual claims are not, as Defendants argue, an impediment to a breach of fiduciary duty claim. Def. Mem. at 27. The "fact that a corporation is bound by its valid contractual obligations does not mean that a board does not owe fiduciary duties when considering ***how to handle those contractual obligations***." *Frederick Hsu Living Tr. v. ODN Holding Corp.*, 2017 WL 1437308, at *24 (Del. Ch. Apr. 14, 2017). Here, as shown in Section I.A above, Defendants exercised their contractual rights in bad faith with the intent of injuring Preferred Stockholders. In particular, Defendants failed to appoint anyone to represent the Preferred Stockholders' interests and specifically structured the Proposed Transactions in an attempt to evade the Liquidation Preference and Conversion Rights. *See In re FLS Holdings, Inc. S'holders Litig.*, 1993 WL 104562, at *5 (Del. Ch. Apr. 2, 1993) (declining to dismiss breach of fiduciary duty claim where "no mechanism employing a truly independent agency on the behalf of the preferred was employed before the transaction was formulated"). Thus, Defendants' bad faith conduct also supports a breach of fiduciary duty claim.[9]

## II.     THE PREFERRED STOCKHOLDERS WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION.

---

[9] Defendant Rogers states that he owns a mere 449 shares of Series B Preferred Stock. Dkt. No. 30-6 at ¶ 6. But Rogers never advocated for Preferred Stockholders. To the contrary, the Board unanimously approved the Proposed Transactions. Dkt. No. 13-2 at 51. Moreover, ***Rogers beneficially owns 19,746 shares of Common Stock*** (*i.e.*, 7,168 shares + 12,577 RSU's), and thus stands to reap ***$572,634*** if Common Stockholders are paid $29 per share. *Id.* at 732, 762. Paying the Liquidation Preference would reduce Rogers' payout on his Common Shares by approximately $233,000. That reduction far exceeds any gain Rogers might realize on his miniscule holdings of Series B Preferred Stock. Thus, Rogers had no incentive to advocate for Preferred Stockholders.

The touchstone of irreparable harm in the 4th Circuit is the "possibility [that] **adequate compensatory or other corrective relief** will be available at a later date." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). Here, **adequate** relief will **not** be available if the Gross Proceeds are not escrowed.  As shown, the only credible evidence in the record concerning the value of the Wheeler Properties—Party C's all-cash bid—shows they are only worth $240 million, which leaves only $110 million of equity (after deducting the $130 million KeyBank loan) to contribute towards the $161.3 million Liquidation Preference if Plaintiffs prevail. Defendants indicate they have insurance (Dkt. No. 21), but there is no evidence it can make up the $51.3 million shortfall between $161.3 million and the $110 million, especially when the insurance will continue to be depleted by defense costs. Thus, if the Gross Proceeds are not escrowed, and Plaintiffs later prevail, simple arithmetic shows that Plaintiffs will be forced to commence "clawback" actions to recover wrongful distributions from Common Stockholders.

Plaintiffs have already cited numerous authorities holding that irreparable injury exists if "seeking redress at law" would require the Plaintiffs to initiate a "multiplicity of vexatious and unprofitable suits." Dkt. No. 13-1 at 14-15. Defendants claim these cases are inapposite because of different fact patterns (Def. Mem. at 29 n.27), but the holding that a multiplicity of lawsuits constitutes irreparable injury is common to all of those cases.

Defendants further claim that "Cedar is valued at well over $100 million more than the liquidation preference in the Wheeler Merger." Def. Mem. at 29. That math ignores the $130 million KeyBank loan encumbering the Wheeler Properties, and moreover, as demonstrated *supra*, the $291.3 million "value" attributed to the Wheeler Properties by Defendants is a fiction. Defendants also claim that even at a more conservative valuation of $240 million, the equity is "nearly $80 million more than the Liquidation Preference" (*id.* at 29 n.26), but again obviously

14

fail to deduct the $130 million KeyBank loan, which reduces the equity to $110 million ($240M-$130M*)—$51.3 million less than the Liquidation Preference*. Obviously, a judgment creditor cannot leap past a secured lender to collect a judgment, and Defendants do not argue otherwise.

Defendants cite Wheeler as a source of recovery (Def. Mem. at 29, 31), but **Wheeler is already effectively insolvent** since the dividend arrears on its Series D preferred stock alone—$26.16 million as of December 31, 2021 (Dkt. No. 13-2 at 352)— far exceeds its market capitalization of $22 million as of the close on June 2, 2022.  Enright Reply Aff., Ex. A.  *See Amazon.com, Inc. v. WDC Holdings LLC*, 2021 WL 3878403, at *8 (4th Cir. Aug. 31, 2021) (irreparable harm exists if "damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected").  Moreover, the former CEO of Wheeler recently alleged that Wheeler's executives are severely mismanaging the company, which could obviously lead the company into bankruptcy. Dkt. No. 13-2 at 608.

## III.   THE BALANCE OF THE CONVENIENCE AND PUBLIC INTEREST FACTORS FAVOR THE PRELIMINARY INJUNCTION.

The "parade of horribles" that Defendants conjure up if the Wheeler Merger is enjoined is a moot point because Plaintiffs have dropped their request to enjoin the Wheeler Merger so long as the $130 million in KeyBank loan proceeds are also held in escrow. Allowing the Wheeler Merger to close will leave $396 million in cash—equal to $29 per Common Share—sitting in an interest-bearing account. Dkt. No. 4 at ¶ 131. Including the $110 million in equity in the Wheeler Properties (at Plaintiffs' more conservative valuation), Common Stockholders are amply secured for the duration of the litigation.

In contrast, if none of the Gross Proceeds are escrowed, and Plaintiffs later prevail, the equity in the Wheeler Properties and insurance cannot conceivably provide a complete recovery,

and ***Plaintiffs will be forced to commence numerous "clawback" actions*** against Common Stockholders. Thus, the balance of convenience here heavily tips in favor of an injunction.

The authorities cited by Defendants (Def. Mem. at 32-33) are all distinguishable because they involve actions seeking to enjoin either a shareholder vote or the transaction itself. *See Parshall v. HCSB Fin. Corp.*, 2017 WL 3130479, at *8 (D.S.C. July 24, 2017) (seeking to enjoin stockholder vote); *Malon v. Franklin Fin. Corp.*, 2014 WL 6791611, at *3 (E.D. Va. Dec. 2, 2014) (same); *Orlando v. CFS Bancorp, Inc*., 2013 WL 5797624, at *6 (N.D. Ind. Oct. 28, 2013) (declining to enjoin transaction); *Dixon v. Cost Plus*, 2012 WL 2499931, at *12 (N.D. Cal. June 27, 2012) (same). Hence, they are all inapposite and should be disregarded.

Again, Plaintiffs are no longer looking to enjoin any of the transactions, but merely to hold the proceeds of those transactions in escrow. Additionally, the shareholder vote already occurred on May 27, 2022. Enright Reply Aff., Ex. B. Common Stockholders voted to approve the Proposed Transactions, which is hardly surprising given that they stand to receive ***all*** of the net proceeds. Preferred Stockholders, of course, had no opportunity to vote even though their interests are materially affected by the Proposed Transactions.

Defendants' wild claims that escrowing proceeds will "destroy" the value of the Common Stock and create "massive uncertainty in the public markets for Cedar stock" (Def. Mem. at 33) is unsupported by any credible expert opinion, and utterly contradicted by the trading history of Cedar common stock after extensive disclosure concerning this litigation. Enright Reply Aff., Ex. C. That disclosure—on May 20, 2022, at 8:50 a.m.—advised that if "the court were to nonetheless grant a preliminary injunction temporarily enjoining the Company's distribution, in whole or in part, of proceeds from the Grocery-Anchored Portfolio Sale to common stockholders and/or consummation of the Company Merger, this is likely to materially adversely affect the ability of

the Company to realize the anticipated benefits from the asset-sale and merger transactions, including [risk of termination of the merger agreement, risk of significant delay pending resolution of legal proceedings, risk of reduced distribution to stockholders, and risks related to required REIT distributions]." *Id.* Far from being "destroyed" by disclosure of these risks, Cedar common stock dropped a mere 1.97% on May 20, 2022, to $26.32 per share, and has since recovered to $26.85 per share. Enright Reply Aff., Ex. D. Likewise, once the Proposed Transactions close, and $396 million—equal to $29 per share—is deposited in escrow, any uncertainty about the closure of the Wheeler Merger will be lifted, and the Common Stock will simply trade at a discount based on the market's perception of the risk that Plaintiffs might prevail. Defendants have not submitted any credible evidence to show otherwise.

## IV.   THE COURT HAS THE DISCRETION TO SET A NOMINAL BOND

Defendants argue a bond is mandatory whenever a court grants a preliminary injunction (Def. Mem. at 34), but that is not the law in the 4th Circuit. Instead, "the district court retains the discretion to set the bond amount as it sees fit *or waive the security requirement*," so long as the district court does not "disregard the bond requirement altogether." *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013). Thus, this Court may waive the bond requirement so long as it explains the reasons for doing so. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999) (*citing* 2d Circuit case approving bond fixed at zero); *see also Defy Ventures, Inc. v. U.S. Small Bus. Admin.*, 469 F. Supp. 3d 459, 481 (D. Md. 2020) (waiving the bond requirement after an explanation); *Coreas v. Bounds*, 458 F. Supp. 3d 352, 362 (D. Md. 2020) (same).

In an effort to convince the Court to require an absurdly large bond for its *in terrorem* effect, Defendants twist far-fetched purported potential harms *to individual Common Stockholders* into a basis to require a bond. This argument ignores Rule 65's plain language that

17

requests bond only for "the costs and damages sustained by ***any party*** found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added). Simply stated, ***the Common Stockholders are not "parties"*** to this litigation, and the proposed preliminary injunction would not enjoin or restrain them, so Plaintiffs cannot be forced to pay bond for them. *See Nokia Corp. v. Interdigital, Inc.,* 645 F.3d 553, 559 (2d Cir. 2011) (internal quotation omitted).

Moreover, the only possible damage to Common Stockholders is the time value of money because, if an injunction issues, the Net Proceeds will be escrowed and Common Stockholders will receive their money after a determination on the merits. Any potential "damage" will be mitigated by holding the $396 million in an interest-bearing account pending a determination on the merits. *See Morgan Keegan & Co. v. Louise Silverman Tr.*, 2012 WL 113400, at *6 n.9 (D. Md. Jan. 12, 2012) (interest compensates for time value of money), *aff'd*, 706 F.3d 562 (4th Cir. 2013). Moreover, the equity in the Wheeler Properties ($110 million according to Plaintiffs; $161.3 million according to Defendants) provides ample additional security in the event the Court finds that any further security is needed.

Based on the foregoing, the Court should exercise its discretion and award at most a nominal bond in the amount of $10,000, especially given that this case involves the deliberate structuring of transactions to adversely affect the interests of Preferred Stockholders, with no one advocating for Preferred Stockholders and Cedar's financial advisors specifically disclaiming any opinion concerning the fairness of the Proposed Transactions to Preferred Stockholders. Dkt. No. 13-2 at 721; *see also Roizen v. Multivest, Inc*., No. 6535, 1981 WL 7631, at *3-4 (Del. Ch. Sept. 25, 1981) (enjoining merger and fixing bond at $10,000 where "[i]n structuring the terms of the merger, no independent person was designated to negotiate on behalf of the minority and no

investment banker was retained to determine what a fair price for the minority would be. The transaction was not structured so as to require the vote of a majority of the minority interest.").[10]

The $200 million bond demanded by Defendants (Def. Mem. at 35) is an outlandish figure for which Defendants cite no authority. Instead, Defendants rely exclusively on the self-serving and conclusory declaration of Yoel Kranz, *the attorney who structured the Proposed Transactions and works at the same firm as the lawyers defending this action*. Dkt. No. 30-5 at ¶ 3. The Kranz declaration is rife with unsubstantiated, speculative assertions untethered to *any* data or legal authorities. For example, in paragraph 7, Kranz states that "[i]t is not uncommon in mergers involving public REITs for the target company's preferred stock to remain outstanding post-transaction as obligations of the surviving enterprise" (*id.* at ¶ 7), but *fails to cite a single precedent transaction, or identify any data set from which his conclusions are drawn*, including how many total transactions are in that dataset, and how many transactions in that dataset involved (like here) preferred stock remaining outstanding at the target level as a subsidiary of the buyer.

Likewise, in paragraph 17, Kranz hedges (using conditional "could" language which evades making any concrete statements while raising the specter of dire consequences) and engages in massive hyperbole—using phrases like "catastrophic" and "value destructive"—without citing a single supporting statute, regulation or decision. *Id.* at ¶ 17. However, a review of 26 U.S. Code § 857(b)(3)(A)-(C) reveals that *a REIT is not required to distribute capital gains from sales of its assets, and instead may opt to retain its capital gains and garner substantial tax*

---

[10] The fact that Plaintiffs' claims have a strong likelihood of success also weighs in favor of a nominal bond. *See, e.g.*, *George Sink PA Inj. Laws. v. George Sink II L. Firm LLC*, 2019 WL 6318778, at *6 (D.S.C. Nov. 26, 2019); *Arkansas Best Corp. v. Carolina Freight Corp.*, 60 F. Supp. 2d 517, 521 (W.D.N.C. 1999).

***benefits for stockholders.*** This reality fatally undermines Kranz's melodramatic intonations that a catastrophe "could" occur if Cedar does not distribute the gains by the end of the year.

In sum, the Kranz declaration is precisely the sort of *ipse dixit* non-expert opinion that courts routinely reject. *See Donalds v. Ethicon, Inc.*, 2021 WL 6126297, at \*6 (D. Md. Dec. 28, 2021) ("This Court will not admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert where there is simply too great an analytical gap between the data and the opinion proffered. Expert testimony rooted in subjective belief or unsupported speculation does not suffice.") (Russell, J.); *see also Sardis v. Overhead Door Corp.*, 10 F.4th 268, 289–90 (4th Cir. 2021) (district court should not admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 2022 WL 1323139, at \*15 (D. Md. May 3, 2022) (same).

Finally, the Court should also consider that setting a cash bond in an amount even remotely approaching what Defendants have requested would effectively deny Preferred Stockholders an adequate legal remedy. *Cf. Torres v. Zamanizadeh*, No. 3:17-CV-1270-AC, 2018 WL 738957, at \*6 (D. Or. Feb. 6, 2018) (judicial review considered as a factor in finding no bond required). Effectively denying the Preferred Stockholders a realistic chance at an adequate remedy by requiring an exorbitant bond is not the answer, and is certainly not required.

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs respectfully move this Court to (i) enter the revised Proposed Order submitted herewith, and (ii) grant such other relief as is just and proper.

Dated:  June 3, 2022

Respectfully submitted,

*/s/ Donald J Enright*
Donald J. Enright
**LEVI & KORSINSKY LLP**
Bar Number: 13551
1101 30th Street, NW, Suite 115
Washington, DC 20007
Telephone: (202) 524-4290
denright@zlk.com

OF COUNSEL:

**WOHL & FRUCHTER LLP**
Joshua E. Fruchter
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Telephone: (845) 290-6818
Facsimile: (718) 504-3773

*Counsel for Plaintiffs and [Proposed] Lead
Counsel for Putative Class*

*Attorneys for Plaintiffs*

21

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2022, service required by Fed. R. Civ. P. 5(a) has been made of the foregoing Reply Memorandum of Law In Support of Plaintiffs' Motion for Preliminary Injunction.

*/s/  Donald J. Enright*
(Bar. No. 13551)