# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| DAVID SYDNEY, et al., Individually and On Behalf of All Others Similarly Situated,<br><br>                      *Plaintiffs*,<br><br>v.<br><br>CEDAR REALTY TRUST, INC., et. al.,<br><br>                      *Defendants*. | Case No.: 8:22-cv-1142-GLR<br><br>REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION |

Plaintiffs respectfully submit this memorandum of law in reply to Wheeler's opposition (Dkt. No. 31) to Plaintiffs' Motion for a TRO ("Motion") (Dkt. No. 13) (converted by so-ordered stipulation into a motion for a preliminary injunction; Dkt. No. 24).[1]

## ARGUMENT[2]

### I. PLAINTIFFS' CONTENTIONS REGARDING THE VALUE OF THE WHEELER PROPERTIES ARE NOT SPECULATIVE.

Under the Wheeler Merger Agreement, Cedar will continue to exist as a wholly-owned subsidiary of Wheeler, and nominally hold title to 19 properties ("Wheeler Properties."). In their main brief, Defendants assert that Wheeler valued the Wheeler Properties "at over $291 million." Dkt. No. 30 at 2.

Wheeler mistakenly argues that "plaintiffs have offered only speculation" for their position that the Wheeler Properties are *not* worth $291.3 million, and thus do *not* have sufficient equity to cover the $161.3 million Liquidation Preference after deducting the $130 million KeyBank loan used to finance the purchase of the Wheeler Properties. Wheeler Mem. at 3. To the contrary, the ***only*** credible evidence in the record concerning the true market value of the Wheeler Properties is the $240 million bid by Party C, which made a legitimate all-cash bid that, unlike Wheeler's "bid," did not propose to assume liability for the Liquidation Preference as part of the consideration paid. Dkt. No. 13-2 at 711.

---

[1] All capitalized terms shall have the meanings given to them in the Amended Complaint. (Dkt. 4). All internal citations and quotations are omitted, and all emphasis in quotes is added. Page cites to Docket No. 13-2, the Affidavit of Donald J. Enright, and the exhibits thereto, are to pages of the PDF file; otherwise, all page cites are to the pages in the relevant document.

[2] Plaintiffs respectfully refer the Court to their brief in reply to the other Defendants' opposition for their full arguments and citations to the record. This brief addresses a few ancillary arguments made by Wheeler.

In contrast, Wheeler did not actually "pay" $291.3 million for the Wheeler Properties. Instead, it borrowed $130 million from KeyBank against the Properties (apparently the maximum KeyBank was willing to lend), and then tacked on another $161.3 million because that just happens to be the difference between the Liquidation Preference and the KeyBank loan. If the Liquidation Preference had been $140 million, then Wheeler would have valued the Wheeler Properties at $270 million. In other words, the $291.3 million "value" is a fiction ***not substantiated by any evidence such as an appraisal, and dictated entirely by the need to make it appear as if Defendants are covering the Liquidation Preference***.

The fact is that Defendants structured the Wheeler Merger so that Wheeler will never have to pay the full Liquidation Preference of $161.3 million. Specifically, after Cedar announced that (i) Preferred Stockholders would receive nothing from the Proposed Transactions, and (ii) and Cedar would become a wholly-owned subsidiary of Wheeler (with its history of shareholder abuse and management dysfunction), the combined market value of the Series B and C Preferred Stock plummeted from $151.3 million to $61.7 million over the next two trading days, causing Preferred Stockholders to lose nearly $90 million. *See* Dkt. No. 13-1 at 6.

The Preferred Stock's combined market value at the time Plaintiffs filed their Motion was approximately $85 million—little more than half of their aggregate Liquidation Preference of $161.3 million. *Id.* Thus, Wheeler can retire the Preferred Stock at a sharp discount to the Liquidation Preference. That is, if Wheeler were to buy all of the Preferred Stock at current market prices, it would reduce the "price" it paid for the Wheeler Properties to $215 million (i.e., $130 million + $85 million) from the inflated $291.3 million assigned in connection with the Proposed Transactions. (*Id.*). In short, the $291.3 million "valuation" assigned by Defendants is a sham because Wheeler never expects to pay that amount. Instead, the $240 million bid by Party C—a

legitimate all-cash bid—is the only credible evidence in the record as to the value of the Wheeler Properties.

Hence, when Wheeler asks: why would it enter into the Wheeler Merger if the Wheeler Properties have insufficient equity value to cover the Liquidation Preference and Preferred Stock dividends (Dkt. No. 31, p.4), the answer is that Wheeler has no expectation or intention of *ever* paying the Liquidation Preference because it was able to crash the price of the Preferred Stock when it announced the Wheeler Merger and thus create an opportunity buy out the Preferred Stock at sharply depressed prices via either a tender offer or open market purchases.

The price of the Preferred Stock crashed because Preferred Stockholders are well aware of how Wheeler treats its own preferred shareholders. Its *modus operandi* is to use the common stock's voting powers to destroy the preferred stock's rights and value. *See* Dkt No. 4 ¶ 100-08. For example, in 2020, Wheeler made a tender offer to take out its own preferred stock after having suspended dividend payments in 2018. Dkt No. 4 ¶ 100-02. In addition, in 2021, Wheeler's common stockholders approved an amendment of the terms of the Company's Series A and B Preferred Stock eliminating all of their accumulated and unpaid dividends (totaling nearly $12 million) and removing their cumulative dividend rights so that no further dividends would accumulate on the Series A and B Preferred Stock. Dkt No. 13-1 p.15.

## II. WHEELER WILL HAVE ABSOLUTE AUTHORITY CONCERNING WHETHER TO DECLARE DIVIDENDS TO THE PREFERRED STOCKHOLDERS.

Wheeler also claims that it "cannot pay itself . . . dividends from Cedar unless the dividend preference held by Cedar's preferred stockholders is satisfied." Wheeler Mem. at 4. But there are other ways for Wheeler to extract cash from the Wheeler Properties, and the Articles Supplementary invest Wheeler with unfettered discretion over whether to authorize/declare

preferred dividends *at all*. Dkt. No. 13-2 at 6, § 3(a); at 23, § 3(a). This authority will enable Wheeler to abuse Preferred Stockholders (for example, by not paying dividends after diverting cash flow from the Wheeler Properties to itself in the form of "management fees") just like it has historically abused its own preferred stockholders. *See* Dkt No. 4 at ¶¶ 100-08; Dkt. No. 13-2 at 352, 544. Indeed, Defendants concede that Wheeler will have the unilateral right to engage in financial transactions that would impact the payment of preferred dividends. Def. Mem. at 30.

### III. WHEELER TORTIOUSLY INTERFERED WITH PLAINTIFFS' CONTRACTUAL RIGHTS AND AIDED AND ABETTED THE OTHER DEFENDANTS' BREACH OF FIDUCIARY DUTY.

"The elements of tortious interference with contract are: 1) existence of a contract between plaintiff and a third party; 2) defendant's knowledge of that contract; 3) defendant's intentional interference with that contract; 4) breach of that contract by the third party; 5) resulting damages to the plaintiff." *Fraidin v. Weitzman*, 611 A.2d 1046, 1057 (Md. Ct. Spec. App. 1992); Dkt. No. 8, p.23. Here, Wheeler disputes the third element and cites to provisions of the Second and Third Restatement of Torts without citing to any Maryland cases adopting such standards.

Wheeler cannot rely on the Restatement (Third) of Torts because its uses different elements for the tortious interference with a contract than Maryland caselaw. *Compare* Restatement (Third) of Torts § 17(c) (stating element three is "the defendant engaged in wrongful conduct as defined in Subsection (2)") with *Fraidin*, 611 A.2d, at 1057 (stating element three is "defendant's intentional interference with that contract"). Wheeler's citation to the Restatement (Second) of Torts § 767 cmt. a. is similarly inapposite, and the Restatement (Second) of Torts §§ 766-67 does not set out the same elements used in Maryland. In the absence of any Maryland case adopting the standards cited by Wheeler, this Court should just apply the plain language of the third element. As a sophisticated REIT with the experience of defending many lawsuits for breaching preferred

4

stockholders' rights, Wheeler had the purpose, knowledge, and intent to design the Wheeler Merger that would violate the Preferred Stockholders' contractual rights.

Even if this Court follows the standards that Wheeler manufactured from two different Restatements, Plaintiffs satisfy those elements. Specifically, Wheeler knowingly interfered with the contractual rights of Preferred Stockholders by collaborating with the other Defendants to engineer a transaction pursuant to which Wheeler will acquire and encumber 19 properties it knew lacked sufficient equity value to pay the Liquidation Preference (after subtracting the $130 million KeyBank loan), and lacked sufficient cash flow to pay preferred dividends (after subtracting payments on the KeyBank loan, and necessary capital expenditures). Further, as noted above, Wheeler knew that announcing the Wheeler Merger would precipitate a sharp drop in the price of the Preferred Stock, so that it would never have to pay the full Liquidation Preference, but could instead buy out Preferred Stock at sharply depressed prices via either a tender offer or open market purchases.

Similarly, the Proposed Transactions indisputably destroy the Conversion Rights as set forth in the Articles Supplementary. As Plaintiffs have already explained (at Dkt No. 13-1, p.23), if the Proposed Transactions are consummated, the Preferred Stockholders would have no mechanism for ever exercising their right to convert to common stock in the event of a future change of control. Defendants do not—and cannot—claim otherwise.

Had Wheeler declined to participate knowingly in the Proposed Transactions, Cedar could not have structured them in this deeply unfair manner. Therefore, Wheeler intentionally made itself part of the causal chain that resulted in the Cedar Defendants' breaches of contract and fiduciary duty. For these reasons, Wheeler's conduct meets all of the elements for claims of

tortious interference and aiding and abetting a breach of fiduciary duty. *See* Dkt. No. 4 at ¶¶ 183-86, 195-98, 204-07.

## CONCLUSION

For the reasons set forth above and in Plaintiffs' main reply brief, Plaintiffs respectfully move this Court to (i) enter the revised Proposed Order submitted herewith, and (ii) grant such other relief as is just and proper.

Dated: June 3, 2022                                     Respectfully submitted,

                                                        */s/ Donald J Enright*
                                                        Donald J. Enright
                                                        **LEVI & KORSINSKY LLP**
                                                        Bar Number: 13551
OF COUNSEL:                                             1101 30th Street, NW, Suite 115
                                                        Washington, DC 20007
**WOHL & FRUCHTER LLP**                                 Telephone: (202) 524-4290
Joshua E. Fruchter                                      denright@zlk.com
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Telephone: (845) 290-6818                               *Counsel for Plaintiffs and [Proposed] Lead*
Facsimile: (718) 504-3773                               *Counsel for Putative Class*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

    I hereby certify that on Jun3, 2022, service required by Fed. R. Civ. P. 5(a) has been made of the foregoing Reply Memorandum of Law In Support of Plaintiffs' Motion for Preliminary Injunction.

*/s/ Donald J. Enright*
(Bar. No. 13551)
