## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| DAVID SYDNEY, et al., Individually and On Behalf of All Others Similarly Situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>CEDAR REALTY TRUST, INC., et. al.,<br><br>*Defendants*. | Case No.: 8:22-cv1142-GLR |

## PLAINTIFFS' [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

## FINDINGS OF FACT

### I.   Introduction

1.      This case arises out of a series of related transactions ("Proposed Transactions") pursuant to which Defendant Cedar Realty Trust, Inc. ("Cedar") proposes to (i) sell a portfolio of 33 grocery-anchored shopping centers (the "Grocery-Anchored Properties") to certain third parties for $840 million in cash (less the outstanding principal of any assumed mortgage debt) ("Grocery-Anchored Sale"), and (ii) enter into a merger with Defendant Wheeler Real Estate Investment Trust, Inc. ("Wheeler") pursuant to which Cedar will transfer nineteen (19) shopping centers to Wheeler and merge into and become a wholly-owned subsidiary of Wheeler ("Wheeler Merger"). Dkt. No. 4 at ¶¶ 124-131.

2.      Cedar proposes to distribute ***all*** of the net proceeds from the Proposed Transactions ***exclusively*** to holders of its publicly-traded common stock ("Common Stockholders"), which it estimates will total about $29 per common share, or $396 million (based on 13,640,067 shares of Cedar common stock outstanding as of April 18, 2022). *Id.* at ¶ 131. In addition, Cedar will be

discharging all of its liabilities, terminating its board of directors ("Board") and all of its executives and other employees, accelerating all unvested equity awards and paying severance to terminated employees, and delisting and canceling its common stock ("Common Stock"). *Id.* at ¶¶ 140-52. In short, the Proposed Transactions constitute a *de facto* liquidation and winding up of Cedar pursuant to which it will continue to nominally exist only as an empty shell. *Id.*

3.      In contrast to Common Stockholders, holders of Cedar's publicly-traded preferred stock ("Preferred Stockholders") will not receive ***any*** of the net proceeds from the Proposed Transactions. *Id.* at ¶ 132. Instead, all of Cedar's preferred stock ("Preferred Stock") will remain outstanding as an obligation of Cedar following consummation of the Wheeler Merger. *Id.*

4.      In light of the unequal treatment of Preferred Stockholders under the Proposed Transactions, several Preferred Stockholders filed a class action complaint against Defendants in Maryland state court on April 12, 2022. (Dkt. No. 3). On May 6, 2022, Plaintiffs filed an amended class action complaint (Dkt. No. 4) ("Amended Complaint"), which was removed by Defendants to this Court on May 11, 2022. (Dkt. No. 1).

5.      The Amended Complaint asserts claims against (i) Cedar and its affiliate Cedar Realty Trust Partnership, L.P. ("Cedar LP"), and the members of the Cedar Board (collectively, the "Cedar Defendants"), and (ii) Wheeler.

6.      First, Plaintiffs allege that the Cedar Defendants have breached the implied duty of good faith and fair dealing, and breached their fiduciary duties to Preferred Stockholders, by structuring the Proposed Transactions in bad faith with the intent of depriving Preferred Stockholders of contractual rights under the Articles Supplementary governing their relationship with Cedar. The bad faith conduct alleged includes without limitation (i) selecting Wheeler as Cedar's merger partner with knowledge of Wheeler's history of shareholder abuse and

management dysfunction with the intent of crashing the prices of the Preferred Stock, and thereby positioning Wheeler to retire the Preferred Stock through a tender offer and/or open market purchases at sharply discounted prices; (ii) transferring inferior properties to Wheeler in connection with the Wheeler Merger (while allocating Cedar's best properties to the Grocery-Anchored Sale); and (iii) misrepresenting that the value and cash flow of the Wheeler Properties are adequate to fulfill Cedar's payment obligations under the Articles Supplementary. Dkt. No. 4 at ¶¶ 1-2, 10-11, 99-139, 159-62, 168-72, 180-81, 192-93, 199-203.

7.      Second, Plaintiffs allege that the Cedar Defendants have breached Sections 2, 4(a) and 7(b) of the Articles Supplementary by depriving Preferred Stockholders of their rights to (i) priority payment of a liquidation preference ("Liquidation Preference") equal to $25.00 per share in the event of "any" liquidation or winding up of Cedar, and (ii) conversion of their Preferred Stock into Common Stock in connection with a transaction qualifying as a "Change of Control" (defined in the Articles Supplementary to include transactions like the Proposed Transactions pursuant to which an entity acquires more than 50% of Cedar and leaves the Preferred Stock as an obligation of a surviving entity without publicly-traded common stock). *Id.* at ¶¶ 5-7, 12-15, 76-98, 156-58, 163, 176-79, 189-91.

8.      Third, Plaintiffs allege that Wheeler has tortiously interfered with the contractual rights of the Preferred Stockholders under the Articles Supplementary, and aided and abetted the Cedar Defendants' breaches of fiduciary duty. *Id.* at ¶¶ 183-86, 195-98, 204-07.

9.      The Amended Complaint seeks, *inter alia*, (i) an injunction enjoining distribution of any of the proceeds from the Proposed Transactions pending a determination on the merits of Plaintiffs' claims, and (ii) imposition of a constructive trust on all of the proceeds of the Proposed

Transactions in favor of Plaintiffs and other Preferred Stockholders pending a determination on the merits of Plaintiffs' claims. *Id.* at 85-86 (Requests for Relief).

10.     In connection with their reply in further support of their motion for a preliminary injunction, Plaintiffs agreed to drop their request to enjoin the Wheeler Merger so long as distribution of the $130 million in proceeds from the Wheeler Merger is preliminarily enjoined, and such proceeds are held in escrow along with the proceeds from the Grocery-Anchored Sale. *See* Dkt. No. 40-6.

## II.     Relevant Facts Concerning Defendant Cedar

### A.     Cedar Corporate Structure

11.     Cedar is a real estate investment trust ("REIT") that focuses primarily on ownership, operation and redevelopment of grocery-anchored shopping centers in high-density urban markets from Washington, D.C. to Boston. ADE Ex. 8 at p.4. Cedar is incorporated in Maryland and has a principal place of business at 928 Carmans Road, Massapequa, New York 11758. ADE Ex. 8, p.1.[1]

12.     Defendant Cedar LP is a Delaware limited partnership. ADE Ex. 8, at. p.4.  Cedar employs an umbrella partnership structure under which it has contributed substantially all of its assets to Cedar LP, and conducts substantially all of its business through Cedar LP.  ADE Ex. 8, at p.4.

---

[1] "ADE" refers to the Exhibits attached to the Affidavit of Donald J. Enright, dated May 13, 2022, originally filed at Dkt. No. 13-2, and refiled at Dkt. No. 48 (as directed by the Court in Dkt. 44 at 2).

**B.  Cedar's Equity Securities**

13.     Cedar's common stock ("Common Stock") is publicly-traded on the New York Stock Exchange ("NYSE") under the ticker "CDR."  ADE Ex. 8, p.27. As of April 18, 2022, there were 13,640,067 shares of Common Stock outstanding. ADE Ex. 27, p.3.

14.     Cedar also has two outstanding series of preferred stock ("Preferred Stock"): 7.25% Series B Preferred Stock and 6.50% Series C Preferred Stock. ADE Ex. 8, p. 66. The Series B Preferred Stock is publicly traded on the NYSE under the ticker "CDR.PB," and the Series C Preferred Stock is publicly traded on the NYSE under the ticker "CDR.PC." ADE Ex. 8, p.1. As of February 25, 2022, there were (i) 1,450,000 shares of Series B Preferred Stock outstanding, and (ii) 5,000,000 shares of Series C Preferred Stock outstanding. ADE Ex. 5, § 4.3(a).

15.     Plaintiffs are Preferred Stockholders holding shares of Series B and/or Series C Preferred Stock. Dkt. No. 4 at ¶¶ 20-27.

**C.  Common Stock and Preferred Stock Ownership of Cedar Board Members**

16.     As of April 21, 2022, the members of Cedar's Board beneficially owned Common Stock in the following amounts with the following approximate values based on anticipated net proceeds from the Proposed Transactions of about $29 per common share:

- Defendant Bruce J. Schanzer (380,687 common shares worth approximately $11.0 million). *See* ADE Ex. 27, p.85.

- Defendant Abraham Eisenstat (41,829 common shares worth approximately $1.2 million). *See* ADE Ex. 27, p.85.

- Defendant Gregg A. Gonsalves (18,626 common shares worth approximately $540,000). *See* ADE Ex. 27, p.85.

- Defendant Darcy D. Morris (2,493 common shares worth approximately $72,000). *See* ADE Ex. 27, p.85.

- Defendant Sabrina L. Kanner (16,987 common shares worth approximately $493,000). *See* ADE Ex. 27, p.85.

- Defendant Richard H. Ross (2,493 common shares worth approximately $72,000). *See* ADE Ex. 27, p.85.

- Defendant Steven G. Rogers (19,746 common shares worth approximately $573,000). *See* ADE Ex. 27, p.85.

- Defendant Sharon Stern (6,093 common shares worth approximately $177,000). *See* ADE Ex. 27, p.85.

17.     Additionally, as of April 21, 2022, Ewing Morris & Co. Investment Partners Ltd. ("Ewing Morris") beneficially owned approximately 1.1 million shares of Common Stock, representing approximately 8.1% of all outstanding common shares (making it Cedar's second largest shareholder). *See* ADE Ex. 27, p.85.  In February 2021, in connection with resolution of a threatened proxy contest (*see infra*), Cedar agreed to appoint Ewing Morris's nominees— Defendants Morris, Ross and Stern—to the Board. *See* ADE Ex. 27, p.30 Defendant Morris is the Co-President and Chief Executive Officer of Ewing Morris. *See* ADE Ex. 27, p.86. Ewing Morris's interests are thus well-represented on the Board.

18.     Defendant Schanzer also serves as Cedar's CEO.  *See* ADE Ex. 27, p.A-51. In addition to receiving approximately $11 million upon consummation of the Proposed Transactions from his beneficial ownership of Common Stock, Defendant Schanzer also stands to earn an additional $30.9 million from cash severance payments, accelerated equity awards, and deferred compensation upon consummation of the Proposed Transactions (assuming no overlap between Schanzer's accelerated equity awards and beneficial ownership of Common Stock). *See* ADE Ex. 27, p. 59; Dkt. No. 4 at ¶ 28 n.3.

19.     As of April 21, 2022, none of the Board members owned any shares of Preferred Stock, except for Defendant Rogers who presently owns 449 shares of Series B Preferred Stock (which is dwarfed by his beneficial ownership of 19,746 shares of Common Stock, worth

approximately $573,000 upon consummation of the Proposed Transactions if all of the net proceeds are distributed exclusively to Common Stockholders). Dkt. No. 30-6 at ¶ 6; ADE Ex. 27, p.85.

### D.  The Contractual Rights of Cedar's Preferred Stockholders

20.     The contractual rights of the Preferred Stock are governed by Articles Supplementary filed with the State of Maryland. *See* ADE Ex. 1, Ex. 2.[2]

#### 1.  Priority Rank of Preferred Stock

21.     Under Section 2 of the Articles Supplementary, Preferred Stock ranks above Common Stock with respect to dividend rights, and rights upon liquidation or winding up. ADE Ex. 1, p. 1 Ex. 2, p.1. For example, Section 2 of Series C Articles Supplementary provides:

> (2) Rank. The Series C Preferred Stock will, with respect to dividend rights and rights upon liquidation, dissolution or winding up of the Corporation, rank (a) senior to all classes or series of Common Stock (as defined in the Charter), and to all equity securities the terms of which provide that such equity securities shall rank junior to the Series C Preferred Stock; (b) on parity with the Series B Preferred Stock (as defined in the Charter) and with all equity securities issued by the Corporation the terms of which specifically provide that such equity securities rank on parity with the Series C Preferred Stock; and (c) junior to all equity securities issued by the Corporation the terms of which specifically provide that such equity securities rank senior to the Series C Preferred Stock. The term "equity securities" shall not include convertible debt securities.

ADE Ex. 1, p.1.

#### 2.  Liquidation Preference of Preferred Stock

22.     Under Section 4(a) of the Articles Supplementary, Preferred Stockholders are entitled to priority payment of the Liquidation Preference of $25.00 per share (plus any accrued

---

[2] The terms of the Series B Articles Supplementary are substantively identical to the terms of the Series C Articles Supplementary. Therefore, key contractual provisions of the Articles Supplementary are illustrated with language from the Series C Articles Supplementary.

but unpaid dividends) in the event of "any" liquidation or winding up. ADE Ex 1, p.3. For example, Section 4(a) of the Series C Articles Supplementary provides:

> (a) In the event of ***any*** voluntary or involuntary liquidation, dissolution or winding up of the Corporation (referred to herein sometimes as a "liquidation"), the holders of Series C Preferred Stock then outstanding shall be entitled to receive out of the assets of the Corporation legally available for distribution to stockholders (after payment or provision for payment of all debts and other liabilities of the Corporation) the sum of (i) the liquidation preference of $25.00 per share and (ii) an amount equal to any accrued and unpaid dividends (whether or not declared) to the date of payment, ***before any distribution of assets is made to holders of Common Stock (as defined in the Charter)*** or any equity securities that the Corporation may issue that rank junior to the Series C Preferred Stock as to liquidation rights.

ADE Ex 1, p.3 (emphasis added).

23.     Section 4(e) of the Articles Supplementary clarifies that a merger or asset sale—without more—does not constitute a liquidation or winding for purposes of Section 4(a). ADE Ex. 1, p.3. For example, Section 4(e) of the Series C Articles Supplementary provides:

> (e) None of a consolidation or merger of the Corporation with or into another entity, the merger of another entity with or into the Corporation, a statutory share exchange by the Corporation or a sale, lease, transfer or conveyance of all or substantially all of the Corporation's assets or business shall be considered a liquidation, dissolution or winding up of the Corporation.

ADE Ex. 1, p.3.

24.     The Articles Supplementary do not expressly define the scope of the terms "liquidation," "dissolution," or "winding up." *See* ADE Ex. 1, Ex. 2. Therefore, it is unclear whether Section 4(e) carves out ***all*** mergers and asset sales from the scope of Section 4(a), ***or*** only carves out mergers or asset sales that are ***not*** accompanied by other characteristics of a liquidation or winding up such as a discharge of all debts, distribution of all net proceeds, termination of all employees, and cancellation of equity securities.

### 3.  **Conversion Rights of Preferred Stock Upon a Change of Control**

25.     The Articles Supplementary also entitle Preferred Stockholders to a Conversion Right upon a Change of Control of Cedar, unless Cedar chooses to exercise its right to redeem the Preferred Stock for a $25.00 cash payment. ADE Ex. 1, p.7, Ex. 2, p.10. A corporate transaction qualifying as a Change of Control triggers the Conversion Right, which entitles a Preferred Stockholder to convert Preferred Stock into Common Stock pursuant to a prescribed ratio that, subject to a cap, seeks to give Preferred Stockholders the number of shares of Common Stock equivalent to $25.00 (for example, if Cedar's Common Stock was worth $50.00 per share, the formula would dictate that each share of Preferred Stock would be exchanged for 0.50 shares of Common Stock). ADE Ex. 1, p. 7-9, Ex. 2, p.10-13. For example, Section 7(b)(i) of the Series C Articles Supplementary provides:

> ***Upon the occurrence of a Change of Control*** (*as defined in subparagraph (j) of Section 5*), each holder of Series C Preferred stock shall have the right, unless, prior to the Change of Control Conversion Date (as defined below), the Corporation has provided or provides notice of its election to redeem the Series C Preferred Stock pursuant to the Redemption Right, to convert some or all of the Series C Preferred Stock held by such holder (the "Change of Control Conversion Right") on the Change of Control Conversion Date into a number of shares of Common Stock per share of Series C Preferred Stock to be converted (the "Common Stock Conversion Consideration") equal to the lesser of (A) the quotient obtained by dividing (1) the sum of (x) the $25.00 liquidation preference plus (y) the amount of any accrued and unpaid dividends to, but not including, the Change of Control Conversion Date . . . by (2) ***the Common Stock Price*** (as defined below) and (B) 9.8814 (the "Stock Cap"), subject to Section 7(b)(ii).

ADE Ex. 1, p.7 (emphasis added).[3]

---

[3] The Stock Cap referenced in Section 7(b)(i) limits the number of shares of Common Stock that a Preferred Stockholder may receive upon exercising the Conversion Right. The Series C Articles Supplementary originally set the Stock Cap at 9.8814 shares, but provide in Section 7(b)(ii) that "[t]he Stock Cap is subject to pro rata adjustments for any stock splits . . . subdivisions or combinations." ADE Ex. 1, p. 7. On or about November 27, 2020, Cedar effected a reverse common stock split of 6.6 to 1—i.e., holders of Common Stock received 1 share of Common Stock for every 6.6 shares of Common Stock they held, reducing the number of shares of Common Stock

26.     As highlighted in the passage quoted above, Section 7(b)(i) of the Articles Supplementary uses the defined term "Common Stock Price" to determine the applicable conversion ratio. In turn, the definition of "Common Stock Price" in Section 7(b)(vii) contemplates that Cedar must have publicly traded shares of Common Stock, without which it would be impossible to calculate the conversion ratio in connection with a Change of Control (unless the consideration paid was solely cash):

> The "Common Stock Price" shall be (i) the amount of cash consideration per share of Common Stock, if the consideration to be received in the Change of Control by holders of Common Stock is solely cash, or (ii) *the average of the closing prices per share of Common Stock on the NYSE for the ten consecutive trading days immediately preceding*, but not including, the effective date of the Change of Control, if the consideration to be received in the Change of Control by holders of Common Stock *is other than solely cash*.

ADE Ex. 1, p.8 (emphasis added).

27.     Section 5(j) of the Articles Supplementary defines when a transaction qualifies as a "Change of Control." For example, Section 5(j) of the Series C Articles Supplementary provides:

> For the purposes of this Section 5 [Redemption] and Section 7 [Conversion] below, *a "Change of Control" is when*, after the original issuance of the Series C Preferred Stock, the following have occurred and are continuing (x) the acquisition by any person, including any syndicate or group deemed to be a "person" under section 13(d)(3) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), of beneficial ownership, directly or indirectly, through a purchase, merger or other acquisition transaction or series of purchases, mergers or other acquisition transactions of shares of the Corporation *entitling that person to exercise more than 50% of the total voting power of all shares of the Corporation entitled to*

that were issued and publicly trading. ADE Ex. 8, p.4. As a result, the Stock Cap for the Series C Preferred Stock was reduced pro rata to 1.4972 shares (9.8814/6.6), and the maximum Common Shares that would be issuable to Series C Preferred Stockholders in connection with a Change of Control given the 5,000,000 of Series C Preferred Stock shares currently outstanding would be: 1.4972 x 5,000,000, or 7,485,909. Dkt. No. 4 at ¶ 89. The Stock Cap for the Series B Preferred Stock was set at 10.2041. Dkt. No. 4 at ¶ 89 n.4. Adjusted for the stock split, that number would be reduced to 1.5461. *Id.* As a result, the maximum Common Shares that would be issuable to Series B Preferred Stockholders in connection with a Change of Control given the 1,450,000 of Series B Preferred Stock shares currently outstanding would be: 1.5461 x 1,450,000, or 2,241,810. *Id.*

*vote generally in elections of directors* . . . , and (y) *following the closing of any transaction referred to in clause (x)*, *neither the Corporation nor the acquiring or surviving entity has a class of common securities* (or American Depositary Receipts ("ADRs") representing such securities) *listed on the New York Stock Exchange (the "NYSE"), the NYSE American, LLC exchange (the "NYSE American"), or the NASDAQ Stock Market (the "NASDAQ"), or listed or quoted on an exchange or quotation system that is successor to the NYSE, the NYSE American or NASDAQ* . . .

ADE Ex. 1, p.5 (emphasis added).

28.     The prospectus ("Series C Prospectus") pursuant to which Cedar sold Series C Preferred Stock to the public warned investors that "*[o]ther than in connection with a Change of Control*, the Series C Preferred Stock does not contain provisions that are intended to protect you if our common stock is delisted from the NYSE." ADE Ex. 28 at S-12 (emphasis added). This language indicates that the definition of "Change of Control" in Section 5(j) of the Articles Supplementary was intended to protect Preferred Stockholders against a delisting of Common Stock.

## III.     Relevant Facts Concerning Defendant Wheeler

### A.     Wheeler's Equity Securities

29.     Wheeler is a REIT that focuses primarily on owning, leasing and operating grocery-anchored shopping centers. ADE Ex. 9, p.2. Wheeler is incorporated in Maryland and has a principal place of business at 2529 Virginia Beach Blvd., Virginia Beach, Virginia, 23452. ADE Ex. 9, p.1.

30.     Wheeler's common stock is publicly-traded on Nasdaq under the ticker "WHLR." ADE Ex. 9, p.1. As of December 31, 2021, there were 9,720,532 shares of Wheeler common stock outstanding. ADE Ex. 9. Wheeler's common stock closed at $1.94 per share on December 31, 2021 (representing a market cap of approximately $18.9 million). ADE Ex. 9, p. 49; *see also* Nasdaq, Historical Data (https://www.nasdaq.com/market-activity/stocks/whlr/historical).

31.     Wheeler also has two outstanding series of publicly-traded preferred stock: Series B Convertible Preferred Stock and Series D Cumulative Convertible Preferred Stock. ADE Ex. 9, p. 29. Wheeler's Series B Preferred Stock is publicly traded on Nasdaq under the ticker "WHRLP," and Wheeler's Series D Preferred Stock is publicly traded on Nasdaq under the ticker "WHLRD." ADE Ex. 9, p.1. As of December 31, 2021, there were (i) 1,872,448 shares of Wheeler's Series B Preferred Stock outstanding, and (ii) 3,152,392 shares of Wheeler's Series D Preferred Stock outstanding. ADE Ex. 9, p.29.

32.     Wheeler also has a non-publicly traded preferred stock outstanding—Series A Preferred Stock—of which there was 562 shares outstanding as of December 31, 2021. ADE Ex. 9, p. 29. Wheeler's Series A Preferred Stock is not relevant to the instant matter.

**B.  Cedar Rejects Wheeler's 2017 Merger Proposal**

33.     In 2017, Wheeler sent Cedar an unsolicited merger request. ADE Ex. 24. Cedar rejected the proposal, deeming it "adversely consequential" to merge with Wheeler:

> Cedar is a $1.35-billion company, with a current equity market capitalization of approximately $550 million. Wheeler is a $375-million company with a current equity market capitalization of approximately $95 million. ***Although relative size differences may not matter in some cases, in this instance they would be adversely consequential***.

*Id.* (emphasis added).

**C.  Wheeler's Suspension of Preferred Stock Dividends and Accumulation of Preferred Dividend Arrears In Excess of the Market Cap of its Common Stock**

34.     In March 2018, Wheeler suspended dividend payments on its common stock. ADE Ex. 11, p.9. Beginning with the three months ended December 31, 2018, Wheeler also suspended dividend payments on Wheeler's Series A, Series B and Series D preferred stock. *Id.*

35.     As of December 31, 2020, Wheeler had accumulated dividend arrears of $30.51 million to holders of its Series A, Series B and Series D preferred stock. ADE Ex. 11, p.14.

36.     In December 2020, Wheeler announced a tender offer for its Series D Preferred stock, and accepted for purchase the following number of shares at the following prices below par: (i) 387,097 shares at a purchase price of $15.50 per share on March 12, 2021, and (ii) 103,513 shares at a purchase price of $18.00 per share on May 15, 2021. ADE Ex. 10, Ex. 11, p.10.

37.     In late 2021, Wheeler's common stockholders approved an amendment of the terms of the Company's Series A and B Preferred Stock eliminating all of their accumulated and unpaid dividends (totaling nearly $12 million), and removing their cumulative dividend rights so that no further dividends would accumulate on the Series A and B Preferred Stock. ADE Ex. 15. The dividend arrears on the Series D Preferred Stock continued to accumulate, however, and as of December 31, 2021, the outstanding Series D Preferred Stock had dividend arrears of approximately $26.16 million (which exceeded the market cap of Wheeler's common stock of $18.9 million as of December 31, 2021). *See* ADE Ex. 9, p.13, 49.

38.     Concerning its Series D Preferred Stock, Wheeler further disclosed in its 2021 Form 10-K that:

> ***[B]eginning on September 21, 2023, holders of the Series D Preferred will have the right to cause the Company to redeem their Series D Preferred at a price of $25.00 per share plus the amount of all accrued but unpaid dividends***. This redemption price is payable by the Company, at the Company's election, in cash or shares of the Company's stock common stock, or a combination of cash and shares of the Company's common stock. Since January 2019, the Company's Series D Preferred (of which there are currently approximately 3.15 million shares outstanding at December 31, 2021) have been accruing unpaid dividends at a rate of 10.75% per annum of the $25.00 liquidation preference per share of Series D Preferred, or at $2.6875 per share per annum. ***As of December 31, 2021, the outstanding Series D Preferred had a liquidation preference of approximately $78.81 million, with aggregate accrued and unpaid dividends in the amount of approximately $26.16 million.*** Furthermore, based upon the closing price of the Company's common stock on February 24, 2022 of $1.97 per share, the Company believes it is unlikely that holders of the Series D Preferred would convert their shares into common stock at the current conversion price of $16.96 per share of common stock. ***As such, there is a significant risk that the Company will not have***

*sufficient cash to pay the aggregate redemption price, and would not be able to meet its redemption obligation without substantial dilution of its common stock*.

ADE Ex. 9, p. 17-18 (emphasis added).

**D.   Wheeler's History of Litigation With Its Preferred Stockholders**

39.     There are at least two litigations pending between Wheeler and its preferred stockholders arising out of Wheeler's treatment of its preferred stockholders. ADE Ex. 9, p. 56-57. First, on March 22, 2021, certain Wheeler preferred stockholders sued Wheeler and various individual defendants in the United States District Court for the District of Maryland alleging that Wheeler improperly amended provisions of its Articles Supplementary in 2018 governing the issuance of the Company's Series D Preferred in violation of Maryland corporate law and without obtaining the consent of preferred stockholders. *Id.* The action seeks to declare the amendment invalid, enjoin further unauthorized amendments, and either compel the Company to redeem the plaintiffs' shares or award damages. *Id.* The court denied the individual defendants' motion to dismiss, and the plaintiffs' summary judgment motion is currently *sub judice*. *Id.*

40.     Second, on October 25, 2021, certain Wheeler preferred stockholders sued Wheeler in the Circuit Court for Baltimore County, Maryland, alleging, *inter alia*, that Wheeler's amendment of its charter to remove the cumulative nature of dividends from the Series B Preferred Stock could not be applied retroactively. *Id.* The action seeks, *inter alia*, an order requiring Wheeler to pay all dividends accrued on the Series B and D Preferred. *Id.* A trial date is set for May 2023. *Id*.

**E.   Wheeler's History of Management Drama and Dysfunction**

41.     On January 30, 2018, Wheeler announced that it had terminated Jon Wheeler ("Mr. Wheeler") as the company's chairman, CEO and president. ADE Ex. 15. Mr. Wheeler also resigned from the Wheeler board. *Id*. Effective immediately, David Kelly ("Kelly") was appointed

14

CEO and president. *Id*. Mr. Wheeler later sued Wheeler for breach of his employment contract and alleged that he was owed severance and bonus payments. ADE Ex. 9, p.56. The Wheeler 2021 10-K discloses that Mr. Wheeler's suit was ultimately settled for $685,000 after the trial court found that Mr. Wheeler's contract had been terminated without cause, and awarded him $520,000 in damages, but no attorneys' fees or prejudgment interest (which Mr. Wheeler appealed). *Id*.

42.     On October 29, 2019, entities ("Stilwell Entities") affiliated with Joseph Stilwell ("Stilwell") issued a proxy statement advising that they owned securities representing approximately 9.8% of Wheeler's common stock, and seeking stockholder support to change the composition of the Wheeler Board to "ensure that the Company is being run in a manner consistent with the best interests of all stockholders." ADE Ex. 16. The Stilwell Entities nominated three individuals to stand for election to the Wheeler Board at the upcoming annual meeting: Stilwell, Paula J. Poskon ("Poskon") and Kerry G. Campbell ("Campbell"). *Id*.

43.     During the ensuing proxy fight, the existing Wheeler Board disclosed a March 16, 2015 order of the SEC (i) finding that Stilwell had failed to adequately disclose conflicts of interest presented by inter-fund loans made between certain funds managed by Stilwell; (ii) suspending Stilwell from various investment and securities-related positions and affiliations for twelve (12) months; and (iii) fining Stilwell $100,000. ADE Ex. 26. The existing Wheeler Board also accused Stilwell of being a prominent member and supporter of a New York-based cult. *Id*. The Stilwell Entities retaliated by, among other things, filing a lawsuit against Wheeler in connection with a related party loan to a real estate project in which the former CEO, Mr. Wheeler, had an interest. ADE Ex 22. Stilwell, Poskon and Campbell ultimately prevailed in the proxy fight, and were elected to the Wheeler Board at the next annual meeting. ADE Ex. 9.

44.     In April 2020, Wheeler terminated the employment of Kelly as Wheeler's CEO and president, with immediate effect and without severance, and in May 2020, Kelly sued Wheeler alleging breach of his employment contract, and claiming that he is owed severance pay and related benefits. ADE Ex. 9, p.56. Trial is set for March 2022. *Id.*

45.     In April 2020, after Kelly's termination, the Wheeler Board appointed Daniel Khoshaba ("Khoshaba"), a Wheeler director since February 2020, as Wheeler's CEO. ADE Ex. 11, p.3. Khoshaba agreed to serve without cash compensation, and instead received an incentive-based compensation package which would begin to vest when the common stock price hit $10 per share. ADE Ex. 17, Ex. A.

46.     On July 5, 2021, Wheeler terminated Khoshaba as Wheeler's CEO, and replaced him with Andrew Franklin. ADE Ex. 17, Ex. A.

47.     During Khoshaba's tenure as CEO, Wheeler's common stock price rose from $1.15 per share on April 14, 2020, to $5.10 per share on July 2, 2021 (the last trading day before Khoshaba's resignation). *See* Nasdaq, WHLR Historical Data (https://www.nasdaq.com/market-activity/stocks/whlr/historical). The next trading day after Wheeler announced Khoshaba's resignation, Wheeler stock dropped 19.61% to close at $4.10 per share. *See* Nasdaq, WHLR Historical Data (https://www.nasdaq.com/market-activity/stocks/whlr/historical).

48.     On December 14, 2021, Khoshaba filed a Schedule 13D disclosing ownership of 1,105,924 shares of Wheeler common stock, constituting an 11.4% stake in Wheeler. ADE Ex. 17. Attached to the filing is a letter from Khoshaba to the Wheeler Board accusing it of forcing him to resign on pretextual grounds ten (10) days before the annual stockholder meeting to renege on his compensation package. ADE Ex. 17, Ex. A. Khoshaba further observed that since his departure, the stock price had dropped by over 60% (to $1.88 per share as of December 14, 2021), while

corporate, general and administrative expenses had increased by 62% in 3Q 2021 (as compared to 3Q 2020 when Khoshaba was CEO). *Id.*

**IV.**   **Relevant Facts Concerning the Proposed Transactions**

    **A.**   **Resolution of February 2021 Proxy Contest Threat**

        49.    In February 2021, three investment firms—Ewing Morris, Camac Partners, LLC ("Camac"), and Barington Companies Equity Partners, L.P. ("Barington")—acquired substantial holdings of Cedar Common Stock, and announced their intention to nominate directors to the Board and/or enter into discussions with Cedar to maximize shareholder value. ADE Ex. 27, p. 30.

        50.    On April 28, 2021, the Company entered into agreements with Camac, Barrington, and Ewing Morris, pursuant to which, *inter alia*, the Board agreed to expand its size from seven members to ten members and appoint Ewing's nominees—Defendants Morris, Ross and Stern—to the Board. *Id.*

    **B.**   **Board Discussions and Negotiations Leading to the Proposed Transactions**

        51.    On June 3, 2021, at the newly reconstituted Board's Q1 2021 meeting, Cedar's management suggested that, with the Cedar's stock then trading for approximately $14 per share, the ***liquidation value*** of the Company, if successfully executed, might be as high as $28 or $29 per share. ADE Ex. 27, p. 31.

        52.    On June 9, 2021, Defendants Schanzer and Gonsalves met with representatives of a previously retained financial advisor, BofA Securities, to discuss a potential liquidation strategy versus a whole-company sale alternative. *Id.*

        53.    On July 15, 2021, Defendants Schanzer and Gonsalves reported to the Board the results of their conversations with BofA Securities and other market observations, and Schanzer presented a proposed dual-track strategic process that would include pursuing a so-called "asset sale/remainco" strategy in tandem with a traditional whole-company sale process. *Id.*

54.     During subsequent meetings, the Board explored the option of a sale or merger of the entire company versus splitting up Cedar's assets into multiple portfolios consisting of (i) the Grocery-Anchored Properties, (ii) certain mixed-use redevelopment projects ("Mixed Use Projects"), and (iii) the Wheeler Properties (referred to in the Proxy as the "Remainco" assets). *Id.*, p. 32.

55.     On September 9, 2021, Cedar issued a press release ("September 2021 Press Release") announcing that the Board had initiated a dual-track process to review Cedar's strategic alternatives in order to maximize stockholder value. ADE Ex. 3. As part of this process, the September 2021 Press Release advised that Cedar was exploring, among other alternatives, "a potential sale or merger involving the entire Company, and alternatively the potential sale of its core grocery-anchored shopping center portfolio and its mixed-use redevelopment projects." *Id*. The September 2021 Press Release quoted Defendant Schanzer as committed to maximizing value for ***all*** shareholders:

> We believe there is a profound disconnect between Cedar's share price and the underlying value of our real estate, as evidenced by recent transaction activity both within our portfolio and in our markets. ***The Board is committed to maximizing value for <u>all</u> our shareholders*** and, accordingly, we believe that this dual-track strategic review process will enable us to achieve that.

*Id*. (emphasis added).

56.     On October 26, 2021, the ultimate purchasers of the Grocery-Anchored Properties ("Grocery-Anchored Purchasers") submitted their initial bid. ADE Ex. 27, p. 33.

57.     On January 21, 2022, the Company received a proposal for a whole-company transaction from Party C, which proposed to acquire of all of the Company's assets other than the Mixed Use Projects in an asset purchase transaction, for an aggregate cash purchase price of $1.05 billion, which valued the Grocery-Anchored Properties at $810.0 million and the Remainco assets

(i.e., the Wheeler Properties) at $240.0 million. *Id.*, p. 34. Party C's proposal indicated Party C's willingness to acquire either only the Grocery-Anchored Properties or the Wheeler Properties at their stated valuations. *Id*.

58.     On January 27, 2022, Wheeler submitted its initial proposal with respect to the Wheeler Properties. *Id.*, p. 35.

59.     After additional rounds of negotiations, the Board elected to proceed with the Proposed Transactions pursuant to which (i) the Grocery-Anchored Purchasers agreed to purchase the Grocery-Anchored Properties for $840 million in cash (less the outstanding principal of any assumed mortgage debt) and the Mixed Use Projects for $80.5 million in cash (less the outstanding principal of any assumed mortgage debt) absent purchase of the Mixed Use Projects by another third party prior to the closing of the sale of the Grocery-Anchored Portfolio, and (ii) Wheeler agreed to the Wheeler Merger, including the purchase of the Wheeler Properties. *Id.*, p.36-38.

60.     On March 1, 2022, the Board's financial advisor, JLL Securities, rendered its oral opinion (subsequently confirmed in writing) that the aggregate consideration to be received by Common Stockholders pursuant to the Proposed Transactions was fair from a financial point of view to such holders ("JLL Fairness Opinion"). *Id.*, p. 38. With respect to Preferred Stockholders, the JLL Fairness Opinion states that "we do ***not*** express ***any*** view as to the fairness of the [Proposed Transactions] to . . . the holders of any other class of securities of the Company, ***including the holders of Series B Preferred Stock and Series C Preferred Stock of the Company*** . . ." *Id.*, p.44 (emphasis added).

61.     Following receipt of the JLL Fairness Opinion, the Board unanimously adopted resolutions which, among other things, (i) approved the Proposed Transactions and declared them in the best interests of the Company and ***Common Stockholders***, and (ii) resolved to recommend

that Common Stockholders vote to approve the Proposed Transactions at a special meeting to be held for such purpose. *Id.*, p.14, 38-39.

62.     In connection with its consideration of the Proposed Transactions and other transactions proposed by other bidders, the Proxy does not indicate that the Board ever appointed an independent representative to advocate for the interests of Preferred Stockholders. Nor did the Proxy provide Preferred Stockholders with the right to vote on the Proposed Transactions; only Common Stockholders were given the right to vote. *See* ADE Ex. 27 (letter dated April 21, 2022, appearing after cover sheet).

### C. The Severe Drop in the Market Cap of the Preferred Stock in Reaction to the Proposed Transactions

63.     On March 2, 2022, the Common Stock closed at $24.88 per share, the Series C Preferred Stock closed at $22.85 per share, and the Series B Preferred Stock closed at $25.61 per share. *See* ADE Ex. 20, Ex. 25.

64.     On March 2, 2022, after the markets closed, Cedar announced the Proposed Transactions. *See* ADE Ex. 4. In connection with the announcement, Defendant Schanzer conceded that the Proposed Transactions were only the best outcome for Common Stockholders:

> We believe this combination of transactions represents ***the best possible outcome for our <u>common</u> shareholders*** and we are very pleased with the progress thus far of our dual-track review of strategic alternatives.

ADE Ex. 4, Ex. 99.1 (press release dated March 2, 2022).

65.     On March 3, 2022—the next trading day following Cedar's announcement—the Common Stock jumped 14.55% to close at $28.50 per share. *See* ADE Ex. 25. In contrast, the

Series C Preferred Stock plummeted 56.89% to close at $9.85 per share, and the Series B Preferred Stock tanked 49.44% to close at $12.95 per share. *See* ADE Ex. 20, Ex. 25, Dkt. No. 4 at ¶ 137.[4]

66.     As a result of the sharp drops in the prices of the Series B and Series C Preferred Stock following announcement of the Proposed Transactions, the combined market cap of the Preferred Stock fell from approximately $151.4 million at the close on March 2, 2022, to $68.0 million at the close on March 3, 2022, nearly $100 million lower than the Liquidation Preference of $161.3 million. *See* ADE Ex. 20, Ex. 25; Dkt. No. 4 at ¶ 137; ADE Ex. 5, § 4.3(a); note 4 *supra*.

67.     In the wake of the carnage experienced by Preferred Stockholders after the Proposed Transactions were announced, a Raymond James analyst opined that the "driving factor" of the Proposed Transactions was to send Preferred Stockholders to "purgatory," and criticized the treatment of Preferred Stockholders under the Proposed Transactions as setting a "bad precedent" for the REIT sector:

> CDR common equity shareholders are winning, but at the cost of Preferred Stockholders . . . ***Certainly other REIT preferred shares have been sent to purgatory in other M&A transactions, but they have been more of a byproduct of M&A, and not the driving factor behind the deal structure***. CDR and its advisors may be patting themselves on the back for creative deal/legal gymnastics, but there could be other broader negative implications for the industry. If CDR can use this structure, what's to stop other REITs from structuring a similar transaction? Could that potentially hurt the investability of other outstanding REIT preferred stock? And what kind of updated language needs to be incorporated into preferred offerings to prevent this from happening again? ***We believe this [deal] sets a bad precedent for the sector***.

ADE Ex. 19, p. 1-2 (emphasis added).

---

[4] *See also* https://seekingalpha.com/symbol/CDR/historical-price-quotes; https://seekingalpha.com/symbol/CDR.PC/historical-price-quotes; https://seekingalpha.com/symbol/CDR.PB/historical-price-quotes.

## V.   Relevant Provisions of the Wheeler Merger Agreement

68.   The Wheeler Merger is governed by an Agreement and Plan of Merger, dated March 2, 2022 (the "Wheeler Merger Agreement"). ADE, Ex. 5.

69.   Under the Wheeler Merger Agreement, Cedar will merge with a newly created, wholly owned subsidiary of Wheeler called "Merger Sub." *Id.* at § 2.1(b). The "Surviving Company" of that interim transaction will be Cedar, and as a result, Cedar will become a wholly owned subsidiary of Wheeler. *Id.*

70.   To finance the acquisition of the Wheeler Properties in connection with the Wheeler Merger, Wheeler is borrowing $130 million from KeyBank ("KeyBank Loan"), repayment of which is secured by the Wheeler Properties. ADE Ex. 6, p.1. Under the Wheeler Merger Agreement, the $130 million in proceeds of the KeyBank Loan will be distributed exclusively to Common Stockholders, and Cedar's Common Stock will be delisted and cancelled. ADE Ex. 5 at §§ 3.1(a)(ii), (iii), (v).

71.   Section 7.3(d) of the Wheeler Merger Agreement provides that the closing of the Grocery-Anchored Sale is a condition to the closing of the Wheeler Merger. *Id.* at § 7.3(d). The Wheeler Merger Agreement further provides that, prior to the closing of the Wheeler Merger, the net proceeds of the Grocery-Anchored Sale shall be paid exclusively to Common Stockholders in an amount equal to the gross proceeds of the Grocery-Anchored Sale, minus any accrued but unpaid dividends on the Preferred Stock and Common Stock, any expenses of the Proposed Transactions, and any remaining unpaid liabilities of Cedar following consummation of the Grocery-Anchored Sale. *Id.* at §§ 1.1(a) (definition of "Closing Dividend Amount"), 3.1(d), 6.16, 7.3(e). Thus, in connection with the Proposed Transactions, Cedar is discharging all of its debts and liabilities, and then distributing all of the net proceeds from the Proposed Transactions exclusively to Common Stockholders.

22

72.     None of the proceeds of the KeyBank Loan or the Grocery-Anchored Sale will be paid to Preferred Stockholders. Instead, all Preferred Stock will remain outstanding, and remain an obligation of Cedar (as the "Surviving Company"). *Id.* at § 3.1(a)(iv). The Proxy states that both classes of Preferred Stock are "expected" to remain listed on the New York Stock Exchange following closing of the Wheeler Merger, and that Cedar will continue to be an independent filer of periodic reports with the SEC (ADE Ex. 27 at 8, 14), but this is not provided for contractually in the Wheeler Merger Agreement. ADE Ex. 5 at § 3.1(a)(iv).

73.     Section 2.4 of the Wheeler Merger Agreement specifies that, upon consummation of the Wheeler Merger, all of the directors and officers of Merger Sub appointed by Wheeler shall become the directors and officers of Cedar. ADE Ex. 5 at § 2.4(b). Thus, under the Wheeler Merger Agreement, all of Cedar's current officers and directors will be terminated. To that end, at or prior to the closing of the Wheeler Merger, all of Cedar's executives shall resign. *Id.* at § 6.14.

74.     Under Section 6.7 of the Wheeler Merger Agreement, Cedar is terminating all of its employees in connection with the Wheeler Merger, subject to the right of Wheeler to make offers of employment to Cedar's terminated employees. *Id.* at § 6.7(a-b). In connection with such terminations, Cedar will pay all of the severance, benefits and other obligations owed to terminated employees. *Id.*

75.     Under Section 3.3. of the Wheeler Merger Agreement, all restricted stock awards and performance restricted stock awards shall vest immediately ahead of schedule, thereby enabling the holders thereof to receive a *pro rata* share of the proceeds being paid under the Proposed Transactions. *Id.* at § 3.3.

## VI. Relevant Facts Concerning the Wheeler Properties

### A. The Value of the Wheeler Properties

76.     In connection with the Wheeler Merger, Wheeler purported to value the Wheeler Properties at $291.3 million based on the sum of: (i) a $130 million KeyBank Loan, and (ii) Cedar's assumption—as a wholly-owned subsidiary of Wheeler—of the $161.3 million Liquidation Preference of the Preferred Stockholders.  ADE Ex. 6, p.1, Ex. 27, p.68. As noted, however, immediately after the Wheeler Merger was announced, the combined market cap of the Preferred Stock plummeted to approximately $68 million. *See* ADE Ex. 20, Ex. 25; Dkt. No. 4 at ¶ 137; ADE Ex. 5, § 4.3(a); note 4 *supra*.

77.     As of June 8, 2022, the combined market cap of the Preferred Stock has only recovered to approximately $83.3 million. *See* ADE Ex. 5, § 4.3(a) (Preferred Stock shares outstanding); note 4 *supra* (Preferred Stock market prices). The depressed market value of the Preferred Stock positions Wheeler to retire all of the outstanding Preferred Stock either through tender offers and/or open market purchases for approximately $83.3 million (*see* ADE Ex. 10), which is a substantial discount to the Liquidation Preference, and would reduce the price "paid" by Wheeler for the Wheeler Properties to only $213.3 million, i.e., the $130 million borrowed from KeyBank, plus the $83.3 million market value of the Preferred Stock. While the prices of the Preferred Stock may change over time, the above calculations illustrate why the valuation of the Wheeler Properties cannot be based on the amount of the Liquidation Preference; namely, because $161.3 million does not now and may never equal the additional amount over $130 million that Wheeler will actually have to pay to retire the Preferred Stock obligation it assumed in connection with its acquisition of the Wheeler Properties.

78.     The only all-cash bid for the Wheeler Properties was submitted by Party C when, on January 21, 2022, it offered to separately acquire the Wheeler Properties for $240.0 million in

cash. ADE Ex. 27, p. 34. Thus, the only credible evidence in the record concerning the market value of the Wheeler Properties is the $240.0 million bid by Party C.

79.     Of further relevance to the value of the Wheeler Properties is the fact that the Wheeler Properties are inferior to the Grocery-Anchored Properties in terms of occupancy rates and base rents. As of December 31, 2021, the Grocery-Anchored Properties had an (i) average occupancy rate of 88.9%, and (ii) average base rent of $15.19 per square foot, while the Wheeler Properties had (i) an average occupancy rate of only 83.7% (approximately 6% lower than the Grocery-Anchored Properties), and (ii) average base rent of only $10.70 per square foot (approximately 30% lower than the Grocery-Anchored Properties). Dkt. Nos. 4-2, 4-3; ADE Ex. 8 at 5-7.

80.     On May 4, 2022, Cedar provided operational updates with respect to the Grocery-Anchored Properties and Wheeler Properties for the period ended March 31, 2022, indicating that since the announcement of the Proposed Transactions on March 2, 2022, there has been a ***decrease*** in the operational performance of the Wheeler Properties, and an ***increase*** in the operational performance of the Grocery-Anchored Properties. ADE Ex. 29 at 15-17. Specifically, between December 31, 2021, and March 31, 2022, the average occupancy rate at the Wheeler Properties has ***decreased*** to 81.3% while the average base rent has ***declined*** to $9.96 per square foot. *Id.* Conversely, at the Grocery-Anchored Properties the average occupancy rate has ***increased*** to 90.6% while average base rent has ***grown*** to $15.31 per square foot. *Id*. These latest operational figures confirm the inferior and potentially deteriorating nature of the Wheeler Properties.

81.     Finally, data from Cedar's website indicates that at least two of the Wheeler Properties—Oakland Commons and Fieldstone Marketplace—have substantially lower vacancy rates than publicly reported by Cedar in its SEC filings. For example, Cedar's 2021 Form 10-K

filed on March 10, 2022 represents that Oakland Commons is 100% occupied, but Cedar's website, other sources, and a call placed to a local retailer indicate that the space previously occupied by Walmart at that property—totaling about 60% of the rentable space—is now vacant. Dkt. No. 13-1 at n.8.

### B. <u>The Cash Flow From the Wheeler Properties</u>

82.     The annual dividends payable to Preferred Stockholders is approximately $10.8 million. ADE Ex. 8, p.50 (Consolidated Statements of Cash Flows); Ex. 27, p. 37.

83.     The Proxy states that for the year ended December 31, 2021, the Wheeler Properties (referred to in the Proxy as the "Remainco" assets) generated net operating income in excess of $19 million. ADE Ex. 27, p. 8, 70.

84.     However, according to Cedar's financial statements, net operating income is calculated *before* deducting (i) interest and principal on debt, and (ii) capital expenditures. ADE Ex. 8, p. 34, 46, 50. Cedar has not disclosed the available cash flow of the Wheeler Properties *after* deducting (i) the interest and principal repayments on the KeyBank Loan used to finance the purchase of the Wheeler Properties, and (ii) capital expenditures necessary to maintain the Wheeler Properties, and whether it would suffice to pay the annual Preferred Stock dividends. Absent such financial data, there is no evidentiary basis to conclude that the Wheeler Properties will generate sufficient cash flow to fund the Preferred Stock dividends.

85.     Additionally, as noted, upon consummation of the Wheeler Merger, Cedar's Board will be terminated and Cedar's officers will resign, and under Section 2.4(b) of the Wheeler Merger Agreement, the new directors and officers of Cedar will be the individuals appointed by Wheeler to serve as the directors and officers of Merger Sub. ADE Ex. 5 at § 2.4(b). Under Section 3(a) of the Articles Supplementary, Cedar's new directors will have absolute authority to determine whether or not to declare dividends on the Preferred Stock. *See* ADE Ex. 1 at § 3(a), Ex. 2 at §

3(a). There is no contractual protection in the Wheeler Merger Agreement or any other document obligating Cedar's new directors to declare dividends on the Preferred Stock after the Wheeler Merger closes. ADE Ex. 5.

86.     Additionally, Cedar's new officers will have the authority to incur additional cash expenses in connection with the operation of the Wheeler Properties that are not currently reflected in Cedar's financial statements, and thereby reduce the cash flow of the Wheeler Properties available to pay Preferred Stock dividends.  For example, additional loans could be taken out encumbering the Wheeler Properties and further reducing the cash flow they generate. There is no contractual protection in the Wheeler Merger Agreement or any other document obligating Cedar's officers to ensure the availability of cash flow from the Wheeler Properties to pay dividends on the Preferred Stock going forward. ADE Ex. 5.

## CONCLUSIONS OF LAW

### I.     Plaintiffs Are Entitled to a Preliminary Injunction

#### A.   Elements of a Preliminary Injunction

87.     In the Fourth Circuit, "[a] plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Amazon.com, Inc. v. WDC Holdings LLC*, 2021 WL 3878403, at *7 (4th Cir. Aug. 31, 2021) (quoting *Winter v. NRDC, Inc*., 555 U.S. 7, 20, 129 S. Ct. 365 (2008)).

88.     To prevail on a motion for a temporary restraining order, movants must demonstrate these four factors by a bare "preponderance of the evidence". *Lonza Walkersville, Inc. v. Adva Biotechnology Ltd*., No. 8:20-CV-03099-PX, 2022 WL 204396, at *2 (D. Md. Jan. 21, 2022).

27

### B.  <u>Absent a Preliminary Injunction, Plaintiffs Will Suffer Irreparable Harm</u>

89.     The Fourth Circuit has held that the traditional purpose of a preliminary injunction is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). Maryland law recognizes the same principle. *See Lerner v. Lerner*, 511 A.2d 501, 512 (Md. 1986) ("[C]omplications can be avoided simply by maintaining the status quo until the merits are decided.").

90.     Thus, in the Fourth Circuit, the element of irreparable harm requires considering whether "adequate compensatory or other corrective relief will be available at a later date." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017); *see also Hughes Network Sys. v. Interdigital Communications Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) (courts issue preliminary injunctions to "preserve the plaintiff's opportunity to receive an award of money damages at judgment").

91.     Under this standard, irreparable harm exists if the funds in dispute are widely distributed before a determination on the merits, because if plaintiffs later prevail, they will need to sue hundreds of potential defendants to recover those distributions; this is "a recourse [that] is so impractical as to be infeasible." *Savoie v. Merchants Bank*, 84 F.3d 52, 58 (2d Cir. 1996); *see also Smith v. Shiebeck*, 24 A.2d 795, 801 (Md. 1942) (irreparable injury exists if the movant "seeking redress at law" would need to initiate a "multiplicity of vexatious and unprofitable suits."); *Sachs Capital Fund I LLC v. Em Grp. LLC*, 2020 Md. Cir. Ct. LEXIS 2, at *9-10 (Md. Cir. Ct. May 22, 2020) (issuing temporary restraining order to prevent money from changing hands when plaintiffs claimed they were entitled to distributions due to "liquidity event"); *Dodocase VR, Inc. v. MerchSource, LLC*, 2018 U.S. Dist. LEXIS 48654, at *35-36 (N.D. Cal. Mar. 23, 2018) ("irreparable harm caused by requiring Plaintiff to simultaneously litigate on two fronts with

28

different attorneys and under different rules instead of preventing Plaintiff from obtaining the benefit of its contracted-for exclusive dispute resolution process.").

92.     Irreparable harm also exists if "damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected." *Amazon*, 2021 WL 3878403, at *8; *see also United States ex rel. Taxpayers Against Fraud v. Singer Co*., 889 F.2d 1327, 1328 (4th Cir. 1989) (upholding district court's finding of irreparable harm where the principal defendant's assets were "in danger of dissolution and depletion").

93.     Here, irreparable harm exists because a preponderance of the evidence shows that "adequate compensatory or other corrective relief" will almost certainly not be available to Plaintiffs at a later date if distribution of the proceeds of the Proposed Transactions is not enjoined and Plaintiffs later prevail on the merits. In particular, if the request for preliminary injunctive relief is not granted, and Plaintiffs later prevail on the merits, they will need to commence a multiplicity of lawsuits against hundreds of Common Stockholders to recover wrongful distributions; "a recourse [that] is so impractical as to be infeasible." *Savoie*, 84 F.3d at 58.

94.     The remaining equity in the Wheeler Properties after deducting the $130 million KeyBank Loan cannot provide a full recovery to Plaintiffs if they prevail because the only credible evidence in the record concerning the present value of the Wheeler Properties is the $240 million all-cash bid for the Wheeler Properties submitted by Party C on January 21, 2022. ADE Ex. 27 at 34. Deducting the $130 million KeyBank Loan (ADE Ex. 6, p.1) from $240 million would leave only $110 million of equity remaining in the Wheeler Properties, which falls over $50 million short of the amount needed to pay the full $161.3 million Liquidation Preference. Moreover, Cedar has speculated that the value of the Wheeler Properties may have decreased in recent months,

which means the equity remaining in the Wheeler Properties may be even less than $110 million. Dkt. No. 30-5 at ¶ 16.

95.     Defendants claim that the Wheeler Properties are worth $291.3 million, but that valuation was backed into by arithmetic rather than objectively determined through an appraisal; namely, adding the Liquidation Preference of $161.3 million to the $130 million KeyBank Loan. (ADE Ex. 6, p.1; Ex. 27, p. 68). The amount of the Liquidation Preference, however, is not a reliable measure of the value of the Wheeler Properties because it does not represent what Wheeler actually paid for the Wheeler Properties. To the contrary, following the announcement of the Proposed Transactions, the market value of the Preferred Stock plummeted from approximately $151.4 million at the close on March 2, 2022, to $68.0 million at the close on March 3, 2022 (*see* Findings of Fact above ("FOF") at ¶¶ 65-66)— nearly $100 million lower than the Liquidation Preference of $161.3 million—and has only recently recovered to approximately $83.3 million. *Id.* ¶ 77. This positions Wheeler to retire the outstanding Preferred Stock at a steep discount to the Liquidation Preference either through tender offers and/or open market purchases (as it has done in the past with respect to its own Series D preferred stock; ADE Ex. 10, Ex. 11, p. 10), thereby substantially reducing the price Wheeler will have actually paid for the Wheeler Properties. The present opportunity for Wheeler to retire the Preferred Stock at a sharp discount to the Liquidation Preference shows why the valuation of the Wheeler Properties cannot be based on the amount of the Liquidation Preference; namely, because $161.3 million does not now and may never equal the additional amount over $130 million that Wheeler will actually have to pay to retire the Preferred Stock obligation it assumed in connection with its acquisition of the Wheeler Properties.

96.     Wheeler's assets also do not represent a source of full recovery for Plaintiffs since the dividend arrears on Wheeler's own Series D preferred stock—$26.16 million as of December

31, 2021—already exceeds the current market cap of Wheeler's common stock ($18.9 million as of December 31, 2021). FOF ¶¶ 30, 37. In particular, Wheeler has disclosed that, beginning on September 21, 2023, holders of the Series D Preferred will have the right to cause Wheeler to redeem their preferred stock for cash and/or common stock at a price equal to $25.00 per share, plus the amount of all accrued but unpaid dividends. ADE Ex. 9, p. 17-18. As of December 31, 2021, that obligation already totaled approximately $78.81 million, and will continue to rise over time as arrears on the dividends payable to Wheeler's Series D preferred shareholders continue to accumulate. ADE Ex. 9, p. 18. Wheeler has disclosed that it may not have sufficient cash to pay that obligation when due, thus requiring it to pay the obligation entirely in common stock, which will substantially dilute Wheeler's common shareholders. *Id*. Finally, a former CEO of Wheeler, Daniel Khoshaba, who resigned in July 2021, recently alleged that Wheeler's current officers and directors are mismanaging the business, resulting in a sharp increase in expenses, which could obviously further diminish the assets from which Wheeler could pay any judgment. *See* ADE Ex. 17, Ex. A.

97.     Finally, while there is evidence in the record that Defendants have insurance (Dkt. No. 21), there is no evidence in the record concerning the amount of such insurance. Moreover, such insurance will be depleted over time by defense costs.

98.     For all of the above reasons, Plaintiffs have shown by a preponderance of the evidence that they will suffer irreparable harm without injunctive relief because "adequate compensatory or other corrective relief" will not be available to Plaintiffs at a later date if distribution of the proceeds of the Proposed Transactions is not enjoined and Plaintiffs later prevail on the merits.

**C.** **Plaintiffs Are Likely to Succeed on the Merits of Their Claims**

    **1.** **Plaintiffs Are Likely to Succeed on the Merits of Their Claim That the Cedar Defendants Breached the Implied Duty of Good Faith and Fair Dealing**

99.    Maryland contract law applies to a corporate charter (which is a contract between the corporation and its stockholders), and to "Articles Supplementary," which "are simply an amendment of the corporate charter." *Impac Mortg. Holdings, Inc. v. Timm*, 255 A.3d 89, 94, 112 (Md. 2021).

100.    Maryland law implies an obligation to act in good faith in every contract. *Clancy v. King*, 954 A.2d 1092, 1106 (Md. 2008). A party acts in bad faith when a "significant motive" for its exercise of contractual rights is to deprive its counterparty of the "fruits of the contract between them." *Clancy*, 954 A.2d at 1109; *accord WSC/2005 v. Trio Ventures Assocs.*, 190 A.3d 255, 268 (Md. 2018); *see also Quadrangle Offshore (Cayman) LLC v. Kenetech Corp.,* 1999 WL 893575, at *10 (Del. Ch. Oct. 13, 1999) (board acts in bad faith where it approves a course of action leading to a liquidation "with the intention of dishonoring" a liquidation preference), *aff'd*, 751 A.2d 878 (Del. 2000).

101.    In particular, under the *Jolly Roger* decision cited by Defendants, leaving a successor company with insufficient assets to pay a liquidation preference is evidence of bad faith. *See Jolly Roger Fund, LP v. Prime Group Realty Trs*, 2007 Md. Cir. Ct. Lexis 10, at *13 (Md. Cir. Ct. Aug 16, 2007) ("[o]f special significance . . . that [defendant] is currently able, if necessary, to pay plaintiffs their liquidation preference. This fact alone defeats plaintiff's argument that [defendant] has effectively prevented plaintiffs from receiving the benefits and entitlements of the agreement.").

102.    Contrary to Defendants' arguments, Maryland law is not solely concerned with one party "prevent[ing] the other party from performing his obligations under the contract" (as this

Court initially assumed in *dicta* in *Whitfield v. Liberty Mut. Grp. Inc.*, 2019 WL 1099077, at *6 n. 12 (D. Md. Mar. 8, 2019) (Russell, J.)). Instead, Plaintiffs have shown that Maryland law is also concerned with "the manner in which a party may exercise the discretion accorded to it by the terms of the agreement." *WSC*, 190 A.3d at 267. That is, a party may exercise contractual rights, but if it exercises those rights in bad faith (*i.e.*, wherein a primary motivation is to deprive the other party of contractual rights), it breaches the implied duty of good faith and fair dealing. *See Clancy*, 954 A.2d at 1108 ("In matters of personal discretion in contract, the party with the discretion is limited to exercising that discretion in good faith.").

103.    Here, even assuming *arguendo* that Defendants' interpretations of the relevant provisions of the Articles Supplementary are correct (*see* discussion *infra*), Defendants could still have breached the implied duty of good faith and fair dealing if they exercised their contractual rights in bad faith. That is to say, if the "primary motivation" for structuring the Proposed Transactions as Defendants did was to deprive Plaintiffs and other Preferred Stockholders of their Liquidation Preference or Conversion Right under the Articles Supplementary, then Defendants acted in bad faith and breached the implied duty of good faith and fair dealing.

104.    Plaintiffs have adduced ample evidence that Defendants structured the Proposed Transactions in bad faith. *First*, in November 2017, the Cedar Defendants summarily rejected Wheeler's merger proposal as "adversely consequential" because of Wheeler's "small size" when Wheeler's market cap was $95 million (and Wheeler had not yet suspended payment of its common and preferred dividends). ADE Ex. 24. Yet, just over four years later, the Cedar Defendants repeatedly insist in the Proxy that a merger with Wheeler is the best interests of Cedar and Common Stockholders even though Wheeler's market cap is presently just barely above $20 million (and dividend arrears totaled approximately $26 million as of December 31, 2021, which

exceeds the market cap of Wheeler's common stock). ADE Ex. 27, p.5, 22, 27, 41. This complete reversal in the Board's attitude towards Wheeler as a merger partner plainly raises a red flag concerning the Board's motives in recommending the Wheeler Merger.

105.    *Second*, with the Board having had previous dealings with Wheeler, and with both Wheeler and Cedar operating in the same real estate niche (i.e., grocery-anchored shopping centers), the Cedar Defendants must have been aware of Wheeler's history of (i) suspending (and in some cases eliminating) the dividends of its own preferred shareholders, and (ii) management drama in terms of terminating three CEO's in four years and the recent Wheeler proxy contest featuring extensive mudslinging. (FOF ¶¶ 34-48). Thus, the Cedar Defendants could reasonably foresee that announcing Wheeler as its merger partner would crash the prices of the Preferred Stock after Preferred Stockholders learned that the Preferred Stock would remain outstanding as an obligation of Wheeler through its 100% ownership of Cedar. And given that such an outcome was foreseeable, it is reasonable to infer that this outcome was Defendants' intent in order to enable Wheeler to retire Preferred Stock at a sharp discount to the Liquidation Preference through open market purchases, and/or a tender offer (as Wheeler previously pursued with its own Series D preferred stock; ADE Ex. 10). Notably, a neutral Raymond James analyst perceived this intent, independently opining that the "driving force" behind the structure of the Proposed Transactions was to send the Preferred Stockholders to "purgatory." ADE Ex. 19 at 1-2.

106.    *Third*, all of the credible evidence in the record concerning the present value of the Wheeler Properties indicates that Defendants have left Wheeler without sufficient assets to cover the Liquidation Preference (which, as noted, is evidence of bad faith under the *Jolly Roger* decision). Specifically, the $240 million all-cash bid for the Wheeler Properties that Party C submitted on January 21, 2022 (ADE Ex. 27, p.34) indicates that the equity in the Wheeler

Properties is insufficient to cover the Liquidation Preference; i.e., deducting the $130 million KeyBank Loan from the $240 million bid by Party C leaves only $110 million of equity remaining in the Wheeler Properties, which falls over $50 million short of the amount needed to pay the $161.3 million Liquidation Preference. Moreover, as of June 8, 2022, the combined market cap of the Series B and C Preferred Stock has only recovered to approximately $83.3 million (FOF ¶ 77), which indicates that Preferred Stockholders have concluded that the Wheeler Properties have insufficient equity to cover the Liquidation Preference (and insufficient cash flow to pay dividends).

107.    *Fourth*, in September 2021, Defendant Schanzer stated that, in connection with pursuing a strategic transaction, the "Board is committed to maximizing value for ***all*** our shareholders" (ADE Ex. 3), which statement can reasonably be construed to include preferred shareholders (since preferred shareholders are shareholders entitled to all rights and privileges under Maryland law; *see Leviness v. Consol. Gas, Elec. Light & Power Co. of Baltimore*, 80 A. 304, 306 (Md. 1911)). That Schanzer was referring to both Common Stockholders and Preferred Stockholders in September 2021 becomes evident when, in connection with announcing the Proposed Transactions, he conceded on March 2, 2022, that the Proposed Transactions represent "the best possible outcome for our ***common*** shareholders." (ADE Ex. 4, Ex. 99.1, Press Release). Schanzer conspicuously omitted Preferred Stockholders from his March 2022 public statement because he apparently understood at that point that the Proposed Transactions were a bad outcome for Preferred Stockholders because their Liquidation Preference would not be paid. Promising to maximize value for "all" shareholders and then structuring transactions several months later that represent a good outcome only for Common Stockholders (and a bad outcome for Preferred Stockholders) is evidence of bad faith.

108.     *Fifth*, during the strategic review process, the Board never appointed an independent representative to advocate for the Preferred Stockholders in connection with its consideration of various transactions even though it was aware, or should have been aware that the interests of Common Stockholders and Preferred Stockholders conflicted, and none of the Board members owned any Preferred Stock (with the exception of Defendant Rogers who owned a *de minimis* number of shares of Series B Preferred Stock that were dwarfed by his holdings of Common Stock; FOF ¶¶16-19). *See In re FLS Holdings, Inc. S'holders Litig*., 1993 WL 104562, at *5 (Del. Ch. Apr. 2, 1993) (declining to dismiss breach of fiduciary duty claim where "no mechanism employing a truly independent agency on the behalf of the preferred was employed before the transaction was formulated").

109.     *Sixth*, Plaintiffs have adduced evidence that Defendants allocated inferior properties to Wheeler in connection with the Wheeler Merger in terms of occupancy rates and base rents per square foot. FOF ¶ 79. This allegation is substantiated by the recent deterioration in the average occupancy rate and base rents of the Wheeler Properties, and recent improvement of the average occupancy rate and base rents of the Grocery-Anchored Properties. *Id.* ¶¶ 80-81.

110.     *Seventh*, Defendants have not substantiated that the cash flow from the Wheeler Properties suffices to pay the annual Preferred Stock dividends after deducting interest and principal payments on the KeyBank Loan, and capital expenditures to maintain the Wheeler Properties. *Id.* ¶¶ 82-84.

111.     *Eighth*, Defendants have not shown that the Articles Supplementary provide any contractual protections to Preferred Stockholders that would prevent (i) the new Cedar directors (appointed by Wheeler) from refusing to declare Preferred Stock dividends, or (ii) the new Cedar officers (appointed by Wheeler) from increasing expenses and thereby diminishing, or eliminating,

the cash flow available from the Wheeler Properties to pay Preferred Stock dividends. *Id.* at ¶¶ 85-86.

112.    *Ninth*, on June 3, 2021, Cedar management reported that "the liquidation value of [Cedar], if successfully executed, might be as high as $28 or $29 per share." ADE Ex. 27, p.31. That range matches the $29 per share Defendants anticipate from the Proposed Transactions. ADE Ex. 4. Thus, in substance, the Proposed Transactions announced in March 2022 mirror the liquidation envisioned by Defendants in June 2021, and the reasonable inference is that Defendants only belatedly structured the Proposed Transactions as an asset sale and merger instead of a straight liquidation to try and avoid payment of the Liquidation Preference.

113.    The abundant evidence of bad faith here distinguishes this case from the *Kimeldorf* decision cited by Defendants where there was no evidence of bad faith because—unlike here— preferred shareholders were not being excluded from distributions, and instead preferred shares were being converted into common shares, and preferred shareholders were "entitled to receive, as conversion rights, whatever shares, securities and other property that is due to the holder of the number of shares of common stock into which the preferred shares are convertible." *Kimeldorf v. First Union Real Est. Equity & Mortg. Invs.*, 764 N.Y.S.2d 73, 74 (1st Dept. 2003).

114.    The abundant evidence of bad faith here also distinguishes this case from the *Jolly Roger* decision cited by Defendants where, to the contrary, the defendant was "currently able, if necessary, to pay plaintiffs their liquidation preference." *Jolly Roger*, 2007 Md. Cir. Ct. Lexis 10, at *13.

115.    For all of the above reasons, Plaintiffs have demonstrated by a preponderance of the evidence that they are likely to succeed on the merits of their claim that the Cedar Defendants acted in bad faith and structured the Proposed Transactions with the primary intent of depriving

Preferred Stockholders of their Liquidation Preference and Conversion Right, and thereby breached the implied duty of good faith and fair dealing (as asserted in the Amended Complaint in Count I at paragraphs 180-81, and in Count III at paragraphs 192-93).

> **2. Plaintiffs Are Likely to Succeed on the Merits of Their Claim That the Cedar Defendants Breached Section 4 of the Articles Supplementary and Preferred Stockholders Are Entitled to Payment of the Liquidation Preference in Connection with the Proposed Transactions**

116.    Maryland courts take an "objective" approach to the interpretation of contracts. *Impac*, 255 A.3d at 95. "Under that approach, the court's inquiry is initially bounded by the 'four corners' of the agreement." *Id*. "The court does not construe particular language in isolation, but considers that language in relation to the entire contract." *Id*. at 96. "The court is to give effect to the plain meaning of the contract, read objectively, regardless of the parties' subjective intent at the time of contract formation." *Id*. That is to say, "when the contract language is plain and unambiguous, 'the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.'" *Id.* In sum, under Maryland law, the initial step in the interpretation of a contract "is to determine whether the contract's meaning is plain and unambiguous. If that is so, the court's task – at least as to the interpretation of the contract – is at an end." *Id*.

117.    "Ambiguity arises when a term of a contract, as viewed in the context of the entire contract and from the perspective of a reasonable person in the position of the parties, is susceptible of more than one meaning." *Id*. "If a contract provision is ambiguous, 'the narrow bounds of the objective approach give way,' and the court may consider extrinsic evidence to ascertain the mutual intent of the parties." *Id.* "In that effort, the court is to consider admissible evidence that illuminates the intentions of the parties at the time the contract was formed." *Id.*

118.    "Ambiguous language in a contract that is not clarified by extrinsic evidence or interpretive aids is construed against a party to the contract when that party drafted the language in question – a canon of construction sometimes referred to by the Latin phrase *contra proferentem* ("against the offeror")." *Id*. at 97. That canon of construction is "based on elementary notions of fairness – that the drafting party was responsible for including the particular language in the contract and presumably had the greater opportunity to clarify the language in its favor, if that was the parties' intent, or at least to protect its own interests from a lack of clarity." *Id.* That rule "is also meant to discourage the drafter from including ambiguous language in order 'to induce another to contract with him on the supposition that the words mean one thing while he hopes the court will adopt a construction by which they will mean another thing more to his advantage.'" *Id.*

119.    Here, Section 4(a) of the Articles Supplementary states that Preferred Stockholders are entitled to priority payment of the Liquidation Preference in "the event of *any* voluntary or involuntary liquidation, dissolution or winding up of [Cedar]." ADE Ex. 1, p.3. The reasonable import of this language is that "any" liquidation or winding up triggers payment of the Liquidation Preference. On the other hand, Section 4(e) carves out an exception to Section 4(a), stating that a merger or sale of all or substantially all of Cedar's assets shall *not* "be considered a liquidation, dissolution or winding up of [Cedar]." ADE Ex. 1., p.3.

120.    The Articles Supplementary do not expressly define the scope of the terms "liquidation," "dissolution," or "winding up." However, cases recognize that a liquidation and winding up are processes that typically feature discharge of debts, distribution of net proceeds to shareholders, termination of employees and payment of severance, and cancellation of stock. *See, e.g.*, *Quadrangle,* 1999 WL 893575, at *11-12 ("paying off creditors" and "winding up business affairs" (e.g., laying off workers and paying severance to executives) signify a liquidation);

*Marcus v. W2007 Grace Acquisition I, Inc*., 203 F. Supp. 3d 332, 339 (S.D.N.Y. 2016) (adopting factors in *Quadrangle* for characterizing a transaction as a *de facto* liquidation); *Dual Inc. v. Lockheed Martin Corp*., 857 A.2d 1095, 1103 (Md. 2004) (finding that company was not "winding up" because "nothing in the record indicates that Dual made any attempt to dispose of existing assets, debts, or obligations"); *Comptroller Of Treasury v. Thompson Trailer Corp*., 121 A.2d 850, 856 (Md. 1956) (""[t]he word 'liquidation' is synonymous with 'winding up or settlement with creditors.' . . . it means 'the act or operation of winding up the affairs of a firm or company by getting in the assets, settling with its debtors and creditors, and appropriating the amount of profit or loss.'").

121.    Many indicia of a liquidation and winding up are present here: Cedar is discharging all of its debts, distributing all of the proceeds of the Proposed Transactions, terminating all of its employees (including all of its executives) and paying severance benefits, terminating the Board, and cancelling all of its stock (and delisting). (FOF ¶¶ 68-75). In short, although Cedar will nominally "exist" as a wholly-owned subsidiary of Wheeler after the Proposed Transactions close, it will be an "empty shell." These facts distinguish the instant case from the *Jolly Roger* decision where the Court found that the REIT had *not* "fired all of its employees, set up severances for its officers, discontinued board meetings, settled with creditors, or otherwise abandoned the form of Trust;" in short, the REIT was *not* rendered an "empty shell." *Jolly Roger*, 2007 Md. Cir. Ct. Lexis 10, at *10, 13.

122.    That said, it is unclear whether the intent of Section 4(e) is to (i) carve out *all* mergers and asset sales from the scope of Section 4(a) even if indicia of a liquidation and winding up (as itemized above) are also present ("Full Carveout"), or (ii) carve out only mergers or asset sales *without more*, i.e., only mergers and asset sales that are *not* accompanied by other indicia of

a liquidation or winding up (as itemized above) ("Partial Carveout"). If the Court adopts the Full Carveout interpretation, Preferred Stockholders would not be entitled to priority payment of the Liquidation Preference in connection with the Proposed Transactions even though many indicia of a liquidation and winding up are present. But if the Court adopts the Partial Carveout interpretation, Preferred Stockholders would be entitled to priority payment of the Liquidation Preference in connection with the Proposed Transactions because aside from there being a merger and sale of assets, many indicia of a liquidation and winding up are present, and Cedar will be an empty shell.

123.    Under *Impac*, a court "does not construe particular language in isolation, but considers that language in relation to the entire contract." 255 A.3d at 96. Here, considering the language in Sections 4(a) and 4(e) of the Articles Supplementary as a whole, those provisions are susceptible to either a "Full Carveout" or "Partial Carveout" interpretation, and are therefore ambiguous. Indeed, while two cases cited by Defendants adopt the "Full Carveout" interpretation when construing similar language (*see Jolly Roger*, 2007 Md. Cir. Ct. Lexis 10, at *1-5; *Kimeldorf*, 764 N.Y.S.2d at 74), a case cited by Plaintiffs adopts the "Partial Carveout" interpretation when construing similar language. *See Quadrangle,* 1999 WL 893575, at *9, 11-12 (holding that language similar to Section 4(e) did not "preclude a claim for a constructive liquidation that *included* asset sales[;] [i]t merely requires more," and that a deal featuring "more" than asset sales such as "paying off creditors" and "winding up business affairs" (e.g., laying off workers and paying severance to executives) could qualify as a constructive liquidation).

124.    Neither party has submitted extrinsic evidence to resolve the ambiguous language in Section 4. Therefore, under *Impac*, the canon of *contra proferentem* applies, as Defendants concede it must. (Dkt. No. 30 at 15) (canon of *contra proferentem* applies when language is ambiguous). This means that Section 4 must be construed against the Cedar Defendants as the

drafters, and the Court must adopt the "Partial Carveout" interpretation triggering payment of the Liquidation Preference in connection with the Proposed Transactions.

125.    For all of the above reasons, Plaintiffs have demonstrated by a preponderance of the evidence that they are likely to succeed on the merits of their claim that the Cedar Defendants breached Section 4 of the Articles Supplementary by declining to provide for payment of the Liquidation Preference in connection with the Proposed Transactions (asserted in Count I of the Amended Complaint).

### 3.  Plaintiffs Are Likely to Succeed on the Merits of Their Claim That the Proposed Transactions Constitute a Change of Control Triggering the Conversion Right Under Section 7 of the Articles Supplementary

126.    The canons of contract interpretation detailed by Maryland's highest court in *Impac* also apply to interpretation of Section 7 of the Articles Supplementary, which entitle Preferred Stockholders to convert their Preferred Stock into Common Stock in the event of a transaction qualifying as a "Change of Control," as defined in Section 5(j) of the Articles Supplementary.

127.    The crucial language here appears in Section 5(j), which provides that a transaction qualifies as a "Change of Control" where, *inter alia*, "neither the Corporation nor the acquiring or surviving entity has a class of [publicly traded] common securities. . ." (hereinafter, "Entity Clause"). ADE Ex. 1 at § 5(j).

128.    Plaintiffs argue that so long as the "surviving entity" in a transaction does not have publicly-traded stock, and the Preferred Stock resides at the "surviving entity" level, it does not matter that the "acquiring entity" has publicly-traded stock; the transaction will still qualify as a "Change of Control" under Section 5(j) of the Articles Supplementary (hereinafter, the "Any Entity" interpretation).

129.    Here, Wheeler is the "acquiring entity" (because Wheeler will own 100% of Cedar pursuant to the Wheeler Merger), and Wheeler's stock is publicly-traded. But under the Wheeler

Merger Agreement, Cedar is the "surviving entity" (ADE Ex. 5 at § 2.1(b)), Cedar will **not** have publicly-traded stock (*id.* at §§ 3.1(a)(ii), (iii), (v) (all Cedar stock will be cancelled)), and the Preferred Stock will be an obligation of Cedar (not Wheeler). (*Id.* at § 3.1(a)(iv)). Therefore, under the "Any Entity" interpretation—because the "surviving entity" at which the Preferred Stock will reside will **not** have publicly-traded stock—the Proposed Transactions qualify as a "Change of Control" and trigger the Conversion Right in Section 7 (even though Wheeler has publicly-traded stock).

130.    Defendants narrowly interpret Section 5(j) to provide that a transaction qualifies as a "Change of Control" if and only if **none** of the entities listed in the Entity Clause have publicly-traded stock (hereinafter, "No Entity" interpretation). Here, the "acquiring entity" (Wheeler) has publicly-traded stock even if the surviving entity (Cedar) does not, and therefore (according to Defendants), the Proposed Transactions do not qualify as a "Change of Control."

131.    Under *Impac*, "the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." 255 A.3d at 96. From the standpoint of reasonableness, the "Any Entity" interpretation advanced by Plaintiffs is more compelling than the "No Entity" interpretation advanced by Defendants. *First*, under the rules of grammar, if the intent of the clause had been to qualify transactions as a "Change of Control" if and only if **none** of the entities listed in the Entity Clause have publicly-traded stock (as Defendants argue), then the Entity Clause should have read "***neither*** the Corporation **nor** the acquiring entity ***nor*** the surviving entity has [publicly-traded stock]." *See* Bonnie Mills, Quick and Dirty Tips, April 9, 2021

https://www.quickanddirtytips.com/education/grammar/when-use-nor) ("You can also use "nor" if you're talking about more than two items, **but you have to repeat "nor" after each element**. So

if you want to add mustard to your list of dislikes, you have to say: "I like *neither* hot dogs **nor** ketchup **_nor_** mustard.") (emphasis added). (Dkt. No. 49-1 at 10).

132.   Instead, the Entity Clause reads "**_neither_** the Corporation **_nor_** the acquiring entity **_or_** the surviving entity has [publicly-traded stock]," which suggests that the reader should look at the "acquiring entity" *or* the "surviving entity," and if one of them does not have publicly-traded stock (i.e., Cedar), the "no publicly traded stock" condition is satisfied, and the transaction qualifies as a Change of Control (even if the other entity referenced in the clause will have publicly-traded stock after the transaction closes).

133.   *Second*, the Entity Clause uses the singular "has" instead of the plural "have" after the word "surviving entity": "neither the Corporation nor the acquiring or surviving entity **_has_** a class of [publicly traded] common securities. . ." As Defendants concede in their opposition brief, correct grammar requires use of a plural verb in a neither/nor clause when followed by a plural subject. (Dkt. No. 30 at 22 (Defendant use a plural verb in a "neither/nor" clause, stating "neither the Preferred Stockholders' liquidation nor their conversion rights **_are_** triggered."); *see also* Dkt. No. 13-1 at n. 13 ("when "neither" and "nor" link a singular term and a plural one, proper usage requires putting the singular term after the "neither," and the plural term after the "nor," and using a plural verb after the "nor" phrase (e.g., "neither the car nor the trucks are available")) (citing The New York Times Manual of Style and Usage).

134.   In Section 5(j) of the Articles Supplementary, however, two terms appear after the "nor" (i.e., acquiring entity and surviving entity), which is plural, and yet the verb is "has" (singular), and not "have" (plural). Thus, to be consistent with the deviant use of a singular verb after two subjects, it is reasonable to interpret the language in Section 5(j) as instructing the reader to look at just one entity (the "acquiring entity" *or* the "surviving entity") to determine whether

the condition is satisfied. Here, the "surviving entity" (Cedar) at which the Preferred Stock will reside does not have publicly-traded stock, and thus that suffices to qualify the Proposed Transactions as a Change of Control.

135.    Additionally, *Impac* instructs that the "court does not construe particular language in isolation, but considers that language in relation to the entire contract." 255 A.3d at 96. Here, Section 7(b)(i) of the Articles Supplementary uses the defined term "Common Stock Price" to determine the applicable conversion ratio. In turn, the definition of "Common Stock Price" in Section 7(b)(vii) contemplates that Cedar must have publicly traded shares of Common Stock, without which it would be impossible to calculate the conversion ratio in connection with a Change of Control (unless the consideration paid is solely cash). Thus, were the Court to adopt Defendants' interpretation, and permit the Preferred Stock to remain an obligation of an entity (i.e., Cedar) without publicly-traded stock, the conversion formula simply could not function in any future transactions involving consideration other than cash since Cedar would not have publicly-traded stock to use as an input in the conversion formula. In other words, Defendants' interpretation— which leaves Preferred Stockholders marooned at an entity without publicly-traded stock (i.e., Cedar)—would make it impossible for Preferred Stockholders to exercise their Conversion Right in connection with future transactions that are not all cash. (Dkt. No. 13-1 at 18).

136.    Defendants contend that, under their interpretation that a Change of Control only occurs if and only if *none* of the entities involved in the transaction have publicly-traded stock, Section 5(j) protects the Preferred Stock from being subjected to a transaction in which the Preferred Stock remain outstanding in a delisted consolidated entity with no publicly traded acquiror, following which the Preferred Stockholders would purportedly lose the right to receive periodic reports and financial information about the company in which they are stockholders. (Dkt.

No. 30 at 21). But as Plaintiffs note, Section 9 of the Articles Supplementary already protects the information rights of Preferred Stockholders in all circumstances. (Dkt. No. 49-1 at 9).

137.    Both parties cite to language on page S-12 of the Series C Prospectus as extrinsic evidence of the intent of Section 5(j). ADE Ex. 28. Defendants claim that the Series C Prospectus warned Preferred Stockholders about the risk of delisting in the following risk factor: "[i]f our common stock is delisted, your ability to transfer or sell your shares of [] Preferred Stock may be very limited and the market value of [] Preferred Stock will likely be materially adversely affected." ADE Ex. 28 at S-12. But as Plaintiffs note, the text accompanying that risk factor subsequently states that "***[o]ther than in connection with a Change of Control***, the Series C Preferred Stock does not contain provisions that are intended to protect you if our common stock is delisted from the NYSE." (Dkt. No. 13-1 at 18). This language makes clear that the "Change of Control" language in Section 5(j) was intended to protect Preferred Stockholders against a delisting. Since that was the intent, it does not make sense to conclude that a transaction that would delist Cedar's Common Stock but still leave the Preferred Stock outstanding as an obligation of Cedar does not qualify as a Change of Control. In sum, the language in the Series C Prospectus favors Plaintiffs' interpretation.

138.    Finally, as Defendants concede (Dkt. No. 30 at 15), even assuming *arguendo* that the language in Section 5(j) is susceptible to both the "Any Entity" and "No Entity" interpretations, and the extrinsic evidence is inconclusive, the canon of *contra proferentem* applies, Section 5(j) must be construed against the Cedar Defendants as the drafters, and the Court must adopt the "Any Entity" interpretation and declare that the Proposed Transactions constitute a Change of Control because the "surviving entity" will not have publicly-traded stock.

139.    For all of the above reasons, Plaintiffs have demonstrated by a preponderance of the evidence that they are likely to succeed on the merits of their claim that the Proposed Transactions constitute of Change of Control triggering their Conversion Right under Section 7 of the Articles Supplementary (asserted in Count III of the Amended Complaint).

### 4. Plaintiffs Are Likely to Succeed on the Merits of Their Claim That the Cedar Defendants Breached Their Fiduciary Duties to Preferred Stockholders

140.    Maryland's General Corporation Law specifies that directors owe stockholders a duty of good faith (General Corp. Law § 2-405.1(c)(1)), and the Court of Appeals has held there is a duty to maximize value when selling a company. *Plank v. Cherneski*, 231 A.3d 436, 465 (Md. 2020).  In Maryland, breach of fiduciary duty is an independent cause of action. *Plank*, 231 A.3d at 465.

141.    A defendant breaches its fiduciary duties when a "primary motivation" for its exercise of contractual rights is to harm its counterparty's interests. *Clancy*, 954 A.2d at 1108; *see also Della Ratta v. Larkin*, 856 A.2d 643, 657 (Md. 2004) (affirming injunction enjoining enforcement of capital call where defendant breached fiduciary duty and acted in bad faith given that "significant motivation for . . . issuing the capital call was to squeeze out some of the limited partners" and defendant "advanced the date of the capital call in order to 'out-maneuver' the Withdrawing Partners and block them from exercising their statutory right to withdraw.").

142.    Under Maryland law, directors owe fiduciary duties to preferred stockholders. *See Leviness v. Consol. Gas, Elec. Light & Power Co. of Baltimore*, 80 A. 304, 306 (Md. 1911) (stating that the preferred stockholder "is expressly invested with all the 'incidents, rights, privileges, immunities and liabilities' of a stockholder"); *see also Eisenberg v. Chicago Milwaukee Corp*., 537 A.2d 1051, 1062 (Del. Ch. 1987) (directors owe fiduciary duties to preferred stockholders); *accord FLS*, 1993 WL 104562, at *4 (Del. Ch. Apr. 2, 1993).

143.     Here, the same bad faith conduct itemized above that establishes a breach of the implied duty of good faith and fair dealing also establishes a breach of fiduciary duty. *See* Conclusions of Law above ("COL") at ¶¶ 104-12.

144.     The fact that the Preferred Stockholders also have contractual claims does not preclude them from asserting a claim for breach of fiduciary duty. *Clancy*, 954 A.2d at 1107-08 (citing Maryland and Delaware case for proposition that a claim for breach of fiduciary duty lies where contractual rights are exercised in bad faith); *see also Frederick Hsu Living Tr. v. ODN Holding Corp.*, 2017 WL 1437308, at *24 (Del. Ch. Apr. 14, 2017) (the "fact that a corporation is bound by its valid contractual obligations does not mean that a board does not owe fiduciary duties when considering how to handle those contractual obligations.").

145.     For all of the above reasons, Plaintiffs have demonstrated by a preponderance of the evidence that they are likely to succeed on the merits of their breach of fiduciary duty claims (asserted in Count V of the Amended Complaint).

### 5.  Plaintiffs Are Likely to Succeed on the Merits of Their Claims Against Wheeler

146.     The elements of tortious interference with contract are: 1) existence of a contract between plaintiff and a third party; 2) defendant's knowledge of that contract; 3) defendant's intentional interference with that contract; 4) breach of that contract by the third party; 5) resulting damages to the plaintiff." *Fraidin v. Weitzman*, 611 A.2d 1046, 1057 (Md. Ct. Spec. App. 1992).

147.     The elements of a claim for aiding and abetting are: "(1) independent tortious conduct by the principal of the tort; (2) assistance, aid or encouragement to the principal of the tort; and (3) knowledge that the tortious act would be the natural consequence of their conduct." *Zucker, Tr. of Anita G. Zucker Tr. Dated Apr. 4, 2007, as Subsequently Amended or Restated v. Bowl Am., Inc.*, 2022 WL 1720151, at *12 (D. Md. May 27, 2022).

148.     Here, Wheeler concedes in its own public filings that is has knowledge of all of the details of the Proposed Transactions. ADE Ex. 6 at 1. Further, under the Wheeler Merger Agreement, Wheeler is obligated to participate in the consummation of the Proposed Transactions. ADE Ex. 5. Finally, Wheeler is aware of its own history of contentious relations with its own preferred shareholders, CEO and boardroom drama, and financial distress, and thus must also have foreseen that its participation in the Proposed Transactions would crash the prices of Cedar's Preferred Stock far below the Liquidation Preference. Accordingly, it is reasonable to infer that Wheeler intended that outcome (especially given Wheeler's past repurchases of its own preferred stock at prices below par; ADE Ex. 10).

149.     For all of the above reasons, Plaintiffs have demonstrated by a preponderance of the evidence that they are likely to succeed on the merits of their claims against Wheeler (asserted in Counts II, IV and VI of the Amended Complaint).

### D.   <u>The Balance of Equities Tips Decidedly in Favor Plaintiffs</u>

150.     Where a plaintiff would face substantial harm in the absence of an injunction, and entering an injunction merely poses a delay to defendant, the balance of equities tips in favor of the plaintiff. *See Wachit Techs., Inc. v. Big Apple Consulting USA, Inc*., 2008 U.S. Dist. LEXIS 34363, at *13 (D. N.C. Apr. 25, 2008) ("Plaintiff appears to be facing destruction if the preliminary injunction does not issue, whereas such an injunction would merely cause Defendants a delay. Thus, under the sliding scale described in *Microsoft*, the balance of hardships weighs heavily in Plaintiff's favor. . . ."); *DMF Leasing, Inc. v. Budget Rent-A-Car Of Maryland, Inc*., 871 A.2d 639, 645 (Md. 2005) (balance of convenience tipped strongly in favor of plaintiff where not granting injunction will result in far greater burden to plaintiff than burden to defendant from granting injunction); *Ledo Pizza Sys. v. Singh*, 2013 U.S. Dist. LEXIS 146938, at *14 (D. Md. Oct. 10,

2013) (granting temporary restraining order even though "defendant will suffer serious economic harm" because "defendant's hardship appears self inflicted").

151.   Here, the balance of the equities weighs in Plaintiffs' favor. Here, as set forth above, Plaintiffs will suffer irreparable harm in the absence of a preliminary injunction. (COL ¶¶ 89-98). In contrast, even if Defendants prevail, a preliminary injunction will only delay distribution of the proceeds of the Proposed Transactions, which can be compensated by escrowing the proceeds of the Proposed Transactions in an interest bearing account (*see infra*).

### E.   The Public Interest Favors an Injunction

152.   The public interest favors class actions, which are designed to enable class representatives with small economic stakes to enforce laws against large corporations on behalf of a large group in a single forum. *Mills v. Elec. Auto-Lite Co*., 396 U.S. 375, 382 (1970) ("small shareholders" should be encouraged to privately enforce the federal securities laws as a "a necessary supplement to [SEC] action."); *Califano v. Yamasaki*, 442 U.S. 682, 700–01, 99 S. Ct. 2545, 2557 (1979) ("the Rule 23 class-action device was designed to allow an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.").

153.   Here, the public interest favors litigating Plaintiffs' claims in a single class action instead of consuming judicial resources if an injunction is not granted, and Plaintiffs prevail on the merits and are forced to litigate a multiplicity of lawsuits against Common Stockholders.

154.   Additionally, a Raymond James analyst has opined that the Proposed Transactions establish "a bad precedent for the [REIT] sector," and are expected to cause "broader negative implications for the [REIT] industry" if Preferred Stockholders "are not made whole." ADE Ex. 19 at 1-2.

## II.     The Court Exercises It Discretion to Waive a Bond

155.     "[T]he district court retains the discretion to set the bond amount as it sees fit or waive the security requirement," so long as the district court does not "disregard the bond requirement altogether." *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013). Thus, the Court may waive a bond so long it explains the reasons for such waiver. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999) (citing case approving bond fixed at zero); *see also Defy Ventures, Inc. v. U.S. Small Bus. Admin.*, 469 F. Supp. 3d 459, 481 (D. Md. 2020) (waiving bond after an explanation); *Coreas v. Bounds*, 458 F. Supp. 3d 352, 362 (D. Md. 2020) (same).

156.     Here, as a threshold matter, Defendants' request for a bond to protect *individual Common Stockholders* ignores Rule 65(c)'s plain language that requires a bond only for "the costs and damages sustained by ***any party*** found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added). The Common Stockholders are not "parties" to this litigation, and so Plaintiffs cannot be forced to post a bond for them under the plain language of the Rule. *MCI Commc'ns Servs., Inc. v. Am. Infrastructure-MD, Inc.*, 2013 WL 4086401, at *19 (D. Md. Aug. 12, 2013) (Russell, J.) (court should look to statute's plain language, and the "analysis ends if the statute's language is clear and unambiguous.").

157.     Moreover, the only possible damage to Common Stockholders is the time value of money because, if an injunction issues, any potential "damage" will be mitigated by holding the $396 million in an interest-bearing account pending a determination on the merits. *See Morgan Keegan & Co. v. Louise Silverman Tr.*, 2012 WL 113400, at *6 n.9 (D. Md. Jan. 12, 2012) (interest compensates for time value of money), *aff'd*, 706 F.3d 562 (4th Cir. 2013). Moreover, the equity in the Wheeler Properties ($110 million according to Plaintiffs; $161.3 million according to

Defendants) provides ample additional security in the event the Court finds that any further security is needed.

158.     Finally, a bond waiver is appropriate if the movant has a strong likelihood of success, as Plaintiffs do here (*see* discussion *supra*). *See George Sink PA Inj. Laws. v. George Sink II L. Firm LLC*, 2019 WL 6318778, at *6 (D.S.C. Nov. 26, 2019); *Arkansas Best Corp. v. Carolina Freight Corp.*, 60 F. Supp. 2d 517, 521 (W.D.N.C. 1999).

159.     Defendants do not support their request for a $200 million bond with any neutral expert opinion evidence. Instead, they rely on the Kranz affidavit. (Dkt. No. 30 at 34-35; Dkt. No. 30-5). But as Plaintiffs observe, Mr. Kranz is the attorney who concededly structured the Proposed Transactions and works at the same firm as the lawyers defending this action. (Dkt. No. 30-5 at ¶¶ 2-3; Dkt. No. 40 at 19). Thus, the Kranz declaration is self-serving.

160.     Moreover, as Plaintiffs have documented (Dkt. No. 40-1 at ¶¶ 3-22), Mr. Kranz's declaration is an *ipse dixit* opinion that does not substantiate its conclusions with any external facts or data. *See Donalds v. Ethicon, Inc.*, 2021 WL 6126297, at *6 (D. Md. Dec. 28, 2021) ("This Court will not admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert where there is simply too great an analytical gap between the data and the opinion proffered. Expert testimony rooted in subjective belief or unsupported speculation does not suffice.") (Russell, J.); *see also Sardis v. Overhead Door Corp.*, 10 F.4th 268, 289–90 (4th Cir. 2021) (district court should not admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 2022 WL 1323139, at *15 (D. Md. May 3, 2022) (same).

161.     Therefore, for the reasons above, the Court exercises its discretion to waive the requirement of a bond.

Dated:  June 13, 2022                                  Respectfully submitted,


                                                       /s/ Donald J Enright
                                                       _____
                                                       Donald J. Enright
                                                       **LEVI & KORSINSKY LLP**
                                                       Bar Number: 13551
OF COUNSEL:                                            1101 30th Street, NW, Suite 115
                                                       Washington, DC 20007
**WOHL & FRUCHTER LLP**                                Telephone: (202) 524-4290
Joshua E. Fruchter                                     denright@zlk.com
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952                                       *Counsel for Plaintiffs and [Proposed] Lead*
Telephone: (845) 290-6818                              *Counsel for Putative Class*
Facsimile: (718) 504-3773


*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 13, 2022, service required by Fed. R. Civ. P. 5(a) has been made of the foregoing Plaintiffs' Proposed Findings of Fact and Conclusions of Law.

<u>*/s/ Donald J. Enright*</u>

(Bar. No. 13551)